**LITE DEPALMA GREENBERG, LLC**
Joseph J. DePalma
570 Broad Street, Suite 1201
Newark, New Jersey 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
Email: jdepalma@litedepalma.com

*Attorneys for Plaintiff*

*[Additional Counsel Listed Below]*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MICHAEL PERRONE, as a participant in and on behalf of the Johnson & Johnson Savings Plan, and on behalf of a class of all others who are similarly situate, | Civil Action No.: |
| | CLASS ACTION COMPPLAINT |
| *Plaintiff,* | **(ERISA)** |
| v. | |
| JOHNSON & JOHNSON, PETER FASOLO, DOMINIC J. CARUSO, and JOHN DOES 1-20, | |
| *Defendants.* | |

Plaintiff Michael Perrone ("Plaintiff"), a participant in the Johnson & Johnson Savings Plan (the "Savings Plan"), bring this action in a representative capacity on behalf of the Savings Plan, and as a class action on behalf of all other similarly situated participants in and beneficiaries of the Savings Plan and other defined contributions plans sponsored by Johnson & Johnson through which participants purchased or held stock of Johnson & Johnson, including the Johnson & Johnson Savings Plan for Union Represented Employees and the Johnson & Johnson Retirement Savings Plan (collectively, the "Plans"). Plaintiff brings this action under Sections 502(a)(2) and 502(a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and 1132(a)(3), against Defendants Johnson & Johnson and the members of the

Pension and Benefits Committee (the "Committee") during the Class Period (see ¶ 6262, infra), including Defendants Peter Fasolo, Dominic J. Caruso and John Does 1-20 (together, Fasolo, Caruso and John Does 1-20 are the "Individual Defendants," and together with Johnson & Johnson, the "Defendants"). By this action, Plaintiff seeks relief for the Plans for Defendants' breaches of their ERISA fiduciary duties as set forth herein.

1.      The Individual Defendants, as members of the Committee, are the Plans' named fiduciaries pursuant to ERISA § 402, 29 U.S.C. § 1102. As ERISA fiduciaries, Individual Defendants owe strict fiduciary duties of loyalty and prudence to the Plans and the participants in and beneficiaries of the Plans. ERISA § 404(a), 29 U.S.C. § 1104(a). ERISA's fiduciary duties are "the highest known to the law." *Perez v. First Bankers Tr. Servs., Inc.*, 2017 WL 1232527, at *72 (D.N.J. Mar. 31, 2017).

2.      Defendant Johnson & Johnson, the Plans' sponsor, is liable for the Individual Defendants' fiduciary breaches because the Individual Defendants were acting within the course and scope of their employment when they engaged in the fiduciary misconduct at issue and because Defendant Johnson & Johnson actively and knowingly participated in the Individual Defendants' fiduciary breaches.

3.      The Plans are designed to help Johnson & Johnson's employees save for retirement. Each of the Plans is a defined contribution plan. In defined contribution retirement plan like the Plans, the plan "provides for an individual account for each participant and for benefits solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses … which may be allocated to such participant's accounts." ERISA § 3(34), 29 U.S.C. § 1002(34).

4.      Thus, unlike traditional defined benefit pensions, in defined contribution plans like

762955.2

the Plans, at retirement participants are entitled to no more than the balance in their individual accounts. As the Supreme Court explained in 2015, in defined contribution plans like the Plans, employees' benefits at retirement "are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1825 (2015) (emphasis added).

5.      At all relevant times, each of the Plans has included as an investment option shares of stock of Johnson & Johnson, the Plans' sponsor and the employer of the participants in the Plans. Plaintiff owned and purchased Johnson & Johnson stock through his account in the Savings Plan during the Class Period.

6.      However, for many years Johnson & Johnson's stock price has been artificially inflated. One of Johnson & Johnson's flagship products, its talc Baby Powder, contains asbestos, a known carcinogen. For decades, Johnson & Johnson's senior leadership has known that its talc contained asbestos, but took no action to disclose that information to the public. Indeed, Johnson & Johnson's senior leadership has endeavored to hide from the public the truth about asbestos in its talc powder products. These efforts were successful, and the public was and has been generally unaware that Johnson & Johnson's talc powder contained asbestos. To date, Johnson & Johnson has not publicly acknowledged that its talc powder contains asbestos.

