**LITE DEPALMA GREENBERG, LLC**
Joseph J. DePalma
570 Broad Street, Suite 1201
Newark, New Jersey 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
Email: jdepalma@litedepalma.com

*Attorneys for Plaintiffs*

*[Additional Counsel Listed Below]*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| MICHAEL PERRONE, TOM TARANTINO and ROCHELLE ROSEN as a participant in and on behalf of the Johnson & Johnson Savings Plan, and on behalf of a class of all others who are similarly situate, | : : : : : : | Civil Action No.: 19-cv-00923 **CONSOLIDATED CLASS ACTION COMPLAINT** |
| *Plaintiffs,* | : | **JURY TRIAL DEMANDED** |
| v. | : : | **(ERISA)** |
| JOHNSON & JOHNSON, PETER FASOLO, DOMINIC J. CARUSO, and JOHN DOES 1-20, | : : : | |
| *Defendants.* | : | |

Plaintiffs Michael Perrone, Tom Tarantino and Rochelle Rosen ("Plaintiffs"), participants in the Johnson & Johnson Savings Plan (the "Savings Plan"), bring this action in a representative capacity on behalf of the Savings Plan, and as a class action on behalf of all other similarly situated participants in and beneficiaries of the Savings Plan and other defined contributions plans sponsored by Johnson & Johnson (or "J&J" or the "Company") through which participants purchased or held stock of Johnson & Johnson, including the Johnson & Johnson Savings Plan for Union Represented Employees and the Johnson & Johnson Retirement Savings Plan (collectively, the "Plans"). Plaintiffs bring this action under Sections 502(a)(2) and 502(a)(3) of the Employee Retirement

1

Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and 1132(a)(3), against Defendants Johnson & Johnson and the members of the Pension and Benefits Committee (the "Committee") during the Class Period (see ¶ 139, infra), including Defendants Peter Fasolo, Dominic J. Caruso and John Does 1-20 (together, Fasolo, Caruso and John Does 1-20 are the "Individual Defendants," and together with Johnson & Johnson, the "Defendants"). By this action, Plaintiffs seek relief for the Plans for Defendants' breaches of their ERISA fiduciary duties as set forth herein. Plaintiffs allege the following based on personal knowledge with respect to their own circumstances and based on information and belief pursuant to the investigation of their counsel, which included a review of the Plan's governing documents; the Plan's annual reports filed with the United States Securities and Exchange Commission ("SEC") and U.S. Department of Labor ("DOL"); discussions with Plan participants; other SEC filings by J&J; other lawsuits against J&J; press releases and other public statements issued by J&J; and media reports and analyses regarding J&J.  Plaintiffs believe that substantial additional evidentiary support exists and will emerge for the allegations set forth herein after there has been a reasonable opportunity for discovery.

1.     The Individual Defendants, as members of the Committee, are the Plans' named fiduciaries pursuant to ERISA § 402, 29 U.S.C. § 1102. As ERISA fiduciaries, Individual Defendants owe strict fiduciary duties of loyalty and prudence to the Plans and the participants in and beneficiaries of the Plans. ERISA § 404(a), 29 U.S.C. § 1104(a). ERISA's fiduciary duties are "the highest known to the law." *Perez v. First Bankers Tr. Servs., Inc.*, 2017 WL 1232527, at *72 (D.N.J. Mar. 31, 2017).

2.     Defendant Johnson & Johnson, the Plans' sponsor, is liable for the Individual Defendants' fiduciary breaches because the Individual Defendants were acting within the course and scope of their employment when they engaged in the fiduciary misconduct at issue and

762955.2

because Defendant Johnson & Johnson actively and knowingly participated in the Individual Defendants' fiduciary breaches.

3.      The Plans are designed to help Johnson & Johnson's employees save for retirement. Each of the Plans is a defined contribution plan. In a defined contribution retirement plan like the Savings Plan, the plan "provides for an individual account for each participant and for benefits solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses … which may be allocated to such participant's accounts." ERISA § 3(34), 29 U.S.C. § 1002(34).

4.      Thus, unlike traditional defined benefit pensions, in defined contribution plans like the Plans, at retirement participants are entitled to no more than the balance in their individual accounts. As the Supreme Court explained in 2015, in defined contribution plans like the Plans, employees' benefits at retirement "are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1825 (2015) (emphasis added).

5.      At all relevant times, each of the Plans has included as an investment option shares of stock of Johnson & Johnson, the Plans' sponsor and the employer of the participants in the Plans. Plaintiffs owned and purchased Johnson & Johnson stock through their accounts in the Savings Plan during the Class Period.

6.      However, for many years Johnson & Johnson's stock price has been artificially inflated. One of Johnson & Johnson's flagship products, its talc Baby Powder, contains asbestos, a known carcinogen. For decades, Johnson & Johnson's senior leadership has known that its talc contained asbestos, but took no action to disclose that information to the public. Indeed, Johnson

3

& Johnson's senior leadership has endeavored to hide from the public the truth about asbestos in its talc powder products. These efforts were successful, and the public was and has been generally unaware that Johnson & Johnson's talc powder contained asbestos. To date, Johnson & Johnson has not publicly acknowledged that its talc powder contains asbestos.

7.      The Individual Defendants, who serve as the Plans' fiduciaries, include many senior executives of Johnson & Johnson. Mr. Caruso, for example, was the company's Chief Financial Officer and a member of the company's Executive Committee for many years prior to his retirement in September 2018. Mr. Fasolo was also a member of the company's Executive Committee. Johnson & Johnson's Executive Committee "is the principal management group responsible for the strategic operations and allocation of the resources of the company."[1]

8.      Defendants knew or should have known that Johnson & Johnson's stock price was artificially inflated in value, and knew or should have known that many of the Plans' participants, including Plaintiffs, allocated significant portions of their retirement savings to Johnson & Johnson stock and made additional purchases of Johnson & Johnson stock for their retirement savings accounts in the Plans on an ongoing basis.

9.      To date, Defendants have failed to take any action to protect the Plans and their participants, and have failed to publicly disclose the truth about asbestos in Johnson & Johnson's talc-related products.

10.     By no later than April 13, 2017, it was inevitable that the truth about asbestos in Johnson & Johnson's talc products would become known to the public. On that date, Johnson & Johnson filed its answer to an amended complaint in multidistrict litigation captioned *In re*

---

[1] *See* Johnson & Johnson, "Our Governance," available at
https://www.jnj.com/caring/citizenship-sustainability/approach/governance (last visiting Jan. 22, 2019).

762955.2

*Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Liability Litig.*, No. 3:16-md-02738 (FLW) (LHG) (the "MDL"). The MDL involves claims against Johnson & Johnson arising out of personal injuries caused by asbestos in Johnson & Johnson's talc powder. Once Johnson & Johnson's answer had been filed, discovery would begin, and the large number of Johnson & Johnson's previously secret internal documents demonstrating the presence of asbestos in the talc powder and efforts to conceal that information would become public.

11.     Despite their knowledge of Johnson & Johnson's false representations and concealment of asbestos in its talc powder, the inflation of Johnson & Johnson's stock price, and the inevitability of the disclosure of the truth, Defendants took no action to disclose the truth to the public. Instead, Defendants stayed quiet as the Plans' participants, including Plaintiffs, continued to purchase and hold the Johnson & Johnson stock at artificially inflated prices.

12.     On December 14, 2018, Reuters published an article citing internal Johnson & Johnson documents showing that Johnson & Johnson's senior executives had been aware of the presence of asbestos in its talc powder for decades, and had actively sought to conceal the information from the public.

13.     Johnson & Johnson's stock price declined more than 10% following the Reuters report, which was picked up and expanded by several other major news outlets, including The New York Times.  The 10% decline corresponded to a loss of $30 billion of Johnson & Johnson's market capitalization.

14.     The decline in Johnson & Johnson's value was more than the amount of liability Johnson & Johnson likely faces in lawsuits alleging personal injuries linked to the asbestos in the talc products, and more than the expected decline in sales of talc products as the public becomes

aware of the serious health risks associated with exposure to the asbestos in Johnson & Johnson's talc powder. Instead, the decline of Johnson & Johnson's share price included a loss of faith in Johnson & Johnson itself and the honesty and dependability of the company and its executive leadership. For a health products company like Johnson & Johnson, the company's image and goodwill are significant. For example, Johnson & Johnson valued its goodwill at $31 billion as of December 31, 2017—nearly 20% of the company's overall value.

15.    Moreover, J&J's undisclosed liabilities have proven to be massive. For instance, in July 2019, a California jury ordered Colgate & Johnson & Johnson to pay $12 million to a 61-year old woman who claimed her mesothelioma (a rare asbestos-related cancer) was caused by using the company's talcum powder. In May 2019, a New York jury ordered J&J to pay $25 million in compensatory damages and $300 million in punitive damages to a woman who said she contracted mesothelioma through decades of daily use of J&J's Baby Powder or its other talc product, Shower to Shower. *See Olson v. Brenntag*, 190328/2017, New York Supreme Court (Manhattan). In March 2019, a California jury ordered J&J to pay a $29 million award in a mesothelioma case. In August 2017, a California jury awarded a woman $70 million in compensatory damages and $347 million in punitive damages. *See Elisha Echeverria v. Johnson & Johnson et al.*, No. B286283 (J&J granted new trial).

16.    The damage to Johnson & Johnson's goodwill and reputation has been exacerbated by Defendants' continued refusal to admit that its talc products contain asbestos. The longer the concealment has gone on, the less credible Johnson & Johnson's statements about health and safety have become.

17.    Defendants had ample authority and every opportunity to correct the record and make the truth about asbestos in Johnson & Johnson's talc products known to the public. Had

they done so, the Plans' participants could have avoided millions of dollars in purchases of artificially inflated J&J shares, and subsequent losses in the value of the Johnson & Johnson stock in their Plan accounts when the truth was revealed to the market.

## JURISDICTION AND VENUE

18.    Plaintiffs bring this action pursuant to ERISA §§ 502(a)(2) and 502(a)(3), 29 U.S.C. §§ 1132(a)(2) and (3).

19.    This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because this action arises under the laws of the United States.

20.    This Court has general personal jurisdiction over defendant Johnson & Johnson, which is incorporated in this District, and over any other defendants who reside in this District. This Court has specific personal jurisdiction over all Defendants because they took the actions described herein in this district through their management of the Plans, all of which were administered in this District.