7.      The Individual Defendants, who serve as the Plans' fiduciaries, include many senior executives of Johnson & Johnson. Mr. Caruso, for example, was the company's Chief Financial Officer and a member of the company's Executive Committee for many years prior to his retirement in September of 2018. Mr. Fasolo was also a member of the company's Executive Committee. Johnson & Johnson's Executive Committee "is the principal management group

3

responsible for the strategic operations and allocation of the resources of the company."[1]

8. Defendants knew that Johnson & Johnson's stock price was artificially inflated in value, and knew that many of the Plans' participants, including Plaintiff, allocated significant portions of their retirement savings to Johnson & Johnson stock and made additional purchases of Johnson & Johnson stock for their retirement savings accounts in the Plans on an ongoing basis.

9. To date, Defendants have failed to take any action to protect the Plans and their participants, and have failed to publicly disclose the truth about asbestos in Johnson & Johnson's talc-related products.

10. By no later than April 13, 2017, it was inevitable that the truth about asbestos in Johnson & Johnson's talc products would become known to the public. On that date, Johnson & Johnson filed its answer to an amended complaint in multidistrict litigation captioned *In re Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Liability Litig.*, No. 3:16-md-02738 (FLW) (LHG) (the "MDL"). The MDL involves claims against Johnson & Johnson arising out of personal injuries caused by asbestos in Johnson & Johnson's talc powder. Once Johnson & Johnson's answer had been filed, discovery would begin, and the large number of Johnson & Johnson's previously secret internal documents demonstrating the presence of asbestos in the talc powder and efforts to conceal that information would become public.

11. Despite their knowledge of Johnson & Johnson's false representations and concealment of asbestos in its talc powder, the inflation of Johnson & Johnson's stock price, and

---

[1] *See* Johnson & Johnson, "Our Governance," available at https://www.jnj.com/caring/citizenship-sustainability/approach/governance (last visiting Jan. 22, 2019).

762955.2

the inevitability of the disclosure of the truth, Defendants took no action to disclose the truth to the public. Instead, Defendants stayed quiet as the Plans' participants, including Plaintiff, continued to purchase and hold the Johnson & Johnson stock at the inflated price.

12.     On December 14, 2018, Reuters published an article citing internal Johnson & Johnson documents showing that Johnson & Johnson's senior executives had been aware of the presence of asbestos in its talc powder for decades, and had actively sought to conceal the information from the public.

13.     Johnson & Johnson's stock price declined more than 10% following the Reuters report, which was picked up and expanded by several other major news outlets, including the New York Times.  The 10% decline corresponded to a loss of $30 billion of Johnson & Johnson's market capitalization.

14.     The decline in Johnson & Johnson's value was more than the amount of liability Johnson & Johnson likely faces in lawsuits regarding personal injuries linked to the asbestos in the talc products, and more than the expected decline in sales of talc products as the public becomes aware of the serious health risks associated with exposure to the asbestos in Johnson & Johnson's talc powder. Instead, the decline of Johnson & Johnson's share price included a loss of faith in Johnson & Johnson itself and the honesty and dependability of the company and its executive leadership. For a health products company like Johnson & Johnson, the company's image and goodwill are significant. For example, Johnson & Johnson valued its goodwill at $31 billion as of December 31, 2017—nearly 20% of the company's overall value.

15.     The damage to Johnson & Johnson's goodwill and reputation has been exacerbated by Defendants' continued refusal to admit that its talc products contain asbestos. The longer the concealment has gone on and continues to go on, the less and less credible Johnson & Johnson's

762955.2

statements about health and safety become.

16.     Defendants had ample authority, and every opportunity to correct the record and make the truth about asbestos in Johnson & Johnson's talc products known to the public. Had they done so, the Plans' participants could have avoided millions of dollars of losses from the loss in value of the Johnson & Johnson stock in their Plan accounts.

## JURISDICTION AND VENUE

17.     Plaintiff brings this action pursuant to ERISA §§ 502(a)(2) and 502(a)(3), 29 U.S.C. §§ 1132(a)(2) and (3).

18.     This Court has subject matter jurisdiction over Plaintiff's claims pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because this action arises under the laws of the United States.