21.    Pursuant to 29 U.S.C. § 1132(e)(2) venue is proper in this District because the Plan is administered in this District and the breaches described herein occurred in this District. Venue is also proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because, for the same reasons, a substantial part of the events or omissions giving rise to the claim occurred in this District.

## PARTIES

22.    The Plans are employee benefit plans and employee pension benefit plans covered by ERISA within the meaning of ERISA § 3(2)(A) & (7), 29 U.S.C. § 1002(2)(A) & (7).

23.    Plaintiff Michael Perrone is an individual residing in the City of Atlantic Highlands, in Monmouth County, and at all relevant times has been a participant in the Savings

Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7). Plaintiff Perrone purchased and owned Johnson & Johnson stock through his retirement savings account in the Savings Plan during the Class Period.

24.     Plaintiff Tom Tarantino is an individual residing in Lawrenceville, Georgia, and at all relevant times has been a participant in the Savings Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).  Until 2007, he was an employee of J&J, and he was and continues to be a participant in the Plan.  He purchased and held Johnson & Johnson stock in his Plan retirement savings account during the Class Period.

25.     Plaintiff Rochelle Rosen is an individual residing in Beverly Hills, California, and at all relevant times has been a participant in the Savings Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).  Until 1994, she was an employee of J&J, and she was and continues to be a participant in the Plan.  She purchased and held Johnson & Johnson stock in her Plan retirement savings account during the Class Period.

26.     Defendant Johnson & Johnson, together with its subsidiaries, researches and develops, manufactures, and sells various products in the health care field worldwide. The Company is incorporated in New Jersey and its principal executive offices are located at One Johnson & Johnson Plaza, New Brunswick, New Jersey, 08933. Johnson & Johnson's common stock is traded on the New York Stock Exchange ("NYSE") under the ticker symbol "JNJ."

27.     Defendant Peter Fasolo, Ph.D. is an Executive Vice President and Chief Human Resource Officer of Johnson & Johnson.  Mr. Fasolo is a member of the Executive Committee and the Chairman of the Pension and Benefits Committee.

28.     Defendant Dominic J. Caruso was the Chief Financial officer of Johnson & Johnson and a member of the Executive Committee, as well as a member of the Pension and

Benefits Committee, from 2007 until his retirement in September 2018.

29.     Doe Defendants 1-20 are members of the Pension & Benefits Committee of Johnson & Johnson (the "Committee").  The Committee is the named fiduciary for the Plans with general authority for the management and administration of the Plans.

30.     Defendants Fasolo, Caruso and Doe Defendants 1-20 are also referred to herein "Individual Defendants."

31.     Each of the Individual Defendants:

- was directly responsible for the management of the Plan;

- was directly involved in the day-to-day operations of the Company at the highest levels;

- was privy to confidential proprietary information concerning the Company and its business and operations;

- owed a fiduciary duty to the Plan; and

- failed to take any steps to ensure that the truth about asbestos in Johnson & Johnson's talc products was disclosed once disclosure became inevitable.

## ADDITIONAL ALLEGATIONS

### Background

32.     J&J was founded in 1887 and is engaged in the research and development, manufacture and sale of a broad range of products in the health care field.  The Company currently has approximately 134,000 employees worldwide spread across more than 260 operating companies.  J&J is located in more than 60 countries, including the U.S., and sells products in virtually all countries throughout the world.

33.     J&J is organized into three business segments:  Consumer, Pharmaceuticals, and Medical Devices.  The Consumer segment focuses on products used in the baby care, oral care, beauty, over-the-counter pharmaceutical, women's health and wound care markets; Johnson's Baby Powder is included in this line of products.

34.     The Executive Committee of J&J is the principal management group responsible for the strategic operations of the Company.  This committee oversees and coordinates the activities of the Company's three business segments.  Senior management groups at U.S. and international operating companies are each responsible for their own strategic plans and the day-to-day operations of those companies.  Members of the Executive Committee include its Chairman, Alex Gorsky ("Gorsky"), who is also J&J's CEO and Chairman of the Board; Vice Chairman Joaquin Duato ("Duato"), who is a 28-year veteran of J&J and is responsible for the Company's Consumer and Pharmaceutical sectors; J&J's CFO Caruso (through July 2018); Jorge Mesquita ("Mesquita"), who is an Executive Vice President and Worldwide Chairman of the Consumer sector; Vice Chairman Paul Stoffels, M.D. ("Stoffels"), who has been with J&J since 2002 and is the Chief Scientific Officer; Michael Sneed ("Sneed"), who is a 36-year veteran of J&J and is the Executive Vice President of Global Corporate Affairs and Chief Communications Officer; J&J's General Counsel Michael H. Ullmann ("Ullmann"); and J&J's new CFO since July 2018, Joseph Wolk ("Wolk").

35.     J&J's most widely known and flagship consumer product is Johnson's Baby Powder.  It first hit markets well over a century ago in 1894.  Johnson's Baby Powder has long been marketed as a product useful to consumers of all ages and has been used generation after generation.  This seemingly innocent product, though, has been hiding a dark and deadly secret, perhaps even since it hit stores in 1894—asbestos, a known carcinogen.

762955.2

36.     The primary ingredient in Johnson's Baby Powder is talc, an inorganic material that is extracted from the earth through mining and later refined for use in consumer products. Asbestos naturally occurs underground near talc deposits.  When viewed on a microscopic level, asbestos looks like tiny dagger-like fibers which penetrate deep into human tissue and lead to lung cancer, cancer of the voice box, ovarian cancer, and mesothelioma.  The link between asbestos and ovarian cancer has been reported since at least 1958; in 2011, the International Agency for Research on Cancer named asbestos a "cause" of ovarian cancer.

37.     Thousands of lawsuits have been filed against J&J alleging that its talc products caused cancer, yet J&J has always maintained the same position— "our products do not contain asbestos."  However, in a recent asbestos-related ovarian cancer litigation, J&J was ordered by a court to produce "troves of internal Johnson & Johnson documents," which tell an entirely different story—J&J has known for decades that its talc products contained asbestos and the Company has gone to great lengths to conceal this information from government regulators and consumers.

38.     Johnson & Johnson has known for decades that its talc products, such as its Baby Powder, include asbestos fibers and that exposure to those fibers can cause ovarian cancer and mesothelioma.  The Company misrepresented and failed to disclose the danger that Johnson & Johnson's talc products posed to consumers, Johnson & Johnson's significant contingent liability related to its talc products, and that Johnson & Johnson's revenues from sales of these products were unsustainable due to the dangerous and harmful nature of its talc products.

39.     According to an article published by Reuters on December 14, 2018, "Johnson & Johnson knew for decades that asbestos lurked in its Baby Powder," internal J&J documents examined by Reuters show that the Company was aware of "tainted J&J talc" as early as 1957.

Lab reports mentioned "fibrous and 'acicular,' or needle-like, tremolite." Tremolite is a mineral that in its naturally occurring fibrous form is classified as asbestos. Lab reports since then, all the way into the early 2000s, showed similar findings.

40.     A November 1967 memo written by William Ashton ("Ashton"), then a -J&J executive who had been in charge of J&J's talc supply for decades, again showed the presence of tremolite. Traces of the mineral appeared when samples from a new talc mine located in Vermont were tested. Just two years later, in 1969, Ashton penned a memo to a company doctor suggesting that J&J rethink its approach. He wrote, "Historically, in our Company, Tremolite has been bad … How bad is Tremolite medically, and how much of it can safely be in a talc base we might develop?" In response, J&J's founder's son, Robert Wood Johnson II, then-retired CEO, expressed "concern over the possibility of the adverse effects on the lungs of babies or mothers."

41.     By the 1970s, asbestos was already widely known as the primary cause of mesothelioma, which caused President Nixon to implement regulations setting limits on exposure to asbestos dust in the workplace. In 1971, after receiving reports that "two unidentified brands of cosmetic talc appeared to contain asbestos," the U.S. Food and Drug Administration ("FDA") opened an inquiry. J&J quickly issued a clear public statement: "Our fifty years of research knowledge in this area indicates that there is no asbestos contained in the powder manufactured by Johnson & Johnson." However, soon after the public statement, Mount Sinai researcher Arthur Langer informed J&J by letter that his team had found "relatively small" amounts of asbestos in Johnson's Baby Powder.

42.     Throughout the remainder of the 1970s, J&J fought back against the "attack on talc," often by deceiving government regulators. In July of 1971, a delegation of scientists were

762955.2

sent to Washington to meet with the FDA team investigating the presence of asbestos in talc products. Both the FDA's accounts and internal J&J records memorializing the meeting showed that J&J talc contained asbestos; the FDA described it at levels "less than 1%" while J&J called it "trace amounts." As the FDA continued its investigation, J&J began sending samples of its talc to private and university labs. Although results showed that some samples tested positive for asbestos, those findings did not make it into J&J's final report to the FDA; instead, J&J reported that "the 'results clearly show' the samples tested 'contain no chrysotile asbestos.'"

43.     In 1973, J&J explored acquiring patents on a process being developed by a British mineralogist to separate talc from tremolite. Tom Shelley, then director of J&J's Central Research Laboratories in New Jersey, recognized that tremolite might one day be prohibited in talc products and therefore a patent on the process of removing it would be valuable to the Company. Shelley later penned a memo to one of J&J's lawyers, "We will want to carefully consider the … patents re asbestos in talc. It's quite possible that we may wish to keep the whole thing confidential rather than allow it to be published in patent form and thus let the whole world know." The patent was never acquired.

44.     Around the same time in 1973, the FDA had finally proposed a rule limiting the amount of asbestos contained in talc to 0.1%. Internal J&J documents show that the Company recognized that it "may have problems" depending on the particular test the FDA would adopt for detecting asbestos in talc. J&J proposed an x-ray scanning technique that would allow for an "automatic 1% tolerance for asbestos," a level ten times that proposed by the FDA. However, J&J failed in its efforts and shifted its focus to persuading the FDA that self-policing in the industry was a better solution than government regulation. In support, J&J again provided lab results showing that after testing samples over a 10-month period its talc contained no asbestos.