19.     This Court has general personal jurisdiction over defendant Johnson & Johnson which is incorporated in this District, and over any other defendants that reside in this District. This Court has specific personal jurisdiction over all Defendants because they took the actions described herein in this district through the management of the Plans, all of which were administered in this District.

20.     Pursuant to 29 U.S.C. § 1132(e)(2) venue is proper in this District because the Plan is administered in this District and the breaches described herein occurred in this District. Venue is also proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because, for the same reasons, a substantial part of the events or omissions giving rise to the claim occurred in this District.

## PARTIES

21.     The Plans are employee benefit plans and employee pension benefit plans covered by ERISA within the meaning of ERISA § 3(2)(A) & (7), 29 U.S.C. § 1002(2)(A) & (7).

762955.2

22.     Plaintiff Michael Perrone is an individual residing in the City of Atlantic Highlands, in Monmouth County, and at all relevant times has been, a participant in the Savings Plan. Plaintiff Perrone purchased and owned Johnson & Johnson stock through his retirement savings account in the Savings Plan during the Class Period.

23.     Defendant Johnson & Johnson, together with its subsidiaries, researches and develops, manufactures, and sells various products in the health care field worldwide. The Company is incorporated in New Jersey and its principal executive offices are located at One Johnson & Johnson Plaza, New Brunswick, New Jersey, 08933. Johnson & Johnson's common stock is traded on the New York Stock Exchange ("NYSE") under the ticker symbol "JNJ."

24.     Defendant Peter Fasolo is an Executive Vice President and Chief Human Resource Officer of Johnson & Johnson.  Mr. Fasolo is a member of the Executive Committee and the Chairman of the Pension and Benefits Committee.

25.     Defendant Dominic J. Caruso was the Chief Financial officer of Johnson & Johnson and a member of the Executive Committee, as well as a member of the Pension and Benefits Committee, for many years prior to his retirement in September of 2018.

26.     Doe Defendants 1-20 are members of the Pension & Benefits Committee of Johnson & Johnson (the "Committee").  The Committee is the named fiduciary for the Plans with general authority for the management and administration of the Plans.

27.     Defendant Fasolo, Caruso and Doe Defendants 1-20 are also referred to herein "Individual Defendants."

28.     Each of the Individual Defendants:

- was directly responsible for the management of the Plan;

- was directly involved in the day-to-day operations of the Company at the

7

highest levels;

- was privy to confidential proprietary information concerning the Company and its business and operations;

- owed a fiduciary duty to the Plan; and

- failed to take any steps to ensure that the truth about asbestos in Johnson & Johnson's talc products was disclosed once disclosure became inevitable.

### ADDITIONAL ALLEGATIONS

29.   Johnson & Johnson has known for decades that its talc products, such as its Baby Powder, include asbestos fibers and that the exposure to those fibers can cause ovarian cancer and mesothelioma.  Defendants misrepresented and failed to disclose the danger that Johnson & Johnson's talc products posed to consumers, Johnson & Johnson's significant contingent liability related to its talc products, and that Johnson & Johnson's revenues from sales of these products were unsustainable due to the dangerous and harmful nature of its talc products.

30.   As recently as January 22, 2019, Johnson & Johnson touted the safety and effectiveness of talc in its products on its website at https://www.johnsonsbaby.com.ph/baby-products/johnsons-baby-powder, stating in pertinent part:

**Is talc safe for my baby's skin?**

JOHNSON'S® Baby talc products are made using U.S. Pharmacopeial (USP) grade talc to ensure it meets the highest-quality, purity and compliance standards. **Our talc is carefully selected, processed and tested to ensure that is asbestos free, as confirmed by regular testing conducted since the 1970s.**

Our confidence in using talc is based on a long history of safe use and more than 30 years of research by independent researchers, scientific review boards and global regulatory authorities.

Read more about our Safety & Care Commitment here: http://www.safetyandcarecommitment.com/ingredient-info/other/talc

762955.2

[Emphasis added].

31.     On September 21, 2017, Ernie Knewitz, a spokesman for Johnson & Johnson, said in an emailed statement to *Bloomberg* that:

> "We are confident that our talc products are, and always have been, free of asbestos, based on decades of monitoring, testing and regulation," Knewitz said. "Historical testing of samples by the FDA, numerous independent laboratories, and numerous independent scientists have all confirmed the absence of asbestos in our talc products."