Yet, just as it had previously done, J&J's report omitted contradictory findings from independent laboratories.  Sadly, the FDA abandoned its efforts to regulate asbestos levels in talc.

45.     In May 1974, the then-head of research and development for one of the largest mines supplying talc to Johnson & Johnson wrote a letter to Johnson & Johnson urging Johnson & Johnson to take measures to mitigate the risk of harm from the asbestos present in the talc.  The letter said that "[t]he use of [mitigation systems] is strongly urged by this writer to provide protection against what are currently considered to be materials presenting a ***severe health hazard*** and are potentially present in all talc ores in use at this time." That document was kept secret by Johnson & Johnson until litigation commenced concerning personal injury claims relating to Johnson & Johnson's talc-related products.

46.     Astonishingly, at first blush, in 1976, the Cosmetic, Toiletry, and Fragrance Association ("CTFA"), now known as the Personal Care Products Council, drafted voluntary guidelines which limited asbestos levels in talc to 0.5%.  However, looking deeper, it is important to note two things:  (i) the CTFA committee responsible for the guidelines was chaired by a then J&J executive, and (ii) the testing procedure, x-ray scanning (the same method proposed by J&J to the FDA a couple of years earlier, which is also the same method J&J has reportedly used for decades), was not, in fact, designed to detect the most common type of asbestos.  J&J appeared to have won the "attack on talc" battle.  For the next 16 years, J&J continued to produce and sell talc products, endangering consumers and raking in profits, as the world seemed to adopt J&J's continued assertions that its talc products were safe.

47.     In 1989, J&J sold its Vermont talc mines to Cyprus Minerals ("Cyprus").  Three years later, in 1992, Cyprus flagged "important environmental issues" in internal memos.  It had found tremolite in its talc reserves from the Hammondsville mine, which was J&J's primary

source of talc used to manufacture Johnson's Baby Powder since 1966. Then in 2002 and 2003, the operators of the same Vermont talc mine discovered the presence of asbestos fibers in talc that was used to produce Johnson's Baby Powder sold in Canada.

48.     J&J's talc safety research is best summed up by its own March 1975 internal memo:

> Our current posture with respect to the sponsorship of talc safety studies has been to initiate studies on as dictated by confrontation. This philosophy, so far, has allowed us to neutralize or hold in check data already generated by investigators who question the safety of talc … we minimize the risk of possible self-generation of scientific data which may be politically or scientifically embarrassing.

49.     Various governmental and non-governmental organizations have recognized the link between talc and cancer. Upon information and belief, in or about 1990, the FDA asked manufacturers of surgical gloves to stop using talc in their products. In or about 1996, the FDA asked the condom industry to stop dusting condoms with talc. In 2005, the Fifth Edition of "Myths & Facts About Ovarian Cancer. What You Need to Know," was published by The Oncology Group and listed "Use of Talc (Baby Powder) in the Genital Area" as a risk factor. *Myths & Facts about ovarian cancer. What you need to know* (Fifth Edition). The Oncology Group, CMPMedica (November 1, 2005), *available at* http://imaging.ubmmedica.com/cancernetwork/forpatients/pdfs/7_M&F%20Ovarian%20Cancer.pdf

50.     In 2006, the Canadian government classified talc as a "very toxic, cancer causing substance." *Talcum Powder Ovarian Cancer Lawsuits Update.* The Legal Examiner (February 5, 2017), *available at* https://pinellas.legalexaminer.com/health/medical-devices-implants/talcum-powder-ovarian-cancer-lawsuits-update/. In 2008, the Cancer Prevention Coalition petitioned the FDA to require a prominent warning on talc products that frequent

perineal talc application increases the risk of ovarian cancer. *Talc Use in Genital Area Linked to Increased Risk for Ovarian Cancer.* Medscape (October 10, 2008), *available at* https://www.medscape.org/viewarticle/581862.  In 2010, the International Association for the Research of Cancer classified talc-based body powder as a human carcinogen. *Preventable Exposures Associated With Human Cancers* Int'l Ass'n for the Research of Cancer (Nov. 10, 2010) *available at* https://monographs.iarc.fr/wp-content/uploads/2018/06/_Cogliano_2011_ JNCI_Preventable_Exposures.pdf.  Both the National Cancer Institute and American Cancer Society warn that genital talc use is a risk factor for ovarian cancer. *Talcum Powder and Cancer.* American Cancer Society (December 4, 2018), *available at* https://www.cancer.org/cancer/ cancer-causes/talcum-powder-and-cancer.html.

### J&J's False and Misleading Statements and Material Omissions in the Company's Financial Reports

51.    On February 22, 2013, the Company filed a Form 10-K for the fiscal year ended December 30, 2012 (the "2012 10-K") with the SEC, which provided the Company's year-end financial results and position and stated that the Company's disclosure controls and procedures were effective as of December 30, 2012.  The 2012 10-K stated that Management's Report on Internal Control Over Financial Reporting "is incorporated herein by reference to the material under the caption 'Management's Report on Internal Control Over Financial Reporting' of the Annual Report, filed as Exhibit 13 to this Report on Form 10-K."  Exhibit 13 to the 2012 10-K stated that the Company's internal control over financial reporting was effective as of December 30, 2012.  The 2012 10-K was signed by Executive Committee members Gorsky and Caruso. The 2012 10-K also contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Gorsky and Caruso attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the

16

disclosure of all fraud.

52.     The 2012 10-K discussed J&J's baby products, stating in pertinent part:

The Consumer segment includes a broad range of products used in the baby care, skin care, oral care, wound care and women's health care fields, as well as nutritional and over-the-counter pharmaceutical products, and wellness and prevention platforms. The Baby Care franchise includes the JOHNSON'S® Baby line of products.

53.     The 2012 10-K discussed J&J's commitment to "delivering high quality and innovative products," and its research activities of "demonstrating product efficacy and regulatory compliance prior to launch," stating in pertinent part:

**Research and Development**

Research activities represent a significant part of the Company's businesses. Research and development expenditures relate to the processes of discovering, testing and developing new products, improving existing products, as well as **demonstrating product efficacy and regulatory compliance prior to launch. The Company remains committed to investing in research and development with the aim of delivering high quality and innovative products…**

**Environment**

The Company is subject to a variety of U.S. and international environmental protection measures. The Company believes that its operations comply in all material respects with applicable environmental laws and regulations.

*        *        *

**Management's Objectives**

The Company manages within a strategic framework aimed at achieving sustainable growth. To accomplish this, the Company's management operates the business consistent with certain strategic principles that have proven successful over time. To this end, the Company participates in growth areas in human health care and is committed to attaining leadership positions in these growth areas through the development of high quality, innovative products and services.

(Emphasis added).

54.     The 2012 10-K discussed the regulations that J&J is subject to, including U.S. regulations concerning "product safety, efficacy, manufacturing, advertising, labeling and safety reporting," stating in pertinent part:

> Most of the Company's businesses are subject to varying degrees of governmental regulation in the countries in which operations are conducted, and the general trend is toward increasingly stringent regulation.  In the United States, the drug, device, diagnostics and cosmetic industries have long been subject to regulation by various federal and state agencies, primarily as to product safety, efficacy, manufacturing, advertising, labeling and safety reporting.

55.      Exhibit 13 to the 2012 10-K discussed that the risks and uncertainties facing the Company are, among others, "product efficacy or safety concerns resulting in product recalls or regulatory action."

56.      Exhibit 13 to the 2012 10-K discussed the product liability cases against J&J's subsidiaries, while stating that its "subsidiaries are confident of the adequacy of the warnings and instructions for use that accompany the products at issue," stating in pertinent part:

> Certain subsidiaries of Johnson & Johnson are involved in numerous product liability cases.  The damages claimed are substantial, and while **these subsidiaries are confident of the adequacy of the warnings and instructions for use that accompany the products at issue**, it is not feasible to predict the ultimate outcome of litigation.   The Company has established product liability accruals in compliance with ASC 450-20 based on currently available information, which in some cases may be limited. Changes to the accruals may be required in the future as additional information becomes available.

(Emphasis added.)

57.     On February 21, 2014, the Company filed a Form 10-K for the fiscal year ended December 29, 2013 (the "2013 10-K") with the SEC, which provided the Company's year-end financial results and position and stated that the Company's disclosure controls and procedures was effective as of December 29, 2013.  The 2013 10-K stated that Management's Report on Internal Control Over Financial Reporting "is incorporated herein by reference to the material

762955.2

under the caption 'Management's Report on Internal Control Over Financial Reporting' of the Annual Report, filed as Exhibit 13 to this Report on Form 10-K." Exhibit 13 to the 2013 10-K stated that the Company's internal control over financial reporting was effective as of December 29, 2013. The 2013 10-K was signed by Executive Committee members Gorsky and Caruso. The 2013 10-K also contained signed SOX certifications by Gorsky and Caruso attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

58.     The 2013 10-K discussed J&J's baby products, stating in pertinent part:

The Consumer segment includes a broad range of products used in the baby care, skin care, oral care, wound care and women's health fields, as well as nutritionals, over-the-counter pharmaceutical products and wellness and prevention platforms. The Baby Care franchise includes the JOHNSON'S® Baby line of products.

59.     The 2013 10-K discussed J&J's commitment to "delivering high quality and innovative products," and its research activities of "demonstrating product efficacy and regulatory compliance prior to launch," stating in pertinent part:

**Research and Development**

Research activities represent a significant part of the Company's businesses. Research and development expenditures relate to the processes of discovering, testing and developing new products, improving existing products, as well as **demonstrating product efficacy and regulatory compliance prior to launch. The Company remains committed to investing in research and development with the aim of delivering high quality and innovative products…**

**Environment**

The Company is subject to a variety of U.S. and international environmental protection measures. The Company believes that its operations comply in all material respects with applicable environmental laws and regulations.

                                *       *       *

The Company engages in areas of human health care where there is an opportunity to make a meaningful difference, and is committed to creating value by developing

19

broadly accessible, high quality, innovative products and services.

(Emphasis added).

60.     The 2013 10-K discussed the regulations that J&J is subject to, including U.S. regulations concerning "product safety, efficacy, manufacturing, advertising, labeling and safety reporting," stating in pertinent part:

> Most of the Company's businesses are subject to varying degrees of governmental regulation in the countries in which operations are conducted, and the general trend is toward increasingly stringent regulation.  In the United States, the drug, device, diagnostics and cosmetic industries have long been subject to regulation by various federal and state agencies, primarily as to product safety, efficacy, manufacturing, advertising, labeling and safety reporting.