32.     On November 16, 2017, *Reuters* published an article titled, "Johnson & Johnson wins California lawsuit claiming asbestos in talc caused cancer," wherein Johnson & Johnson was quoted stating that "Johnson's Baby Powder has been around since 1894 and it does not contain asbestos or cause mesothelioma or ovarian cancer."

33.     In May of 1974, the then-head of research and development for one of the largest mines supplying talc to Johnson & Johnson wrote a letter to Johnson & Johnson urging Johnson & Johnson to take measures to mitigate the risk of harm from the asbestos present in the talc.  The letter said that "[t]he use of [mitigation systems] is strongly urged by this writer to provide protection against what are currently considered to be materials presenting a ***severe health hazard*** and are potentially present in all talc ores in use at this time." That document was kept secret by Johnson & Johnson until litigation commenced concerning personal injury claims relating to Johnson & Johnson's talc-related products.

34.     On December 14, 2018, an investigative report by Reuters detailed the fact that Johnson & Johnson had known for decades and concealed the presence of asbestos in its products. *See* Lisa Girion, *Special Report:  J&J Knew For Decades That Asbestos Lurked In Its Baby Powder*, REUTERS (Dec. 14, 2018) *available at* https://www.reuters.com/article/us-johnson-johnson-cancer-special-report/special-report-jj-knew-for-decades-that-asbestos-lurked-in-its-

762955.2

baby-powder-idUSKBN1OD1RQ.

35.     The report by Reuters also exposed the fact that Johnson & Johnson took measures to influence regulators' attempts to limit the presence of asbestos in consumer products like the Johnson & Johnson products at issue and that Johnson & Johnson had funded some of the scientific research it used to buttress its earlier claims that its products were asbestos-free.  Shares of Johnson & Johnson stock declined by more than 12.5% following the release of this report.

36.     Defendants could have, and should have, disclosed the facts about the presence of asbestos in Johnson & Johnson's products as soon as they became aware of them.  However, Defendants failed to make any corrective disclosures, even after it became inevitable that the truth about the presence of asbestos in Johnson & Johnson's talc powder would become public.

37.     On information and belief, Defendants were or should have been aware that Johnson & Johnson's talc powder products contained asbestos. Many of the Committee members were also members of Johnson & Johnson's Executive Committee, which handled matters of the highest importance to Johnson & Johnson, including Defendants Fasolo and Caruso.

38.     By no later than April 13, 2017, it was inevitable that the truth about asbestos in Johnson & Johnson's talc products would become known to the public. As noted above, Johnson & Johnson filed its answer in the MDL regarding personal injury and product liability claims arising out of asbestos in Johnson & Johnson's talc powder. Once Johnson & Johnson's answer had been filed, discovery began, and the large number of Johnson & Johnson's previously secret internal documents demonstrating the presence of asbestos in the talc powder and efforts to conceal that information would become public.

39.     For example, Dr. Joanne Waldstreicher, J&J's longtime chief medical officer, was deposed during discovery in the MDL in April of 2018. During her deposition, Dr. Waldstreicher

762955.2

was examined about recently-unsealed documents that discussed the presence of asbestos in its talc-related products.

40.     Despite their knowledge of Johnson & Johnson's false representations and concealment of asbestos in its talc powder, the inflation of Johnson & Johnson's stock price, and the inevitability of the disclosure of the truth once discovery began in the MDL, Defendants took no action to protect the Plans from further harm by disclosing the truth to the public.

41.     A proper disclosure could have, and should have, been made in the regular course of Johnson & Johnson's securities filings.  Indeed, Johnson & Johnson used its securities filings repeatedly during the Class Period to perpetrate false statements about the <u>absence</u> of asbestos in its talc-related products.   Those statements are currently the subject of pending claims for violations of the federal securities laws.

42.     Defendants' failures to make corrective disclosures caused numerous participants in the Plans to continue making purchases of Johnson & Johnson stock despite the fact that the price of the stock was artificially inflated. Moreover, Defendants' failure to make corrective disclosure compounded and magnified the reputational harm that Johnson & Johnson has suffered and will continue to suffer as the truth about the asbestos in its talc powder becomes public.

43.     Making a corrective disclosure once it became inevitable that the public would learn about the asbestos in the talc powder was an alternative action that the Defendants could have taken that would have been entirely consistent with the securities laws and which no prudent fiduciary could have viewed as more likely to harm the Plan than to help it.