61.     Exhibit 13 to the 2013 10-K discussed that the risks and uncertainties facing the Company are, among others, "product efficacy or safety concerns resulting in product recalls or regulatory action."

62.     Exhibit 13 to the 2013 10-K discussed the product liability cases against J&J's subsidiaries, while stating that its "subsidiaries believe they have substantial defenses," stating in pertinent part:

> Certain subsidiaries of Johnson & Johnson are involved in numerous product liability claims and lawsuits involving multiple products. Claimants in these cases seek substantial compensatory and, where available, punitive damages.  While **these subsidiaries believe they have substantial defenses**, it is not feasible to predict the ultimate outcome of litigation.  The Company has established product liability accruals in compliance with ASC 450-20 based on currently available information, which in some cases may be limited. Changes to the accruals may be required in the future as additional information becomes available.

(Emphasis added).

63.     On May 12, 2014, J&J issued the following statement in an article published by Fox 32, titled "Popular Baby Powder Allegedly Caused Cancer in Pro-Figure Skater":

> We have no higher responsibility than the health and safety of consumers who rely on our products.  It is important for consumers to know that **the safety of cosmetic**

**talc is supported by decades of scientific evidence and independent peer-reviewed studies**.

(Emphasis added).

64.     On February 24, 2015, the Company filed a Form 10-K for the fiscal year ended December 28, 2014 (the "2014 10-K") with the SEC, which provided the Company's year-end financial results and position and stated that the Company's disclosure controls and procedures was effective as of December 28, 2014. The 2014 10-K stated that Management's Report on Internal Control Over Financial Reporting "is incorporated herein by reference to the material under the caption 'Management's Report on Internal Control Over Financial Reporting' of the Annual Report, filed as Exhibit 13 to this Report on Form 10-K." Exhibit 13 to the 2014 10-K stated that the Company's internal control over financial reporting was effective as of December 28, 2014. The 2014 10-K was signed by Executive Committee members Gorsky and Caruso. The 2014 10-K also contained signed SOX certifications by Gorsky and Caruso attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

65.     The 2014 10-K discussed J&J's baby products, stating in pertinent part:

The Consumer segment includes a broad range of products used in the baby care, oral care, skin care, over-the-counter pharmaceutical, women's health and wound care markets. Baby Care includes the JOHNSON'S® Baby line of products.

66.     The 2014 10-K discussed J&J's commitment to "delivering high quality and innovative products," and its research activities of "demonstrating product efficacy and regulatory compliance prior to launch," stating in pertinent part:

**Research and Development**

Research activities represent a significant part of the Company's businesses. Research and development expenditures relate to the processes of discovering, testing and developing new products, improving existing products, as well as

**demonstrating product efficacy and regulatory compliance prior to launch. The Company remains committed to investing in research and development with the aim of delivering high quality and innovative products…**

**Environment**

The Company is subject to a variety of U.S. and international environmental protection measures.   The Company believes that its operations comply in all material respects with applicable environmental laws and regulations.

*     *     *

The Company engages in areas of human health care where there is an opportunity to make a meaningful difference, and is committed to creating value by developing broadly accessible, high quality, innovative products and services.

(Emphasis added).

67.     The 2014 10-K discussed the regulations that J&J is subject to, including U.S. regulations concerning "product safety, efficacy, manufacturing, advertising, labeling and safety reporting," stating in pertinent part:

Most of the Company's businesses are subject to varying degrees of governmental regulation in the countries in which operations are conducted, and the general trend is toward increasingly stringent regulation.   In the U.S., the drug, device, diagnostics and cosmetic industries have long been subject to regulation by various federal and state agencies, primarily as to product safety, efficacy, manufacturing, advertising, labeling and safety reporting.

68.     Exhibit 13 to the 2014 10-K discussed that the risks and uncertainties facing the Company are, among others, "product efficacy or safety concerns resulting in product recalls or regulatory action."

69.     Exhibit 13 to the 2014 10-K discussed the product liability cases against J&J's subsidiaries, while stating that its "subsidiaries believe they have substantial defenses," stating in pertinent part:

Certain subsidiaries of Johnson & Johnson are involved in numerous product liability claims and lawsuits involving multiple products. Claimants in these cases seek substantial compensatory and, where available, punitive damages.   **While**

22

**these subsidiaries believe they have substantial defenses**, it is not feasible to predict the ultimate outcome of litigation.  The Company has established product liability accruals in compliance with ASC 450-20 based on currently available information, which in some cases may be limited.  In addition, product liability accruals can represent projected product liability for thousands of claims around the world, each in different litigation environments and with different fact patterns.  Changes to the accruals may be required in the future as additional information becomes available.

(Emphasis added).

70.     On April 8, 2015, J&J stated on its website that:

Various agencies and governmental bodies have examined whether talc is a carcinogen, and none have concluded that it is.  These include the U.S. Food and Drug Administration and National Toxicology Program, part of the U.S. Department of Health and Human services.

71.     On February 24, 2016, the Company filed a Form 10-K for the fiscal year ended January 3, 2016 (the "2015 10-K") with the SEC, with the SEC, which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting and disclosure controls and procedures were effective as of January 3, 2016. The 2015 10-K was signed by Executive Committee members Gorsky and Caruso.  The 2015 10-K also contained signed SOX certifications by Gorsky and Caruso attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

72.     The 2015 10-K discussed J&J's commitment to "delivering high quality and innovative products," as well as its research activities of "demonstrating product efficacy and regulatory compliance prior to launch," stating in pertinent part:

**Research and Development**

Research activities represent a significant part of the Company's businesses. Research and development expenditures relate to the processes of discovering, testing and developing new products, improving existing products, as well as **demonstrating product efficacy and regulatory compliance prior to launch.**

**The Company remains committed to investing in research and development with the aim of delivering high quality and innovative products…**

**Environment**

The Company is subject to a variety of U.S. and international environmental protection measures.  The Company believes that its operations comply in all material respects with applicable environmental laws and regulations.

\*       \*       \*

The Company engages in areas of human health care where there is an opportunity to make a meaningful difference, and is committed to creating value by developing broadly accessible, high quality, innovative products and services.

(Emphasis added).

73.     The 2015 10-K discussed the regulations that J&J is subject to, including U.S. regulations concerning "product safety, efficacy, manufacturing, advertising, labeling and safety reporting," stating in pertinent part:

The Company's businesses are subject to varying degrees of governmental regulation in the countries in which operations are conducted, and the general trend is toward increasingly stringent regulation.  In the U.S., the drug, device and cosmetic industries have long been subject to regulation by various federal and state agencies, primarily as to product safety, efficacy, manufacturing, advertising, labeling and safety reporting.

74.     The 2015 10-K discussed that the risks and uncertainties facing the Company are, among others, "product efficacy or safety concerns resulting in product recalls or regulatory action."

75.     The 2015 10-K discussed the product liability cases against J&J's subsidiaries, while stating that its "subsidiaries believe they have substantial defenses," stating in pertinent part:

Certain subsidiaries of Johnson & Johnson are involved in numerous product liability claims and lawsuits involving multiple products. Claimants in these cases seek substantial compensatory and, where available, punitive damages.  While **these subsidiaries believe they have substantial defenses**, it is not feasible to

24

predict the ultimate outcome of litigation.  The Company has established accruals for product liability claims and lawsuits in compliance with ASC 450-20 based on currently available information, which in some cases may be limited.  The Company accrues an estimate of the legal defense costs needed to defend each matter.  For certain of these matters, the Company has accrued additional amounts such as estimated costs associated with settlements, damage and other losses.  Product liability accruals can represent projected product liability for thousands of claims around the world, each in different litigation environments and with different fact patterns.  Changes to the accruals may be required in the future as additional information becomes available.

(Emphasis added).

76.     On December 30, 2016, J&J touted the safety and effectiveness of talc in its products on its website at https://www.safetyandcarecommitment.com/Ingredients/Talc, stating in pertinent part:

**In our products**

**We continue to use talc in our products because decades of science have reaffirmed its safety.**  Because of its safety and effectiveness, we confidently include pharmaceutical grade talc in our products. Your trust in our products and your confidence using them every day is a huge responsibility—that's why **we only use ingredients in our products deemed safe by the latest science**.

Science, research, clinical evidence and 30 years of studies by medical experts around the world continue to support the safety of cosmetic talc.

(Emphasis added).

77.     On February 27, 2017, the Company filed a Form 10-K for the fiscal year ended January 1, 2017 (the "2016 10-K") with the SEC, with the SEC, which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting and disclosure controls and procedures were effective as of January 1, 2017. The 2016 10-K was signed by Executive Committee members Gorsky and Caruso.  The 2016 10-K also contained signed SOX certifications by Gorsky and Caruso attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls

over financial reporting, and the disclosure of all fraud.

78.    The 2016 10-K discussed J&J's baby products, stating in pertinent part:

> The Consumer segment includes a broad range of products used in the baby care, oral care, beauty (previously referred to as skin care), over-the-counter pharmaceutical, women's health and wound care markets.  Baby Care includes the JOHNSON'S® line of products.

79.    The 2016 10-K discussed the pending lawsuits against J&J and its subsidiaries based on nondisclosure of alleged health risks associated with talc contained in J&J's baby products, stating in pertinent part:

> Claims for personal injury have been made against Johnson & Johnson Consumer Inc. and Johnson & Johnson arising out of the use of JOHNSON'S® Baby Powder. The number of pending product liability lawsuits continues to increase, and the Company continues to receive information with respect to potential costs and the anticipated number of cases.  Lawsuits have been primarily filed in state courts in Missouri, New Jersey and California.  In addition, a federal multi-district litigation proceeding has been created for this litigation in the District Court of New Jersey. The Company has established an accrual for defense costs in connection with product liability litigation associated with JOHNSON'S® Baby Powder. Changes to this accrual may be required in the future as additional information becomes available.