44.     Nor are the corrective disclosures at issue here merely a matter of hindsight. It would have been obvious to any prudent and loyalty fiduciary no later than April of 2017 that corrective disclosure would have benefitted the Plans. As the Second Circuit has explained, "[a]

11

reasonable business executive could plausibly foresee that the inevitable disclosure of longstanding corporate fraud would reflect badly on the company and undermine faith in its future pronouncements." *Jander v. Ret. Plans Comm. of IBM*, 910 F.3d 620, 629 (2d Cir. 2018).

45.     Many economists and financial analysts have concluded that corporate fraud has significant reputational consequences that translate into concrete economic harm. For example, reputational penalties have been found to include "a loss of sales by a firm that engages in consumer fraud… and increases in the rate of return required by investors when a firm issues vague or misleading financial statements." Deborah L. Murphy, Ronald E. Shrieves & Samuel L. Tibbs, *Understanding the Penalties Associated with Corporate Misconduct: An Empirical Examination of Earnings and Risk*, Journal of Financial and Quantitative Analysis, Vol. 44, No. 1 (Feb. 2009). Moreover, studies have shown "a significant negative average abnormal stock price reaction (loss in firm value) when allegations of corporate misconduct are announced." *Id. See also* Jonathan M. Karpoff, D. Scott Lee and Gerald S. Martin, *The Cost to Firms of Cooking the Books*, Journal of Financial and Quantitative Analysis, Vol. 43, No. 3 (Sept. 2008). Indeed, the longer the fraudulent corporate conduct lasts, the greater the reputational harm will likely be.

46.     In Johnson & Johnson's case, the reputational harm from the news stories about asbestos has been real and dramatic. For example, analysts noted that the Reuters report would cause "significant damage… for J&J's valuable brand name" and that "the brand name an accompanying trust are critical" for Johnson & Johnson's success.  *See* Ciara Linnane, *Johnson & Johnson's Stock Slammed After Report it Knew of Asbestos in Baby Powder*, Marketwatch.com (Dec. 14, 2018), available at https://www.marketwatch.com/story/johnson-johnson-stock-slammed-by-report-it-knew-of-asbestos-in-baby-powder-2018-12-14.

## DEFENDANTS' FIDUCIARY STATUS UNDER ERISA

47.     ERISA requires that every plan identify "one or more" "named fiduciaries" with general responsibility for administering the plan. ERISA § 402(a)(1).

48.     According to its charter the purpose of Johnson & Johnson's Pension and Benefits Committee ("the Committee") was, *inter alia*, to oversee and manage "the various pension, long-term incentive, savings, health and welfare plans that cover the Company's employees."  Also by virtue of its charter, the Committee was always made up of at least three members of Johnson & Johnson's Board of Directors.

49.     The Committee was a named fiduciary of the Plan during the Class Period, with general authority to carry out essentially all fiduciary functions for the Plans.

50.     Defendants Fasolo, Caruso and Doe Defendants 1-20 were the members of the Committee responsible for exercising that primary fiduciary authority.

51.     ERISA also defines fiduciary status so that anyone is a fiduciary "to the extent" they in fact perform a fiduciary function. ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus in addition to expressly designated fiduciaries, anyone is a fiduciary "to the extent" he "exercises any discretionary authority or discretionary control respecting management of such plan" or "exercises any authority or control respecting management or disposition of its assets" or "has any discretionary authority or discretionary responsibility in the administration of such plan." *Id.*

52.     As this Court has previously recognized, "[t]he definition of 'fiduciary' under ERISA has a functional component—a fiduciary's status is determined by the actual 'control and authority' that he or she exercises with respect to the Plan."  *In re Schering-Plough Erisa Litig.*, 2010 WL 2667414, at *9 (D.N.J. June 29, 2010).

53.     Here, the Individual Defendants exercised control and authority over the Plan as

762955.2

members of the Committee.

54.     In the Third Circuit, an employer whose employees act as named fiduciaries for a Plan can be liable under a theory of respondeat superior. *McMahon v. McDowell*, 794 F.2d 100, 109 (3d Cir. 1986) ("[I]f a beneficiary or participant can show that the plan fiduciaries breached their duties, he may also be able to recover damages, for the benefit of the plan, directly from the employer.").