> *        *        *

> In June 2014, the Mississippi Attorney General filed a complaint in Chancery Court of The First Judicial District of Hinds County, Mississippi against Johnson & Johnson and Johnson & Johnson Consumer Companies, Inc. (now Johnson & Johnson Consumer Inc.) (JJCI).  The complaint alleges that defendants failed to disclose alleged health risks associated with female consumers' use of talc contained in JOHNSON'S® Baby Powder and JOHNSON'S® Shower to Shower (a product no longer sold by JJCI) and seeks injunctive and monetary relief.  This matter is currently scheduled for trial in September 2017.

> *        *        *

> In May 2014, two purported class actions were filed in federal court, one in the United States District Court for the Central District of California and one in the United States District Court for the Southern District of Illinois, against Johnson & Johnson (J&J) and Johnson & Johnson Consumer Companies, Inc. (now Johnson & Johnson Consumer Inc.) (JJCI), alleging violations of state consumer fraud statutes based on nondisclosure of alleged health risks associated with talc

contained in JOHNSON'S® Baby Powder and JOHNSON'S® Shower to Shower (a product no longer sold by JJCI). Both cases seek injunctive relief and monetary damages; neither includes a claim for personal injuries. In October 2016, both cases were transferred to the United States District Court for the District Court of New Jersey as part of a newly created federal multi-district litigation. In December 2016, J&J and JJCI filed a motion to dismiss one of the cases.

80.     The 2016 10-K discussed J&J's commitment to "delivering high quality and innovative products," and its research activities of "demonstrating product efficacy and regulatory compliance prior to launch," stating in pertinent part:

**Research and Development**

Research activities represent a significant part of the Company's businesses. Research and development expenditures relate to the processes of discovering, testing and developing new products, improving existing products, as well as demonstrating product efficacy and regulatory compliance prior to launch. The Company remains committed to investing in research and development with the aim of delivering high quality and innovative products…

**Environment**

The Company is subject to a variety of U.S. and international environmental protection measures. The Company believes that its operations comply in all material respects with applicable environmental laws and regulations.

                        *        *        *

The Company is broadly based in human health care, and is **committed to creating value by developing accessible, high quality, innovative products and services**.

(Emphasis added).

81.     The 2016 10-K discussed that the risks and uncertainties facing the Company are, among others, "[p]roduct efficacy or safety concerns, whether or not based on scientific evidence, potentially resulting in product withdrawals, recalls, regulatory action on the part of the U.S. Food and Drug Administration (or international counterparts), declining sales and reputational damage."

27

82.     The 2016 10-K discussed the product liability cases against J&J and its subsidiaries, while stating that "the Company believes it has substantial defenses," stating in pertinent part:

> Johnson & Johnson and certain of its subsidiaries are involved in numerous product liability claims and lawsuits involving multiple products. Claimants in these cases seek substantial compensatory and, where available, punitive damages. **While the Company believes it has substantial defenses**, it is not feasible to predict the ultimate outcome of litigation. The Company has established accruals for product liability claims and lawsuits in compliance with ASC 450-20 based on currently available information, which in some cases may be limited. The Company accrues an estimate of the legal defense costs needed to defend each matter when those costs are probable and can be reasonably estimated. For certain of these matters, the Company has accrued additional amounts such as estimated costs associated with settlements, damages and other losses. To the extent adverse verdicts have been rendered against the Company, the Company does not record an accrual until a loss is determined to be probable and can be reasonably estimated. Product liability accruals can represent projected product liability for thousands of claims around the world, each in different litigation environments and with different fact patterns. Changes to the accruals may be required in the future as additional information becomes available.
>
> The most significant of these cases include the DePuy ASR™ XL Acetabular System and DePuy ASR™ Hip Resurfacing System, the PINNACLE® Acetabular Cup System, pelvic meshes, RISPERDAL®, XARELTO® and JOHNSON'S® Baby Powder. As of January 1, 2017, in the U.S. there were approximately 2,000 plaintiffs with direct claims in pending lawsuits regarding injuries allegedly due to the DePuy ASR™ XL Acetabular System and DePuy ASR™ Hip Resurfacing System, 9,400 with respect to the PINNACLE® Acetabular Cup System, 54,800 with respect to pelvic meshes, 18,500 with respect to RISPERDAL®, 16,900 with respect to XARELTO® and 3,100 with respect to JOHNSON'S® Baby Powder.

(Emphasis added).

83.     On September 21, 2017, Ernie Knewitz, a spokesman for Johnson & Johnson, said in an emailed statement to *Bloomberg* that:

> "We are confident that our talc products are, and always have been, free of asbestos, based on decades of monitoring, testing and regulation," Knewitz said. "Historical testing of samples by the FDA, numerous independent laboratories, and numerous independent scientists have all confirmed the absence of asbestos in our talc products."

84.     On November 16, 2017, Reuters published an article titled, "Johnson & Johnson wins California lawsuit claiming asbestos in talc caused cancer," wherein a J&J spokesperson was quoted stating that "Johnson's Baby Powder has been around since 1894 and ***it does not contain asbestos*** or cause mesothelioma or ovarian cancer" (emphasis added).

85.     As recently as January 22, 2019, Johnson & Johnson touted the safety and effectiveness of talc in its products on its website at https://www.johnsonsbaby.com.ph/baby-products/johnsons-baby-powder, stating in pertinent part:

> **Is talc safe for my baby's skin?**
>
> JOHNSON'S® Baby talc products are made using U.S. Pharmacopeial (USP) grade talc to ensure it meets the highest-quality, purity and compliance standards. **Our talc is carefully selected, processed and tested to ensure that is asbestos free, as confirmed by regular testing conducted since the 1970s.**
>
> Our confidence in using talc is based on a long history of safe use and more than 30 years of research by independent researchers, scientific review boards and global regulatory authorities.
>
> Read more about our Safety & Care Commitment here: http://www.safetyandcarecommitment.com/ingredient-info/other/talc

(Emphasis added).

86.     The Company's statements in paragraphs 49-83 were materially false and misleading because: (a) Defendants failed to disclose the fact that J&J talc products contained asbestos; (b) J&J's senior officers had been aware for decades of the presence of asbestos in the Company's talc products; (c) that exposure to these products could cause cancer; and (d) that J&J is subject to substantial liability in lawsuits for personal injuries caused by exposure to the Company's talc products.

**The Truth is Revealed**

87.     On December 14, 2018, an investigative report by Reuters detailed the fact that Johnson & Johnson had known for decades about, and concealed the presence of asbestos in, its products.  *See* Lisa Girion, *Special Report:  J&J Knew For Decades That Asbestos Lurked In Its Baby Powder*, REUTERS (Dec. 14, 2018) *available at* https://www.reuters.com/article/us-johnson-johnson-cancer-special-report/special-report-jj-knew-for-decades-that-asbestos-lurked-in-its-baby-powder-idUSKBN1OD1RQ.

88.     The report by Reuters also exposed the fact that Johnson & Johnson took measures to influence regulators' attempts to limit the presence of asbestos in consumer products like the Johnson & Johnson products at issue and that Johnson & Johnson had funded some of the scientific research it used to buttress its earlier claims that its products were asbestos-free.  Shares of Johnson & Johnson stock declined by more than 12.5% following the release of this report.

## DEFENDANTS' BREACHES OF FIDUCIARY DUTY

89.     Throughout the Class Period, Defendants knew or should have known about J&J's failure to disclose the truth about its talc products.  Defendants knew or should have known that J&J's public SEC filings were materially false and misleading, and that J&J's stock price did not reflect material information about the Company.  They further knew or should have known that J&J, along with Executive Committee members Gorsky and Caruso, misled the public in its SEC filings on which the public was relying.  Yet Defendants did nothing to act upon that knowledge to protect the retirement savings of the Plan participants to whom they owed their fiduciary duties.

90.     Defendant Fasolo was a member of the Executive Committee, a committee composed of J&J's most senior managers who oversee and coordinate the activities of the Company's three business segments, including the Consumer segment.  Members of the Executive Committee included its CEO Gorsky; CFO Caruso; Duato, who is responsible for the

Company's Consumer and Pharmaceutical sectors; Worldwide Chairman of the Consumer Sector Mesquita; Chief Scientific Officer Stoffels; Chief Communications Officer Sneed; General Counsel Ullmann; and new CFO Wolk.

91.     CEO Gorsky and CFO Caruso were the Sarbanes-Oxley co-signatories of J&J's SEC filings, and, indeed, were the people who actually made many of J&J's misleading statements and material omissions that artificially drove up the Company's stock price.  They were centrally involved in the preparation of the financial statements, including with respect to what was and was not disclosed regarding the safety of the Company's talc products.  They were responsible for ensuring that that reporting complied with the federal securities laws, which of course require truth and accuracy in all financial reporting.  Just like the CEOs before him, as seen throughout the internal J&J documents that were recently made public, Gorsky was aware of J&J's longtime position that its talc products were "safe" and all of the past and present scientific evidence to the contrary.

92.     Duato and Mesquita were heads of J&J's Consumer segment, the business unit responsible for the manufacturing and sale of Johnson's Baby Powder, and oversaw all aspects of that segment.  This included, along with Stoffels, oversight of the testing of talc products for asbestos.

93.     Sneed, as Chief Communications Officer, was responsible for the preparation and oversight of all statements made to consumers regarding the safety of J&J's talc products.

94.     Ullmann, as J&J's General Counsel, oversaw all of the Company's legal matters, including the thousands of lawsuits filed against J&J for its failure to warn consumers of the dangers associated with the use of its talc products.  Ullmann also oversaw and reviewed the collection of the damning internal documents that were eventually produced in pending

litigations; he had direct knowledge of this evidence, which showed that J&J had been aware of the presence of asbestos in its talc products since the 1950s.

95.     Through his membership on the Executive Committee, Fasolo was directly involved in frequent discussions about the presence of asbestos in the Company's talc products. Arguably, no one else at J&J was more centrally involved in the Company's misrepresentations than the members of the Executive Committee.  No one else was better positioned to understand the effect that these misrepresentations were having on J&J's stock price than the members of the Executive Committee, including Fasolo.

96.     Given the longstanding concealment by J&J of the asbestos in its talc, and the circulation of this information throughout the Company, it is far more likely than not that each Defendant knew or should have known that the misrepresentations regarding the presence of asbestos in the Company's talc products.  The truth was concealed from the public, enabled J&J's stock to trade at an artificially high prices, and when the truth finally did emerge, J&J's stock price dropped as that artificial inflation value was wiped away.