55.     Here, the Individual Defendants' breaches of fiduciary duty occurred during the course and scope of their employment with Johnson & Johnson. Indeed, the Individual Defendants' failure to make corrective disclosures was a crucial part of Johnson & Johnson's strategy with respect to asbestos in its talc powder. Thus Johnson & Johnson knowingly participated, an encouraged, the Individual Defendants' fiduciary breaches in this case. Johnson & Johnson thus shares liability for the Individual Defendants' fiduciary breaches in this case.

### ERISA'S FIDUCIARY DUTIES

56.     ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

57.     "[T]he duties charged to an ERISA fiduciary are 'the highest known to the law.'" *Solis v. Koresko*, 884 F. Supp. 2d 261, 292 (E.D. Pa. 2012), *aff'd sub nom. Sec'y U.S. Dep't of Labor v. Koresko*, 646 F. App'x 230 (3d Cir. 2016) *(citing Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir.1982)) (describing ERISA fiduciary duties as "the highest known to the law").

14

58.     These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence. They entail, among other things:

(a) The duty to conduct an independent and thorough investigation into, and to continually monitor, the merits of all the investment alternatives of a plan;

(b) The duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor; and

(c) The duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

59.     According to Department of Labor ("DOL") regulations and case law interpreting these statutory provisions, in order to comply with the prudence requirement under ERISA §404(a), a fiduciary must show that: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

60.     Even though a plan may be designed, or even required, to hold stock of the plan's sponsor as an investment option, such as an employee stock ownership plan (an "ESOP"), plan

762955.2

fiduciaries are nevertheless subject to all of the ordinary fiduciary duties apart from the duty to diversify. As the Supreme Court explained, "because ESOP fiduciaries are ERISA fiduciaries and because § 1104(a)(1)(B)'s duty of prudence applies to all ERISA fiduciaries, ESOP fiduciaries are subject to the duty of prudence just as other ERISA fiduciaries are." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014). The Supreme Court held that these fiduciary duties trump even the instructions of the plan document: "the duty of prudence trumps the instructions of a plan document, such as an instruction to invest exclusively in employer stock even if financial goals demand the contrary." *Id.* at 2468.

61.     ERISA § 405 renders plan fiduciaries liable for the breaches of other fiduciaries under certain circumstances, such as when a fiduciary knowingly participates in or conceals the breach of another fiduciary, if the fiduciary's own breach enables the breach by the other fiduciary, or if the fiduciary is aware of the other fiduciary's breach yet makes no reasonable effort to correct the breach.

## CLASS ACTION ALLEGATIONS

62.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(1) and (b)(3) on behalf of a Class, consisting of all participants in or beneficiaries the Plans who purchased or held Johnson & Johnson stock through their accounts in the Plans during the Class Period, excluding Defendants and the Court or any employees of the Court. As used herein, the term "Class Period" means the time beginning not later than April 11, 2017 (or such earlier date that disclosure of the truth about asbestos in Johnson & Johnson's talc powder products became inevitable) and continuing until Johnson & Johnson makes appropriate corrective disclosures regarding asbestos in its talc powder.

63.     The members of the Class are so numerous that joinder of all members is

762955.2

impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

64.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

65.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

66.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- Whether Defendants had actual or constructive knowledge that Johnson & Johnson's stock price was artificially inflated during the Class Period;

- Whether disclosure that Johnson & Johnson's talc products was inevitable during the Class Period;

- Whether Defendants had the authority to make corrective disclosure for Johnson & Johnson regarding asbestos in the talc powder;

- Whether Defendants' failure to make corrective disclosure regarding asbestos in the talc powder once disclosure of those facts became inevitable caused

762955.2

Plaintiff and the Plans to overpay for Johnson & Johnson stock during the Class Period; and

- Whether Defendants' failure to make corrective disclosure regarding asbestos in the talc powder once disclosure of those facts became inevitable caused additional declines to the value of the Johnson & Johnson stock held by Plaintiff and the Plans as a result of the delayed disclosure.

67. There are no substantial individual questions among Class members on the merits of this action.

68. Plaintiff's claims are typical of the members of the Class.

69. Plaintiff has been injured by the alleged breaches of fiduciary duties and is committed to fairly, adequately and vigorously representing and protecting the interests of Class members.