97.     Fasolo, as well as the other members of the Committee, had a front row seat as J&J continuously misrepresented the safety of its talc products.  And each Defendant was also a fiduciary of the Plan, charged under ERISA with ensuring the prudence of Plan investments, well aware that the Fund was a popular Plan investment, and also aware that this popular investment had become an imprudent one.  Yet none of them took a single action to protect Plan participants from that imprudent and ultimately harmful investment.

98.     As Plan fiduciaries, Defendants were required to investigate and monitor whether the Fund was a prudent retirement investment and to cause corrective disclosures to be made about J&J.  Notwithstanding these duties, Defendants did nothing to protect the retirement savings

762955.2

of the Plan participants from harm as the result of the artificial inflation of J&J's stock price.

99.     Defendants had the ability to effectuate corrective public disclosures to cure the fraud consistent with the requirements of the federal securities laws to correct the artificial inflation.  Fasolo, as a member of the Executive Committee, was uniquely situated to fix this problem.  He could have tried to cause truthful or corrective disclosures to be made much earlier to cure the Company's misrepresentations and material omissions and to make the Fund a prudent investment again for the Plan.

100.    If Defendants had caused corrective public disclosure near the very beginning of J&J's misrepresentations and material omissions—at the beginning of the Class Period—almost all of the artificial inflation of J&J's stock price that occurred could have been avoided, and virtually no Plan participants who purchased inflated shares of the Fund would have been harmed. But as the concealment went on, more and more Plan participants made purchases at artificially high prices, the harm to Plan participants steadily increased.  As two experts framed the issue:

> If the fraud occurs on one day at the beginning of the class period so that the gap between the value line and the price line appears immediately, the bias will be small because only investors who purchased the securities in the first few days of the class period are affected by the error.  However, if the fraud consists of a series of omissions and misrepresentations so that the gap between the price line and the value line widens slowly, the inflation will be overstated for a much larger group of purchasers.

Bradford Cornell and R. Gregory Morgan, Using Finance Theory to Measure Damages in Fraud on the Market Cases, 37 UCLA L. Rev. 883, 911 (1990) (emphasis added).

101.    Defendants also needed to act to prevent future harm and damage to the Plan's investment in J&J stock.  This position was at risk from a large stock price correction when the public learned the truth and realized that the Company had concealed a fraud.  As time passed, J&J stock price inflated further due to the misrepresentations and material omissions and the size of the scandal grew, making the eventual collapse worse.  The concealment of this critical

information by the Company put the Plan's holding of J&J stock at risk for a serious and lasting decline in value, and hurt management's credibility and the long-term prospects of J&J as an investment.  This significant harm to the Plan could have been prevented or mitigated by timely disclosure.

102.    This reputational damage is not merely theoretical.   Economists and finance experts have conducted numerous empirical studies on the matter, and concluded "the reputational penalty" a company suffers because it perpetrates a prolonged misrepresentation is significantly greater than any regulatory fines or other penalties that it may occur—in fact, the reputational penalty is "7.5 times the sum of all penalties imposed through the legal and regulatory system."  Jonathan M. Karpoff, D. Scott Lee and Gerald S. Martin, *The Cost to Firms of Cooking the Books, Journal of Financial and Quantitative Analysis*, Vol. 43, No. 3 (Sept. 2008). Moreover, "[f]or each dollar that a firm misleadingly inflates its market value, on average, it loses this dollar when its misconduct is revealed, plus an additional $3.08 … [of which] $2.71 is due to lost reputation."  *See id.* (emphasis added).  And this reputational damage, unsurprisingly, increases the longer the misrepresentations and material omissions goes on.  *Id.*

103.    Defendants cannot argue that the federal securities laws prevented them from causing a truthful disclosure to be made.  In this situation, ERISA and the federal securities laws compelled exactly the same action—tell the truth and correct the inflated stock price.  No law or duty required them to conceal or prevent the disclosure of the truth—quite the opposite.

104.    This also means that Defendants knew—or should have known—that disclosure of the asbestos in J&J's talc products was going to happen one way or another.  J&J had spent over 60 years concealing the fact that asbestos was present in its talc products.  The Company sought to influence and manipulate government agencies by withholding all evidence which did

34

not support its misrepresentations that its products were safe.  It was more likely than not that the Company's concealment would soon be discovered, as evidenced by the increasing number of users of its products developing cancer, the increasing number of lawsuits filed by victims, and the increasing number of those cases overcoming motions to dismiss and proceeding on to discovery, which Defendants knew (or should have known).  When the internal documents showing the perpetration of the massive coverup and misrepresentation were made public, the truth would certainly have to be disclosed to the public.  In other words, J&J's misrepresentations about the safety of its talc products were a ticking time bomb.  Eventually, that bomb would go off and the truth would have to be disclosed, bringing the artificial inflation of J&J's stock to a swift and painful end.  If Defendants were really considering that timely disclosures would do Plan participants more harm or good, they should have considered that, given the likelihood of the truth coming out, a stock price correction was unavoidable—the only relevant question for them should have been whether it would be better for Plan participants for the correction to occur sooner or later.  Given the overwhelming evidence and research showing that later disclosure of the truth and correction of artificial inflation increases the risk of a harsher price correction, as well as a slower-than-necessary price recovery, and given the virtual certainty that J&J's concealment was going to be revealed in discovery, Defendants should have recognized that earlier disclosure was by far the less harmful option than the one that they did choose—namely, waiting for the truth to come out on its own.  This decision by Defendants led to a much harsher price correction, and a more sluggish recovery, than was necessary.

105.    Defendants could not have reasonably believed that attempting to effectuate truthful, corrective disclosure would do more harm than good to the Plan or its participants.  First and foremost, the participation of the fiduciaries in the concealment and misrepresentation of

material information from Plan participants runs counter to ERISA's fundamental obligation that fiduciaries must communicate truthfully and accurately with those to whom a fiduciary duty is owed.  At a minimum, Defendants had the fiduciary obligation to cause the truth to be disclosed to correct the artificial inflation of J&J stock and not to perpetuate it.

106.    Truthful disclosure was also needed to prevent worse future harm to the Plan and J&J's stock price.  Defendants may argue that they were concerned that correcting the artificial inflation would temporarily lower the stock price, but that concern should not have deterred disclosing the truth.  Every stock overvaluation in history, when corrected, has resulted in a temporary drop in the stock price; that is an inherent quality of efficient markets.  But here, with disclosure a virtual certainty regardless and an increasing risk of a harsher correction and a slower recovery, Defendants should have disclosed the truth sooner rather than later to minimize the ongoing harm (to prevent further artificial inflation and purchases at excessive prices) as well as worse future damage to J&J's stock price, and, therefore, the retirement savings of Plan participants invested in the Fund.

107.    The longer that J&J's concealment of the truth went on, the more Plan participants bought at artificially inflated prices, and the size of the harm to each purchaser increased over time as the stock price inflated.  As a result, J&J stock had farther to fall when the truth inevitably came out, so that the purchasers were hurt even worse as the result of choosing to invest in the Fund.

108.    The Plan holders of Fund shares suffered greater harm and damage in this same manner from Defendants' failure to end the fraud.  While they held Fund shares over the period of time when the stock price was artificially appreciating in value, they were deceived by the false growth.  They suffered greater losses when J&J's stock price corrected, and fell further due to the

36

loss of management credibility.  They also were deprived of the option of transferring their shares into one of the different, prudent investment alternatives under the Plan, which would have spared them from the greater losses when the stock correction took place. And they are burdened by the outcome of a slower-than-necessary stock-price recovery due to J&J's prolonged misrepresentation of the truth and the reputational harm that it caused.

109.    Additionally, the issuance of a corrective disclosure was arguably required by the federal securities laws, reifying the inevitability of the truth's coming out.  By the very same mechanism that J&J could have used to make corrective disclosures to the general public under the federal securities laws, it could also have made disclosures to Plan participants, because Plan participants are, after all, part of the general public.  Defendants did not have to make a "special" disclosure only to Plan participants, but could simply have caused, through personnel with financial disclosure responsibilities—including some of the Defendants in this case—one corrective public disclosure to be made to the market and thereby simultaneously satisfied their obligations under ERISA and the Company's obligations under the federal securities laws.

110.    And, even if Defendants determined that public disclosure was not required by the securities laws, disclosure was certainly not prohibited by them.  As discussed above, the truth's emergence, and thus J&J's stock price correction, was inevitable.  Thus, Defendants, in weighing harm versus good, should have concluded that even a disclosure not required by the securities laws would, in this case, be less harmful than waiting for the disclosure to happen through some other mechanism—in this case, the public disclosure of J&J's internal documents produced in recent litigation.

111.    Indeed, earlier disclosure by J&J would have affirmatively benefitted the Plan and its participants, as well as mitigated the harm.  With the truth about J&J's fraud and concealment,

Plan participants could properly evaluate the Fund versus their other investment alternatives for their retirement savings.  Plan participants considering new purchases with their contributions could select healthier, prudent investment options available through the Plan which outperformed J&J stock during the Class Period.  And over the long term, the failure to act by the Plan fiduciaries to disclose corporate fraud is likely to have a chilling effect on future purchases of the Fund by Plan participants, because their trust in their employer has likely been eroded by this malfeasance.  Such an effect constitutes a net harm to the Plan.

112.    Millions upon millions of dollars were lost from the retirement accounts of J&J employees.  Defendants, as Plan fiduciaries, are directly responsible for this enormous harm that its breaches of duty caused.

113.    Defendants could have, and should have, disclosed the facts about the presence of asbestos in Johnson & Johnson's talc products as soon as they became aware of them.  However, Defendants failed to make any corrective disclosures, even after it became inevitable that the truth about the presence of asbestos in Johnson & Johnson's talc powder would become public.

114.    On information and belief, Defendants were or should have been aware that Johnson & Johnson's talc powder products contained asbestos. Many of the Committee members were also members of Johnson & Johnson's Executive Committee, which handled matters of the highest importance to Johnson & Johnson, including Defendants Fasolo and Caruso.