70. Plaintiff has retained counsel who are experienced in class action litigation in general and who have significant experience successfully representing ERISA plan participants in claims related to ERISA's fiduciary duties.

71. Neither Plaintiff, nor his counsel, have any interests that would cause them to refrain from vigorously pursuing this action.

72. Plaintiff is an adequate class representative.

73. Class certification of Plaintiff's claims is appropriate pursuant to Fed. R. Civ. P. 23(b)(1) because the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Defendants, and/or because adjudications with respect to individual Class members would as a practical matter be dispositive of the interests of non-party Class members.

762955.2

74.     In the alternative, class certification is also appropriate under Fed. R. Civ. Pro. 23(b)(3) because common issues of law and fact predominate over questions affecting only individual members of the Class and because a class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

75.     There will be no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I
### Breach of Fiduciary Duty
### ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1)
### All Defendants

76.     Plaintiff repeats and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

77.     ERISA § 404, 29 U.S.C. §1104, requires ERISA fiduciaries to perform their fiduciary duties and responsibilities prudently, as would an experienced ERISA fiduciary, and loyally, exclusively in the interest of the plan and its participants for the purpose of providing benefits.

78.     As alleged above, the Individual Defendants were express fiduciaries for the Plans.

79.     The Individual Defendants, as the Plans' fiduciaries, could, and should, have acted to protect the Plans, including making corrective disclosure publicly admitting the existence of asbestos in Johnson & Johnson's talc powder.

80.     But the Individual Defendants did not take action to protect the Plans. The Individual Defendants failed to make any corrective disclosure, and in the interim Plaintiff and the Class Members continued to acquire and hold Johnson & Johnson stock at an inflated price. The Individual Defendants failure to make any corrective disclosure have compounded the

19

reputational and goodwill harm that Plaintiff and the Class Members have suffered and will suffer as the truth about asbestos in Johnson & Johnson's talc powder becomes known to the public.

81.     Johnson & Johnson knew about, and encouraged, Individual Defendants' failure to make appropriate corrective disclosures regarding asbestos in its talc powder. Indeed, silence about and concealment of asbestos in the talc powder were part a Johnson & Johnson's corporate strategy. Thus the Individual Defendants' failure to make corrective disclosures were taken within the course and scope of their employment with Johnson & Johnson, and Johnson & Johnson knowingly participated in the Individual Defendants' fiduciary breaches.

82.     These actions, and failures to act, violated the duties of prudence and loyalty contained in ERISA § 404(a).

83.     Under ERISA § 409(a), 29 U.S.C. § 1109(a), a fiduciary that violates any of ERISA's duties, including ERISA § 404(a), must "make good" to the plan the losses to the plan resulting from its violations, and is "subject to such other equitable or remedial relief as the court may deem appropriate."

84.     Thus under ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a), Defendants are liable, in an amount to be determined at trial, for the losses to the Plan caused by their violations of ERISA § 404(a), and are "subject to such other equitable or remedial relief" as the Court "may deem appropriate."

85.     Under ERISA § 502(a)(3), Defendants are also subject to appropriate equitable relief including, but not limited to, constructive trust and equitable surcharge.

**COUNT II**
**Breach of Co-Fiduciary Duty**
**ERISA § 405(a)(1)-(3), 29 U.S.C. § 1105(a)(1)-(3)**
**All Defendants**

86.     Plaintiff repeats and realleges each of the allegations in the foregoing paragraphs

20

as if fully set forth herein.

87.     A fiduciary with respect to a plan liable for the breach "of another fiduciary" for the same plan if "he participates knowingly in, or knowingly undertakes to conceal, an act or omissions of such other fiduciary, knowing such act or omission is a breach," ERISA § 405(a)(1), or if, "by his failure to comply with [his fiduciary duties] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach," ERISA § 405(a)(2), or if "he has knowledge of a breach by some other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach." ERISA § 405(a)(3).

88.     Pursuant to § 405 of ERISA, 29 U.S.C. § 1105, Defendants are also liable as co-fiduciaries with respect to the above-described violations because they participated knowingly in their co-fiduciaries' breaches; enabled other fiduciaries to violate ERISA by virtue of their own breaches of fiduciary duty; knowingly undertook to conceal those breaches; enabled their co-fiduciaries to commit the breaches and failed to make any reasonable efforts to remedy the breaches.