115.    By no later than April 13, 2017, it was inevitable that the truth about asbestos in Johnson & Johnson's talc products would become known to the public. As noted above, Johnson & Johnson filed its answer in the MDL regarding personal injury and product liability claims arising out of asbestos in Johnson & Johnson's talc powder. Once Johnson & Johnson's answer had been filed, discovery began, and the large number of Johnson & Johnson's previously secret

38

internal documents demonstrating the presence of asbestos in the talc powder and efforts to conceal that information would become public.

116.    For example, Dr. Joanne Waldstreicher, J&J's longtime chief medical officer, was deposed during discovery in the MDL in April of 2018. During her deposition, Dr. Waldstreicher was examined about recently-unsealed documents that discussed the presence of asbestos in its talc-related products.

117.    Despite their knowledge of Johnson & Johnson's false representations and concealment of asbestos in its talc powder, the inflation of Johnson & Johnson's stock price, and the inevitability of the disclosure of the truth once discovery began in the MDL, Defendants took no action to protect the Plans from further harm by disclosing the truth to the public.

118.    A proper disclosure could have, and should have, been made in the regular course of Johnson & Johnson's securities filings.  Indeed, Johnson & Johnson used its securities filings repeatedly during the Class Period to perpetrate false statements about the absence of asbestos in its talc-related products.  Those statements are currently the subject of pending claims for violations of the federal securities laws.

119.    Defendants' failures to make corrective disclosures caused numerous participants in the Plans to continue making purchases of Johnson & Johnson stock despite the fact that the price of the stock was artificially inflated. Moreover, Defendants' failure to make corrective disclosure compounded and magnified the reputational harm that Johnson & Johnson has suffered and will continue to suffer as the truth about the asbestos in its talc powder becomes public.

120.    Making a corrective disclosure once it became inevitable that the public would learn about the asbestos in the talc powder was an alternative action that the Defendants could have taken that would have been entirely consistent with the securities laws and which no prudent

fiduciary could have viewed as more likely to harm the Plan than to help it.

121.    Nor are the corrective disclosures at issue here merely a matter of hindsight. It would have been obvious to any prudent and loyalty fiduciary no later than April of 2017 that corrective disclosure would have benefitted the Plans. As the Second Circuit has explained, "[a] reasonable business executive could plausibly foresee that the inevitable disclosure of longstanding corporate fraud would reflect badly on the company and undermine faith in its future pronouncements." *Jander v. Ret. Plans Comm. of IBM*, 910 F.3d 620, 629 (2d Cir. 2018).

122.    Many economists and financial analysts have concluded that corporate misrepresentation and concealment of material facts has significant reputational consequences that translate into concrete economic harm. For example, reputational penalties have been found to include "a loss of sales by a firm that engages in consumer fraud… and increases in the rate of return required by investors when a firm issues vague or misleading financial statements." Deborah L. Murphy, Ronald E. Shrieves & Samuel L. Tibbs, *Understanding the Penalties Associated with Corporate Misconduct: An Empirical Examination of Earnings and Risk*, Journal of Financial and Quantitative Analysis, Vol. 44, No. 1 (Feb. 2009). Moreover, studies have shown "a significant negative average abnormal stock price reaction (loss in firm value) when allegations of corporate misconduct are announced." *Id. See also* Jonathan M. Karpoff, D. Scott Lee and Gerald S. Martin, *The Cost to Firms of Cooking the Books*, Journal of Financial and Quantitative Analysis, Vol. 43, No. 3 (Sept. 2008). Indeed, the longer the misleading corporate conduct lasts, the greater the reputational harm will likely be.

123.    In Johnson & Johnson's case, the reputational harm from the news stories about asbestos has been real and dramatic. For example, analysts noted that the Reuters report would cause "significant damage… for J&J's valuable brand name" and that "the brand name an

accompanying trust are critical" for Johnson & Johnson's success. *See* Ciara Linnane, *Johnson & Johnson's Stock Slammed After Report it Knew of Asbestos in Baby Powder*, Marketwatch.com (Dec. 14, 2018), available at https://www.marketwatch.com/story/johnson-johnson-stock-slammed-by-report-it-knew-of-asbestos-in-baby-powder-2018-12-14.

### DEFENDANTS' FIDUCIARY STATUS UNDER ERISA

124.    ERISA requires that every plan identify "one or more" "named fiduciaries" with general responsibility for administering the plan. ERISA § 402(a)(1).

125.    According to its charter the purpose of Johnson & Johnson's Pension and Benefits Committee (the "Committee") was, *inter alia*, to oversee and manage "the various pension, long-term incentive, savings, health and welfare plans that cover the Company's employees." Also by virtue of its charter, the Committee was always made up of at least three members of Johnson & Johnson's Board of Directors.

126.    The Committee was a named fiduciary of the Plan during the Class Period, with general authority to carry out essentially all fiduciary functions for the Plans.

127.    Defendants Fasolo, Caruso and Doe Defendants 1-20 were the members of the Committee responsible for exercising that primary fiduciary authority.

128.    ERISA also defines fiduciary status so that anyone is a fiduciary "to the extent" they in fact perform a fiduciary function. ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus in addition to expressly designated fiduciaries, anyone is a fiduciary "to the extent" he "exercises any discretionary authority or discretionary control respecting management of such plan" or "exercises any authority or control respecting management or disposition of its assets" or "has any discretionary authority or discretionary responsibility in the administration of such plan." *Id.*

129.    As this Court has previously recognized, "[t]he definition of 'fiduciary' under

ERISA has a functional component—a fiduciary's status is determined by the actual 'control and authority' that he or she exercises with respect to the Plan." *In re Schering-Plough Erisa Litig.*, 2010 WL 2667414, at *9 (D.N.J. June 29, 2010).

130.    Here, the Individual Defendants exercised control and authority over the Plan as members of the Committee.

131.    In the Third Circuit, an employer whose employees act as named fiduciaries for a Plan can be liable under a theory of respondeat superior. *McMahon v. McDowell*, 794 F.2d 100, 109 (3d Cir. 1986) ("[I]f a beneficiary or participant can show that the plan fiduciaries breached their duties, he may also be able to recover damages, for the benefit of the plan, directly from the employer.").

132.    Here, the Individual Defendants' breaches of fiduciary duty occurred during the course and scope of their employment with Johnson & Johnson. Indeed, the Individual Defendants' failure to make corrective disclosures was a crucial part of Johnson & Johnson's strategy with respect to asbestos in its talc powder. Thus Johnson & Johnson knowingly participated, an encouraged, the Individual Defendants' fiduciary breaches in this case. Johnson & Johnson thus shares liability for the Individual Defendants' fiduciary breaches in this case.

### ERISA'S FIDUCIARY DUTIES

133.    ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

42

134.    "[T]he duties charged to an ERISA fiduciary are 'the highest known to the law.'"
*Solis v. Koresko*, 884 F. Supp. 2d 261, 292 (E.D. Pa. 2012), *aff'd sub nom. Sec'y U.S. Dep't of
Labor v. Koresko*, 646 F. App'x 230 (3d Cir. 2016) *(citing Donovan v. Bierwirth*, 680 F.2d 263,
272 n. 8 (2d Cir.1982)) (describing ERISA fiduciary duties as "the highest known to the law").

135.    These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the
duties of loyalty, exclusive purpose and prudence. They entail, among other things:

> (a) The duty to conduct an independent and thorough investigation into, and to
> continually monitor, the merits of all the investment alternatives of a plan;
>
> (b) The duty to avoid conflicts of interest and to resolve them promptly when they
> occur. A fiduciary must always administer a plan with an "eye single" to the
> interests of the participants and beneficiaries, regardless of the interests of the
> fiduciaries themselves or the plan sponsor; and
>
> (c) The duty to disclose and inform, which encompasses: (1) a negative duty not to
> misinform; (2) an affirmative duty to inform when the fiduciary knows or
> should know that silence might be harmful; and (3) a duty to convey complete
> and accurate information material to the circumstances of participants and
> beneficiaries.

136.    According to Department of Labor ("DOL") regulations and case law interpreting
these statutory provisions, in order to comply with the prudence requirement under ERISA
§404(a), a fiduciary must show that: (a) he has given appropriate consideration to those facts and
circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or
should know are relevant to the particular investment or investment course of action involved,
including the role the investment or investment course of action plays in that portion of the plan's

investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

137.    Even though a plan may be designed, or even required, to hold stock of the plan's sponsor as an investment option, such as an employee stock ownership plan (an "ESOP"), plan fiduciaries are nevertheless subject to all of the ordinary fiduciary duties apart from the duty to diversify. As the Supreme Court explained, "because ESOP fiduciaries are ERISA fiduciaries and because § 1104(a)(1)(B)'s duty of prudence applies to all ERISA fiduciaries, ESOP fiduciaries are subject to the duty of prudence just as other ERISA fiduciaries are." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014). The Supreme Court held that these fiduciary duties trump even the instructions of the plan document: "the duty of prudence trumps the instructions of a plan document, such as an instruction to invest exclusively in employer stock even if financial goals demand the contrary." *Id.* at 2468.

138.    ERISA § 405 renders plan fiduciaries liable for the breaches of other fiduciaries under certain circumstances, such as when a fiduciary knowingly participates in or conceals the breach of another fiduciary, if the fiduciary's own breach enables the breach by the other fiduciary, or if the fiduciary is aware of the other fiduciary's breach yet makes no reasonable effort to correct the breach.

## CLASS ACTION ALLEGATIONS

139.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(1) and (b)(3) on behalf of a class of persons similarly situated (the "Class"):

> All participants in or beneficiaries the Plans who purchased or held Johnson & Johnson stock through their accounts in the Plans during the Class Period, excluding Defendants and the Court or any employees of the Court.

44

140.    As used herein, the term "Class Period" means the time beginning not later than April 11, 2017 (or such earlier date that disclosure of the truth about asbestos in Johnson & Johnson's talc powder products became inevitable) until December 14, 2018.

141.    Excluded from the Class are Defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

142.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

143.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

144.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and ERISA litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

145.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- Whether Defendants had actual or constructive knowledge that Johnson & Johnson's stock price was artificially inflated during the Class Period;

- Whether disclosure that Johnson & Johnson's talc products was inevitable during the Class Period;

- Whether Defendants had the authority to make corrective disclosure for Johnson & Johnson regarding asbestos in the talc powder;

- Whether Defendants' failure to make corrective disclosure regarding asbestos in the talc powder once disclosure of those facts became inevitable caused Plaintiffs and the Plans to overpay for Johnson & Johnson stock during the Class Period; and

- Whether Defendants' failure to make corrective disclosure regarding asbestos in the talc powder once disclosure of those facts became inevitable caused additional declines to the value of the Johnson & Johnson stock held by Plaintiffs and the Plans as a result of the delayed disclosure.