89.     ERISA § 502(a)(2) permits plan participants, such as Plaintiff, to bring civil actions for "appropriate relief" under ERISA § 409.

90.     Under ERISA § 409(a), a fiduciary that violates any of ERISA's duties, including ERISA § 405(a)(1), (a)(2) and (a)(3), must "make good" to the Plans the losses to the Plans resulting from its violations of ERISA § 405(a)(1), (a)(2) and (a)(3), and is "subject to such other equitable or remedial relief as the court may deem appropriate."

91.     Thus Defendants are liable, in an amount to be determined at trial, for the losses to the ESOP caused by their violations of ERISA § 405(a)(1), (a)(2) and (a)(3), and are "subject

21

to such other equitable or remedial relief" as the Court "may deem appropriate."

92.     Under ERISA § 502(a)(3), Defendants are also subject to appropriate equitable relief including, but not limited to, constructive trust and equitable surcharge.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Declare that Defendants breached their fiduciary duties to the Plans;

B.     Enjoin Defendants from further violations of their fiduciary responsibilities, obligations, and duties and from further engaging in transactions prohibited by ERISA;

C.     Order that Defendants make good to the Plans the losses resulting from their serial breaches of fiduciary duty;

D.     Order that Defendants disgorge any profits that they have made through their breaches of fiduciary duty and prohibited transactions and impose a constructive trust and/or equitable lien on any funds received by Defendants therefrom;

E.     Order any other available equitable relief, or remedies, including but not limited to, the imposition of a surcharge, the restoration of the Plans to the position they would have been but for the breaches of fiduciary duty and self-dealing; and any other kind of relief and/or damages available pursuant to ERISA §§ 409 and 502(a)(2) and (3);

F.     Award Plaintiff's reasonable attorneys' fees and costs of suit incurred herein pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or for the benefit obtained for the Plans;

G.     Order Defendants to pay prejudgment interest; and

H.     Award such other and further relief as the Court deems equitable and just.

762955.2

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

**LITE DEPALMA GREENBERG, LLC**

Dated: January 22, 2019

_  /s/ Joseph J. DePalma_
Joseph J. DePalma
570 Broad Street, Suite 1201
Newark, New Jersey 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
jdepalma@litedepalma.com

**SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP**
Todd Schneider*
James A. Bloom*
Kyle G. Bates*
2000 Powell Street, Ste. 1400
Emeryville, California  94608
Telephone: (415) 421-7100
tschneider@schneiderwallace.com
jbloom@schneiderwallace.com
kbates@schneiderwallace.com

**SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP**
Garrett W. Wotkyns*
8501 North Scottsdale Road, Suite 270
Scottsdale, Arizona 85253
Telephone: (480) 428-0141
gwotkyns@schneiderwallace.com

*Pro Hac Vice application forthcoming*

***Attorneys for Plaintiff***

762955.2

## <u>LOCAL CIVIL RULE 11.2 CERTIFICATION</u>

Pursuant to Local Civil Rule 11.2, I hereby certify that the matter in controversy is

related to the following civil action:

- *Frank Hall v. Johnson & Johnson, Alex Gorsky, and Dominic J. Caruso* (3:18-cv-01833-FLW-TJB)

I hereby certify that the following statements made by me are true.  I am aware that if any

of the foregoing statements made by me are willfully false, I am subject to punishment.

**LITE DEPALMA GREENBERG, LLC**

Dated: January 22, 2019         */s/ Joseph J. DePalma*
Joseph J. DePalma
570 Broad Street, Suite 1201
Newark, New Jersey 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
jdepalma@litedepalma.com

**SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP**
Todd Schneider*
James A. Bloom*
Kyle G. Bates*
2000 Powell Street, Ste. 1400
Emeryville, California  94608
Telephone: (415) 421-7100
tschneider@schneiderwallace.com
jbloom@schneiderwallace.com
kbates@schneiderwallace.com

**SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP**
Garrett W. Wotkyns*
8501 North Scottsdale Road, Suite 270
Scottsdale, Arizona 85253
Telephone: (480) 428-0141
gwotkyns@schneiderwallace.com

*\*Pro Hac Vice application forthcoming*

***Attorneys for Plaintiff***

762955.2