146.    There are no substantial individual questions among Class members on the merits of this action.

147.    Plaintiffs' claims are typical of the members of the Class.

148.    Plaintiffs have been injured by the alleged breaches of fiduciary duties and are committed to fairly, adequately and vigorously representing and protecting the interests of Class members.

149.    Plaintiffs have retained counsel who are experienced in class action litigation in general and who have significant experience successfully representing ERISA plan participants in claims related to ERISA's fiduciary duties.

150.    Neither Plaintiffs, nor their counsel, have any interests that would cause them to refrain from vigorously pursuing this action.

151.     Plaintiffs are adequate class representatives.

152.     Class certification of Plaintiffs' claims is appropriate pursuant to Fed. R. Civ. P. 23(b)(1) because the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Defendants, and/or because adjudications with respect to individual Class members would as a practical matter be dispositive of the interests of non-party Class members.

153.     In the alternative, class certification is also appropriate under Fed. R. Civ. Pro. 23(b)(3) because common issues of law and fact predominate over questions affecting only individual members of the Class and because a class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

154.     There will be no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I
### Breach of Fiduciary Duty
### ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1)
### All Defendants

155.     Plaintiffs repeat and reallege each of the allegations in the foregoing paragraphs as if fully set forth herein.

156.     ERISA § 404, 29 U.S.C. §1104, requires ERISA fiduciaries to perform their fiduciary duties and responsibilities prudently, as would an experienced ERISA fiduciary, and loyally, exclusively in the interest of the plan and its participants for the purpose of providing benefits.

157.     As alleged above, the Individual Defendants were express fiduciaries for the Plans.

47

158.    The Individual Defendants were actually or constructively aware that the J&J stock in the Plans was artificially inflated in value, and were or should have been aware that disclosure of the truth about asbestos in the talc powder was inevitable. The Individual Defendants, as the Plans' fiduciaries, could, and should, have acted to protect the Plans, including making corrective disclosure publicly admitting the existence of asbestos in Johnson & Johnson's talc powder.

159.    But the Individual Defendants did not take action to protect the Plans. The Individual Defendants failed to make any corrective disclosure, and in the interim Plaintiffs and the Class Members continued to acquire and hold Johnson & Johnson stock at an inflated price. The Individual Defendants failure to make any corrective disclosure have compounded the reputational and goodwill harm that Plaintiffs and the Class Members have suffered and will suffer as the truth about asbestos in Johnson & Johnson's talc powder becomes known to the public.

160.    The Individual Defendants failure to make a corrective disclosure once disclosure of the truth about asbestos in Johnson & Johnson's talc powder became inevitable violated the Individual Defendants' duties of prudence and loyalty under ERISA § 404(a).

161.    Johnson & Johnson knew about, and encouraged, Individual Defendants' failure to make appropriate corrective disclosures regarding asbestos in its talc powder. Indeed, silence about and concealment of asbestos in the talc powder were part a Johnson & Johnson's corporate strategy. Thus the Individual Defendants' failure to make corrective disclosures were taken within the course and scope of their employment with Johnson & Johnson, and Johnson & Johnson knowingly participated in the Individual Defendants' fiduciary breaches.

162.    These actions, and failures to act, violated the duties of prudence and loyalty contained in ERISA § 404(a).

762955.2

163.   Under ERISA § 409(a), 29 U.S.C. § 1109(a), a fiduciary that violates any of ERISA's duties, including ERISA § 404(a), must "make good" to the plan the losses to the plan resulting from its violations, and is "subject to such other equitable or remedial relief as the court may deem appropriate."

164.   Thus under ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a), Defendants are liable, in an amount to be determined at trial, for the losses to the Plan caused by their violations of ERISA § 404(a), and are "subject to such other equitable or remedial relief" as the Court "may deem appropriate."

165.   Under ERISA § 502(a)(3), Defendants are also subject to appropriate equitable relief including, but not limited to, constructive trust and equitable surcharge.

**COUNT II**
**Breach of Co-Fiduciary Duty**
**ERISA § 405(a)(1)-(3), 29 U.S.C. § 1105(a)(1)-(3)**
**All Defendants**

166.   Plaintiffs repeat and reallege each of the allegations in the foregoing paragraphs as if fully set forth herein.

167.   A fiduciary with respect to a plan liable for the breach "of another fiduciary" for the same plan if "he participates knowingly in, or knowingly undertakes to conceal, an act or omissions of such other fiduciary, knowing such act or omission is a breach," ERISA § 405(a)(1), or if, "by his failure to comply with [his fiduciary duties] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach," ERISA § 405(a)(2), or if "he has knowledge of a breach by some other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach." ERISA § 405(a)(3).

168.     Pursuant to § 405 of ERISA, 29 U.S.C. § 1105, Defendants are also liable as co-fiduciaries with respect to the above-described violations because they participated knowingly in their co-fiduciaries' breaches; enabled other fiduciaries to violate ERISA by virtue of their own breaches of fiduciary duty; knowingly undertook to conceal those breaches; enabled their co-fiduciaries to commit the breaches and failed to make any reasonable efforts to remedy the breaches.

169.     ERISA § 502(a)(2) permits plan participants, such as Plaintiffs, to bring civil actions for "appropriate relief" under ERISA § 409.

170.     Under ERISA § 409(a), a fiduciary that violates any of ERISA's duties, including ERISA § 405(a)(1), (a)(2) and (a)(3), must "make good" to the Plans the losses to the Plans resulting from its violations of ERISA § 405(a)(1), (a)(2) and (a)(3), and is "subject to such other equitable or remedial relief as the court may deem appropriate."

171.     Thus Defendants are liable, in an amount to be determined at trial, for the losses to the ESOP caused by their violations of ERISA § 405(a)(1), (a)(2) and (a)(3), and are "subject to such other equitable or remedial relief" as the Court "may deem appropriate."

172.     Under ERISA § 502(a)(3), Defendants are also subject to appropriate equitable relief including, but not limited to, constructive trust and equitable surcharge.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.     Determine that the instant action may be maintained as a class action under Rule 23, Federal Rules of Civil Procedure, appointing Plaintiffs as class representatives, and determining that Plaintiffs' counsel satisfies the prerequisites of Rule 23(g);

B.     Declare that Defendants breached their ERISA fiduciary duties to the Plans;

762955.2

C.      Enjoin Defendants from further violations of their fiduciary responsibilities, obligations, and duties and from further engaging in transactions prohibited by ERISA;

D.      Order that Defendants make good to the Plans the losses resulting from their serial breaches of fiduciary duty;

E.      Order that Defendants disgorge any profits that they have made through their breaches of fiduciary duty and prohibited transactions and impose a constructive trust and/or equitable lien on any funds received by Defendants therefrom;

F.      Order any other available equitable relief, or remedies, including but not limited to, the imposition of a surcharge, the restoration of the Plans to the position they would have been but for the breaches of fiduciary duty and self-dealing; and any other kind of relief and/or damages available pursuant to ERISA §§ 409 and 502(a)(2) and (3);

G.      Award Plaintiffs' reasonable attorneys' fees and costs of suit incurred herein pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or for the benefit obtained for the Plans;

H.      Order Defendants to pay prejudgment interest; and

I.      Award such other and further relief as the Court deems equitable and just.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury in this action of all issues so triable.


**LITE DEPALMA GREENBERG, LLC**

Dated: July 19, 2019                     _/s/ Joseph J. DePalma_
                                          Joseph J. DePalma
                                          570 Broad Street, Suite 1201
                                          Newark, New Jersey 07102
                                          Telephone: (973) 623-3000
                                          Facsimile: (973) 623-0858
                                          jdepalma@litedepalma.com

**SCHNEIDER WALLACE COTTRELL KONECKY WOTKYNS LLP**
Todd Schneider*
James A. Bloom*
Kyle G. Bates*
2000 Powell Street, Ste. 1400
Emeryville, California 94608
Telephone: (415) 421-7100
tschneider@schneiderwallace.com
jbloom@schneiderwallace.com
kbates@schneiderwallace.com

**SCHNEIDER WALLACE COTTRELL KONECKY WOTKYNS LLP**
Garrett W. Wotkyns*
8501 North Scottsdale Road, Suite 270
Scottsdale, Arizona 85253
Telephone: (480) 428-0141
gwotkyns@schneiderwallace.com

**ZAMANSKY LLC**
Samuel E. Bonderoff*
Jacob H. Zamansky*
James Ostaszewski*
50 Broadway, 32nd Floor
New York, NY 10004
Telephone:    (212) 742-1414
samuel@zamansky.com

*_Pro Hac Vice_ application forthcoming

_**Attorneys for Plaintiffs**_

## LOCAL CIVIL RULE 11.2 CERTIFICATION

Pursuant to Local Civil Rule 11.2, I hereby certify that the matter in controversy is

related to the following civil action:

- *Frank Hall v. Johnson & Johnson, Alex Gorsky, and Dominic J. Caruso*
  (3:18-cv-01833-FLW-TJB)

I hereby certify that the following statements made by me are true. I am aware that if any

of the foregoing statements made by me are willfully false, I am subject to punishment.

**LITE DEPALMA GREENBERG, LLC**

Dated: July 19, 2019          */s/ Joseph J. DePalma*
Joseph J. DePalma
570 Broad Street, Suite 1201
Newark, New Jersey 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
jdepalma@litedepalma.com

**SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP**
Todd Schneider*
James A. Bloom*
Kyle G. Bates*
2000 Powell Street, Ste. 1400
Emeryville, California 94608
Telephone: (415) 421-7100
tschneider@schneiderwallace.com
jbloom@schneiderwallace.com
kbates@schneiderwallace.com

**SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP**
Garrett W. Wotkyns*
8501 North Scottsdale Road, Suite 270
Scottsdale, Arizona 85253
Telephone: (480) 428-0141
gwotkyns@schneiderwallace.com

*Pro Hac Vice application forthcoming*

***Attorneys for Plaintiffs***