**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | |
| MICHAEL PERRONE, TOM TARANTINO, | : | |
| and ROCHELLE ROSEN | : | |
| | : | Civil Action No.: 19-00923 (FLW) |
| Plaintiff, | : | |
| | : | **OPINION** |
| vs. | : | |
| | : | |
| JOHNSON & JOHNSON, *et al*., | : | |
| | : | |
| Defendants. | : | |
| | : | |

**WOLFSON, Chief Judge:**

Presently before the Court is a motion by defendants Johnson & Johnson ("J&J" or the "Company"), Peter Fasolo ("Fasolo"), and Dominic Caruso ("Caruso") (collectively, "Defendants"), to dismiss Plaintiffs Michael Perrone, Tom Tarantino, and Rochelle Rosen (collectively, "Plaintiffs") consolidated Class Action Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6).[1]  In this class action, Plaintiffs, who are all participants in the Johnson & Johnson Savings Plan, allege that Defendants breached their fiduciary duties to participants in two J&J sponsored employee benefit plans – the Johnson & Johnson Savings Plan for Union Represented Employees and the Johnson & Johnson Retirement Savings Plan (collectively, the "Plans") – in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"). Plaintiffs assert that J&J's senior leadership, including Fasolo and Caruso (the "Individual

---

[1]     On June 20, 2019, this Court consolidated two pending lawsuits, *Michael Perrone v. Johnson & Johnson*, et al., No. 3:1 9-cv-00923-FLW-TJB and *Tom Tarantino, et al v. Johnson and Johnson Pension and Benefits Committee*, et al., No. 3:19-cv-0l 1 15-FLW-TJB, and directed Plaintiffs to file a consolidated Class Action Complaint, which was docketed on July 17, 2019. *See* ECF Nos. 17, 25.

Defendants") have been aware for decades that J&J's talc-based products, including J&J's Baby Powder, contain asbestos, and that they have concealed that information from investors, resulting in an artificial inflation of the value of the Company's stock.  Plaintiffs allege Defendants breached their fiduciary duties of loyalty and prudence by investing in J&J stock on behalf of the Plans, when they knew or should have known that J&J's stock price was artificially inflated.  In the instant matter, Defendants move to dismiss the Complaint on the bases that Plaintiffs have not adequately alleged that the Individual Defendants breached their fiduciary duties, and further, that J&J is not a fiduciary of the Plans, and thus, not subject to liability under the ERISA statute. Defendants also seek to strike Plaintiffs' jury demand.

For the reasons set forth below, Defendant's motion is **GRANTED.**  Plaintiffs' claims are dismissed without prejudice with the right to file an amended complaint within 45 days.

## I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The following allegations are taken from the Consolidated Class Action Complaint ("Compl.") and assumed true for purposes of this motion to dismiss.

### A.   Defendants

J&J is a global healthcare company engaged in the development, manufacturing, and sale of a broad range of healthcare products.  Compl. ¶¶7, 26.  J&J has three business segments: Pharmaceutical, Medical Device, and Consumer, which are overseen by the Company's Executive Committee.  *Id.* at ¶¶33-34.[2]  The Executive Committee "is the principle management group responsible for the strategic operations of the Company" and its members are as follows: the two Individual Defendants, Caruso (through his retirement in July 2018) and Fasolo, as well as the

---

[2]    One of the products produced by the Consumer segment is Johnson and Johnson's Baby Powder, which is made of talc and is purportedly the Company's flagship product.  Compl. ¶¶33,35.

2

Company's CEO, Alex Gorsky ("Gorsky"); Vice-Chairman Joaquin Duato ("Duato"), who is responsible for the Company's Consumer and Pharmaceutical segments; Jorge Mesquita ("Mesquita"), an Executive Vice-President and Worldwide Chairman of the Consumer sector; Vice Chairman Paul Stoffels, M.D. ("Stoffels"), the Chief Scientific Officer; Michael Sneed ("Sneed"), the Executive Vice-President of Global Corporate Affairs and Chief Communications Officer; J&J's General Counsel Michael H. Ullmann ("Ullmann"); and Joseph Wolk ("Wolk"), J&J's current- CFO since July 2018. *Id*. at ¶¶27,34.

In addition to being members of the Executive Committee, the Individual Defendants were, at the times relevant to the Complaint, both senior J&J executives, and members of the J&J Pension & Benefits Committee. *Id*. at ¶¶7, 27-29. Caruso was J&J's Chief Financial Officer from 2007 until his retirement in September 2018. *Id*. at ¶28. Fasolo is currently the Company's Executive Vice President and the Company's Chief Human Resource Officer. *Id*. ¶27.

### B. The Plans

J&J offers its employees the opportunity to participate in the Plans, which are both defined contribution retirement savings plans.[3] *Id*. at ¶3. Plan participants can choose various investment options, including an Employee Stock Ownership Plan ("ESOP"), where the employee's contributions are invested in J&J common stock.[4] *Id*. at ¶5. The named fiduciary of the Plans is the J&J Pension & Benefits Committee (the "PBC"), which is comprised of a group of J&J employees including the Individual Defendants. *Id*. at ¶¶1, 27-29, 126-127. Plaintiffs allege that

---

[3]    In defined contribution plans, employees' benefits at retirement "are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1825 (2015).

[4]    An ESOP is an employee retirement benefit plan in which the employees primarily invest in securities issued by the employer. 29 U.S.C. § 1107(d)(6).

the Individual Defendants, members of the PBC, exercised actual control and authority over the Plans. *Id.* at ¶130.

### C.   Defendant's Alleged Misconduct and the Inflation of Company Stock

Plaintiffs allege that J&J has known for decades that its talc products contained asbestos and the Company has gone to great lengths to conceal this information from government regulators and consumers. *Id.* at ¶37. Plaintiffs assert that the Company's decades-long deception was only uncovered as a result of discovery during recent asbestos-related ovarian cancer litigation, when J&J was ordered to produce internal company documents which purportedly established that the Company has known of the dangerous nature of its talc-based products since as early as 1957. *Id.* at ¶¶37-38.

On December 14, 2018, Reuters published an article entitled "Special Report: Johnson & Johnson knew for decades that asbestos lurked in its Baby Powder" (the "Reuters Article"), which examined the internal company documents, and outlined the Company's alleged knowledge of asbestos in its talc and the ensuing cover-up. *Id.* at ¶¶39, 87.

### i.   The Company's Alleged Historical Knowledge of Asbestos in the Talc Products

The internal documents reviewed by Reuters revealed that the Company was aware of "tainted J&J talc" as early as 1957, and lab reports from that era mentioned the presence of "fibrous and 'acicular,' or needle-like, tremolite" in J&J's talc supply. *Id.* Plaintiffs claim that tremolite is a mineral that is classified as asbestos. *Id.* Furthermore, Plaintiffs allege that in 2002 and 2003, tremolite asbestos fibers were discovered in the talc mine where J&J obtains talc for use in the Company's Canadian Baby Powder. *Id.* at ¶47.

Plaintiffs further allege that a November 1967 memo written by William Ashton ("Ashton"), then a J&J executive in charge of the Company's talc, discussed the presence of

tremolite in a new talc mine the Company had opened.  *Id*. at ¶40.  Two years later, in 1969, Ashton allegedly penned a memo suggesting that J&J rethink its approach to talc, writing "[h]istorically, in our Company, [t]remolite has been bad … How bad is [t]remolite medically, and how much of it can safely be in a talc base we might develop?"  In response, J&J's founder's son, Robert Wood Johnson II, then-retired CEO, allegedly expressed "concern over the possibility of the adverse effects on the lungs of babies or mothers."  *Id*.

According to Plaintiffs' allegations, the concern about talc in asbestos was not solely an internal one; it was also the subject of public discussion.  In 1971, after receiving reports that "two unidentified brands of cosmetic talc appeared to contain asbestos," the U.S. Food and Drug Administration ("FDA") allegedly opened an inquiry into the presence of asbestos in talc-based products.  *Id*. at  ¶41.  In response to the FDA's inquiry, J&J issued a public statement, defending its products: "Our fifty years of research knowledge in this area indicates that there is no asbestos contained in the powder manufactured by [J&J]."  *Id*.  However, shortly after the Company's public statement, a researcher at Mount Sinai informed J&J by letter that his team had found "relatively small" amounts of asbestos in J&J's Baby Powder.  *Id*.

J&J also allegedly made efforts to control the FDA's research and regulation of talc-based products.  *Id*. at ¶¶42, 43, 44.  In July 1971, scientists convened in Washington to assist the FDA in investigating the presence of asbestos in talc products.  *Id*. at ¶42.  Both the FDA's and J&J's records memorializing the meetings allegedly indicated that J&J's talc contained asbestos; the FDA described it at levels "less than 1%" while J&J called it "trace amounts."  *Id*.  As the FDA continued its investigation, J&J began sending samples of its talc to private and university labs.  *Id*.  Although the test results from those labs allegedly showed that some samples tested positive for asbestos, those findings were supposedly omitted from J&J's final report to the FDA; instead,

J&J reported that "the 'results clearly show' the samples tested 'contain no chrysotile asbestos.'" *Id*. Later, in 1973, the FDA proposed a rule limiting the amount of legally permissible asbestos in talc to .1%. *Id*. at ¶44. Internal Company documents allegedly recognized that the Company "may have problems" meeting the FDA's proposed standard, depending on the type of testing method the FDA intended to utilize. *Id*. Accordingly, J&J allegedly sought to persuade the FDA that "self-policing in the industry was a better solution than government regulation." *Id*. In support of its efforts, J&J, after testing samples over a 10-month period, purportedly provided the FDA with lab results showing that its talc contained no asbestos. *Id*. However, Plaintiffs allege that J&J omitted contradictory findings from independent laboratories. *Id*. Eventually, the FDA abandoned its efforts to regulate the asbestos levels in talc. *Id*.

In 1975, an internal J&J memo purportedly recognized the Company's attempts at controlling the scientific narrative regarding the safety of talc. *Id*. at ¶48. The memo explained that the Company's "current posture with respect to the sponsorship of talc safety studies has been to initiate studies on (sic) as dictated by confrontation. This philosophy, so far, has allowed us to neutralize or hold in check data already generated by investigators to question the safety of talc … we minimize the risk of possible self-generation of scientific data which may be politically or scientifically embarrassing." *Id*.

In December 2018, after the Reuters' Article revealed the Company's alleged history of actively hiding the presence of asbestos in its talc powder from the public, J&J's stock price declined more than 10%. *Id*. at ¶¶12-13, 87-88. Plaintiffs allege that the 10% decline corresponded to a loss of $30 billion of Johnson & Johnson's market capitalization, and was more than the potential liability J&J likely faces in lawsuits alleging personal injuries linked to asbestos in talc products, and more than the expected decline in sales of talc products as the public becomes

aware of the serious health risks associated with exposure to the asbestos in J&J's talc-based products. *Id*. at ¶¶13-14.

### ii.   The Allegedly False and Misleading Statements and Omissions in the Company's SEC Filings

Plaintiffs allege that both before and after the release of the December 2018 Reuters Article, J&J issued various false and misleading statements aimed at continuing its decades long misinformation campaign about the safety of its talc-based products. *Id*. at ¶¶51-83. To that end, J&J allegedly made materially false and misleading statements about the purported safety of talc products across more than 10 publicly-filed documents, including the Company's 2012, 2013, 2014, 2015, and 2016 annual reports on Form 10-Ks filed with the SEC, as well as public statements to news outlets and on its own website. *Id*. For example, in its 2012 Form 10-K filing, the Company purportedly avowed, "[r]esearch activities represent a significant part of the Company's businesses. Research and development expenditures relate to the processes of discovering, testing and developing new products, improving existing products, as well as demonstrating product efficacy and regulatory compliance prior to launch. The Company remains committed to investing in research and development with the aim of delivering high quality and innovative products…." *Id*. at ¶53. In an exhibit to the 2012 Form 10-K, J&J also addressed the product liability cases pending against the company, stating "[c]ertain subsidiaries of [J&J] are involved in numerous product liability cases. The damages claimed are substantial, and while these subsidiaries are confident of the adequacy of the warnings and instructions for use that accompany the products at issue, it is not feasible to predict the ultimate outcome of litigation." *Id*. at ¶56. The Company made identical statements in its 2013, 2014, 2015, and 2016 Form 10-Ks. *Id*. at ¶¶59, 66, 69, 72, 75, 80, 82.

The Company's 2016 Form 10-K provided additional information on the product liability cases, explaining that the "Company ha[d] established accruals for product liability claims and lawsuits in compliance with ASC 450-20 based on currently available information, which in some cases may be limited. The Company accrues an estimate of the legal defense costs needed to defend each matter when those costs are probable and can be reasonably estimated." *Id*. at ¶82.

In addition to the statements in its SEC filings, the Company also issued other public statements regarding the safety of its talc products. For example, on December 30, 2016, J&J published a statement emphasizing the safety and effectiveness of talc, declaring:

> We continue to use talc in our products because decades of science have reaffirmed its safety. Because of its safety and effectiveness, we confidently include pharmaceutical grade talc in our products. Your trust in our products and your confidence using them every day is a huge responsibility—that's why we only use ingredients in our products deemed safe by the latest science. Science, research, clinical evidence and 30 years of studies by medical experts around the world continue to support the safety of cosmetic talc.

*Id*. at ¶76. On September 21, 2017, Ernie Knewitz, a spokesman for J&J, said in an emailed-statement to the news outlet, Bloomberg: "We are confident that our talc products are, and always have been, free of asbestos, based on decades of monitoring, testing and regulation . . . . Historical testing of samples by the FDA, numerous independent laboratories, and numerous independent scientists have all confirmed the absence of asbestos in our talc products." *Id*. at ¶83. On November 16, 2017, Reuters published an article titled, "Johnson & Johnson wins California lawsuit claiming asbestos in talc caused cancer," wherein a J&J spokesperson was quoted stating, that "Johnson's Baby Powder has been around since 1894 and it does not contain asbestos or cause mesothelioma or ovarian cancer." *Id*. at ¶84.

In January 2019, the Company issued another statement on its website, "[o]ur talc is carefully selected, processed and tested to ensure that is asbestos free, as confirmed by regular

testing conducted since the 1970s. Our confidence in using talc is based on a long history of safe use and more than 30 years of research by independent researchers, scientific review boards and global regulatory authorities." *Id*. at ¶85.

Plaintiffs allege that because the Individual Defendants were on the Executive Committee, they knew or should have known that J&J's talc products contained asbestos and caused cancer, and they could have "effectuate[d] corrective public disclosures to cure the fraud" prior to the publication of the Reuters Article in December 2018. *Id*. ¶¶89-99. Plaintiffs allege that if Defendants had made a truthful and timely disclosure of the facts revealed in the Reuters Article, prior to its release, Plaintiffs would have avoided the harm imposed by the stock losses which followed the Reuters Article. *Id*. at ¶¶110-111.

### D.  This Consolidated Class Action

In July 2019, Plaintiffs filed the instant Complaint, on behalf of all participants or beneficiaries who purchased or held J&J stock through their accounts in the Plans between April 11, 2017 and December 14, 2018 (the "Class Period"). Plaintiffs allege breaches of the duties of prudence and loyalty[5] pursuant to Section 404(a) of ERISA (Count 1), and breaches of fiduciary duty committed by co-fiduciaries under Section 405(a)(1)-(3) of ERISA (Count 2). *See* ECF. No. 25.

Subsequently, Defendants filed the instant motion to dismiss, arguing that Plaintiffs have failed to state a claim under ERISA because 1) Defendants could not have issued the corrective disclosures that the Complaint alleges as an alternative action; 2) even if Defendants could have

---

[5]     Although the Complaint purportedly alleges breaches of both the duties of loyalty and prudence, the substance of Plaintiffs' claims solely involves the prudence of continued investment in J&J common stock.

issued those disclosures, doing so would have caused the Plans more harm than good; 3)  J&J is not a fiduciary to the Plans and cannot be held liable under ERISA;  and 4) Plaintiffs' co-fiduciary claim is derivative and conclusory.  Defendants also seek to strike Plaintiffs' jury demand, contending that there is no right to a jury trial under ERISA. Plaintiffs oppose the motion.

## II.  **LEGAL STANDARD**

Under Fed. R. Civ. P. 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quotations omitted).  Under such a standard, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "[A] complaint must do more than allege the plaintiff's entitlement to relief.  A complaint has to 'show' such an entitlement with its facts."  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

However, Rule 12(b)(6) only requires a "short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Twombly*, 550 U.S. at 555.  The complaint must include "enough factual matter (taken as true) to suggest the required element.  This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element."  *Phillips*,

515 F.3d at 234 (citation and quotations omitted); *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) ("[A] claimant does not have to set out in detail the facts upon which he bases his claim. The pleading standard is not akin to a probability requirement; to survive a motion to dismiss, a complaint merely has to state a plausible claim for relief." (citation and quotations omitted)).

In sum, under the current pleading regime, when a court considers a dismissal motion, three sequential steps must be taken: first, "it must take note of the elements the plaintiff must plead to state a claim." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quotations omitted). Next, the court "should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* (quotations omitted). Lastly, "when there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* (quotations and brackets omitted).

## III. ANALYSIS

### A. The Plans' Fiduciaries

As an initial matter, the Court must determine whether J&J is a fiduciary of the Plans. *See Pegram v. Herdrich*, 530 U.S. 211, 226 (2000) (explaining that in "every case charging breach of ERISA fiduciary duty ... the threshold question is ... whether [the defendant] was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint."). ERISA requires every plan to identify at least one "named fiduciary" with the responsibility for plan administration. *See* 29 U.S.C. § 1102(a)(1). A "named fiduciary" is defined as: "fiduciary who is named in the plan instrument, or who, pursuant to a procedure specified in the plan, is identified as a fiduciary (A) by a person who is an employer or employee organization

11

with respect to the plan or (B) by such an employer and such an employee organization acting

jointly." 29 U.S.C. § 1102(a)(2).

Additionally, a person who acts in a fiduciary capacity, will be considered a fiduciary of

the ERISA plan, regardless of whether that person is expressly named.  In that respect, ERISA

provides:

> person[6] is a fiduciary with respect to a plan to the extent (i) he
> exercises any discretionary authority or discretionary control
> respecting management of such plan or exercises any authority or
> control respecting management or disposition of its assets, (ii) he
> renders investment advice for a fee or other compensation, direct or
> indirect, with respect to any moneys or other property of such plan,
> or has any authority or responsibility to do so, or (iii) he has any
> discretionary authority or discretionary responsibility in the
> administration of such plan.

29 U.S.C 1002(21)(A).  Thus, under ERISA, fiduciaries are defined "in functional terms of control

and authority over the plan." *Mertens v. Hewitt Assocs.,* 508 U.S. 248, 251 (1993); *see also*

*Edmonson v. Lincoln Nat. Life Ins. Co.,* 725 F.3d 406, 413 (3d Cir. 2013) ("ERISA ... defines

'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over

the plan.").  As such, a person may be a fiduciary of an ERISA plan regardless of whether he, she,

or it is expressly named as an administrator of the plan.  Furthermore, "[f]iduciary duties under

ERISA attach not just to particular persons, but to particular persons performing particular

functions." (alteration in original) (internal citations and quotation marks omitted)). *Mertens*, 508

U.S at 251. "[W]here an administrator of a plan decides matters required in plan administration or

involving obligations imposed upon the administrator by the plan, the fiduciary duties imposed by

ERISA attach." *Payonk v. HMW Indus.*, 883 F.2d 221, 225 (3d Cir. 1989). However, where

---

[6]     ERISA  defines "person" broadly to "mean[] an individual, partnership, joint venture,
corporation, mutual company, joint-stock company, trust, estate, unincorporated organization,
association, or employee organization." 29 U.S.C. §1002(9).

"employers conduct businesses and make business decisions not regulated by ERISA, no fiduciary duties apply." *Id.*

The named fiduciary of the Plans at issue is the PBC, which consists of a group of J&J employees.  Compl. ¶¶1,29.  Plaintiffs allege, and Defendants do not dispute, that the Individual Defendants, Caruso and Fasolo, were members of the PBC during the Class Period, and thus constitute fiduciaries of the Plans.[7]  Compl. ¶¶124-124.  However, J&J is not a named administrator of the Plans.[8]  Nonetheless, Plaintiffs aver that J&J is liable for the Individual Defendants' fiduciary breaches because it employed the Individual Defendants, who were "acting

---

[7]  Although Defendants do not dispute that the Individual Defendants were fiduciaries, they argue that they cannot be subject to breach of fiduciary duty in this context, because the alleged inaction occurred in their capacity as corporate officers. Corporate officers who are also administrators of an ERISA plan are only subject to liability for breach of fiduciary duty when and to the extent that they were acting as plan administrators during the complained of conduct. *See Payonk*, 883 F.2d at 225 ("when employers wear two hats as employers and administrators . . . they assume fiduciary status only when and to the extent that they function in their capacity as plan administrators, not when they conduct business that is not regulated by ERISA." (alteration in original) (internal citations and quotation marks omitted)).

[8]  Plaintiffs' Complaint is devoid of allegations regarding who determines the membership of the PBC. Plaintiffs' only allegations in that regard are that the PBC was the named fiduciary of the Plan during the Class Period, is tasked with overseeing and managing the Company's retirement benefit plans, and that the PBC was always made up of at least three members of J&J's Board of Directors.  Compl. ¶¶125-126.  To the extent J&J may have had the power to appoint and remove members of the Committee, the Company would also have had a fiduciary duty to monitor its appointed fiduciaries.  *See Scalia v. WPN Corp.,* 417 F. Supp. 3d 658, 669 (W.D. Pa. 2019) ("The power to appoint and dismiss an investment fiduciary "carries with it a duty 'to monitor appropriately' those subject to removal."); *Graden v. Conexant Sys., Inc.*, 574 F. Supp. 2d 456, 466 (D.N.J. 2008) (finding that employer-sponsor of ERISA plan was a fiduciary, despite not being named administrator of the plan, where plaintiff alleged that employer "had the   authority and discretion to appoint, monitor and remove officers and employees [from] the individual fiduciary roles with respect to the Plan." (alteration in original)); *see also* 29 C.F.R. § 2509.75–8, D–4 (stating that where an employer's directors possess responsibility for selecting and retaining plan fiduciaries, the directors are ERISA fiduciaries with respect to those functions).  Here, however, Plaintiffs have not expressly alleged that J&J had authority over who was appointed to the PBC or that J&J had a duty to monitor the Committee's members.

within the course and scope of their employment when they engaged in the fiduciary misconduct," and J&J "actively and knowingly participated in the Individual Defendants' fiduciary breaches." *Id*. at ¶132*; see also* Pl. Br. at 24-26.  Alternatively, in addition to arguing that J&J is vicariously liable for the actions of its employees, who were fiduciaries of the Plans, Plaintiffs argue that J&J is a fiduciary within the meaning of Section1002(21)(A) because the Company exercise control over the Plans' assets – J&J's common stock.

### i. Respondeat Superior Theory of Liability

In support of their respondeat superior theory of liability, Plaintiffs rely on *McMahon v. McDowell*, 794 F.2d 100, 109 (3d Cir. 1986).  Compl. ¶132*; see also* Pl. Br. at 24-26.  In *McMahon*, the plaintiffs alleged that the plan fiduciaries breached fiduciary duties to the ERISA plan's beneficiaries by failing to collect delinquent pension plan contributions. 794 F.2d. at 108.  The plaintiffs brought suit against both the named fiduciaries of the plan, as well as their employer, the plan's sponsor.  *Id*. at 109.  Although the employer was not a fiduciary of the plan, the Third Circuit explained that "if a beneficiary or participant can show that the plan fiduciaries breached their duties, he may also be able to recover damages, for the benefit of the plan, directly from the employer." *Id*.[9]

Here, Defendants contend that Plaintiffs' respondeat superior theory of liability is not cognizable, in this context, because *McMahon's* holding is limited to cases involving plan funding. Def. Br. at 23; Def. Reply Br. at 8.  Defendants contend that while "[i]t makes sense to apply respondeat superior to plan funding claims, because the employer is the entity ultimately

---

[9]    The Third Circuit ultimately affirmed the grant of summary judgment in favor of defendants, however, concluding that the plan fiduciaries had not breached their fiduciary duties, and thus there was no basis for direct liability against the fiduciaries nor vicarious liability against the employer.  *McMahon*, 794 F.2d at 113.

responsible for funding; it makes no sense to apply the doctrine to other fiduciary breach claims." Def. Reply Br. at 8.

Defendants have not identified case law which supports the proposition that *McMahon's* central holding is inapplicable in this context. While there is limited case law on this issue, it appears that contrary to Defendants' assertions, other district courts within this Circuit have applied *McMahon*'s respondeat superior theory of liability outside of the ERISA plan-funding context. *See Crosley v. Composition Roofers' Union Local 30 Employees' Pension Plan*, No. 04-5954, 2005 WL 2405979, at \*7 (E.D. Pa. Sept. 29, 2005) (explaining that respondeat superior liability attaches in the ERISA context when an agent breaches his fiduciary duty while acting in the course and scope of employment and thus, Plaintiff could pursue claims against employer-sponsor of ERSIA plan where company's board members were named fiduciaries of the plan" (citing *McMahon*, 794 F.2d at 109)); *In re Wilmington Tr. Corp. ERISA Litig.*, 943 F. Supp. 2d 478, 493 (D. Del. 2013) (finding that plaintiff had adequately alleged, in a breach of fiduciary duty case, that WT Corp, employer-sponsor of ERISA plan, was a de facto fiduciary of the plan under the doctrine of respondeat superior where plaintiff alleged that named fiduciaries of the plan were a wholly owned subsidiary of WT Corp, and employees and officers of WT Corp); *Cannon v. MBNA Corp.*, 2007 WL 2009672 (D. Del. July 6, 2007).

In *Cannon*, former employers of MBNA Corporation, brought a civil enforcement action under ERISA, alleging that defendants – including MBNA Corporation – breached their fiduciary duties to the ERISA plan's participants by, *inter alia*, making false representations that artificially inflated employer's stock value, and that were also conveyed to the ERISA plan's participants. 2007 WL 2009672 at \*1-2. MBNA moved to dismiss the claims against it on the basis that it was not a fiduciary of the ERISA plan. *Id*. at \*3. Relying largely on *McMahon*, the district court found

15

that "[b]ecause the doctrine of respondeat superior may apply in ERISA cases, and because the information necessary to determine whether [the employees were acting in the scope of their employment] is not available here, prior to discovery, this court is unwilling to find that the plaintiffs' claims against [the employer] are insufficient at this stage in the proceedings." *Id.*

Indeed, all of the circuit courts which have considered the issue have held that respondeat superior can be a source of liability for employer-sponsors of ERISA plans. *See Miller v. Mellon Long Term Disability Plan*, 721 F. Supp. 2d 415, 436 (W.D. Pa. 2010) (recognizing "that the majority of the circuits, including the Third Circuit, appear to allow [a respondeat superior] theory of recovery, but apply slightly different tests")); *see also Am. Fed'n of Unions v. Equitable Life Assur. Soc.,* 841 F.2d 658, 665 (5th Cir. 1988) ("[t]he doctrine of respondeat superior can be a source of liability in ERISA cases" if the employer "actively and knowingly participat[ed]" in the employee's breach of fiduciary duty); *Nat'l Football Scouting, Inc. v. Cont'l Assur. Co.,* 931 F.2d 646, 648–49 (10th Cir. 1991) (adopting the Fifth Circuit's finding that "in ERISA cases, the doctrine of respondeat superior could impose liability on a principal for the misdeeds of his agent"); *Hamilton v. Carell*, 243 F.3d 992, 1002 (6th Cir. 2001) (holding that the common-law doctrine of respondeat superior applies "in an ERISA-context, [when] the agent . . . breached his or her fiduciary duties while acting in the course and scope of employment"); *Howell v. Motorola, Inc.*, 633 F.3d 552, 563 (7th Cir. 2011) (explaining that "[t]he federal common law of agency supplies the governing principles in ERISA cases" and "[t]he doctrine of respondeat superior can be found within that body of law").

On the other hand, district courts within the Second, Eighth, and Ninth Circuits routinely reject the applicability of agency principals in ERISA cases, finding that it would deviate from the liability provisions outlined in the statutory scheme. *See e.g, Crowley v. Corning*, 234 F. Supp.2d

16

222, 228–29 (W.D.N.Y. 2002) (rejecting, without discussion, plaintiff's respondeat superior theory of liability); *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, No. 02 -8853, 2005 WL 563166, at *4 (S.D.N.Y. Mar. 10, 2005) (finding "no reason to recognize an implied ERISA cause of action under the doctrine of respondeat superior, in light of the Supreme Court's "unwillingness to infer causes of action in the ERISA context" (internal citations and quotations marks omitted)); *Goodman v. Crittenden Hosp. Ass'n, Inc.,* 143 F. Supp. 3d 795, 799 (E.D. Ark. 2015) (declining to apply doctrine of respondeat superior out of concern that doing so "would expand who may be liable for a fiduciary's violations of duty, and that would alter the balance Congress struck when it expanded the common law's concept of a fiduciary"); *Tool v. Nat'l Emp. Ben. Servs., Inc*., 957 F. Supp. 1114, 1120 (N.D. Cal. 1996) (rejecting argument that non-fiduciary could be held vicariously liable under ERISA, emphasizing applying common law agency principles the ERISA-context "would contradict the Ninth Circuit's strict construction of the liability provisions in ERISA"). However, *McMahon* is clearly at odds with those cases. In each of the cases rejecting the application of respondeat superior, the court found that application of the doctrine, in any context, would be inconsistent with ERISA's concept of fiduciary responsibility, as the statute only aims to impose liability on those who are named or functional fiduciaries of the ERISA Plan, not their employers. *See e.g.*, *Goodman*, 143 F. Supp. at 799; *Tool*, F. Supp. at 1120. *McMahon* stands in contrast; if respondeat superior liability was found to be at odds with ERISA's statutory scheme, the Third Circuit would not have permitted the doctrine's application in *McMahon*.

While Defendants are correct that ERISA imposes liability only on fiduciaries and co-fiduciaries, it does not appear that Congress intended to obviate the baseline principle of agency law that, under certain circumstances, employers are vicariously liable for the acts of their employees and agents. As a general rule, the Supreme Court has held that respondeat superior

liability may be inferred under a federal statute in the absence of an express contrary intent.  *See Meyer v. Holley*, 537 U.S. 280, 284 (2003) (explaining, in interpreting the Fair Housing Act, that "[w]hen Congress creates a tort action, it legislates against a background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules" and finding that the act provides for provides for vicarious liability); *see also Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 447 (1999) ("[t]he common law of trusts" offers a "starting point for analysis [of ERISA] ... [unless] it is inconsistent with the language of the statute, its structure, or its purposes").  In *Kling v. Fidelity Mgmt. Trust Co*., 323 F. Supp. 2d 132, 135(D. Mass. 2004), the plaintiffs alleged breach of fiduciary duty claims against the employer-sponsor of the ERISA plan, alleging that it was subject to liability under the doctrine for respondeat superior for the breaches committed by its directors and officers, who were the ERISA plan's fiduciaries.  *Id*. at 135.  The defendants argued, as Defendants do here, that the application of respondeat superior is "inconsistent with ERISA's functional concept of fiduciary responsibility." *Id*. at 145.  The court agreed with defendants that "ERISA imposes a functional definition of fiduciary status ... [and] under the 'two hats' doctrine, courts have held that certain actions of an employer ... fall outside the scope of ERISA fiduciary duty," but explained that district courts were split about whether the doctrine of respondeat superior was applicable in an ERISA context and the majority of courts found the doctrine applied.  *Id*. at 146 (collecting cases).  Accordingly, that court rejected defendants' argument and found that the plaintiffs could allege a breach of fiduciary duty claim against the sponsor of the ERISA plan. *Id*.

Similarly, I do not find that ERISA evinces an intent within the statute to eliminate the vicarious liability of a corporation for the acts of its employees or agents.  Rather, I find, as other courts have found, that applying the doctrine of respondeat superior would serve to further

ERISA's protective purpose.  *See Stanton v. Shearson Lehman/Am. Exp., Inc.*, 631 F. Supp. 100, 104–05 (N.D. Ga. 1986) (finding that "[a]pplying common law agency principles in ERISA actions would further Congress's intent to protect retirement plans from self-dealing, imprudent investing and misappropriation of plan funds"); *see also Mass. v. Morash*, 490 U.S. 107, 115 (1989) (explaining that by enacting ERISA, Congress intended "insure against the possibility that the employee's expectation of the [retirement] benefit would be defeated through poor management.").  Thus, in my view, the more persuasive authority is that the doctrine of respondeat superior applies in the instant case, consistent with the Third Circuit's guidance.

Accordingly, consistent with the Third Circuit's guidance in *McMahon*, and the majority of the Circuits to have addressed this issue, the Court finds that to the extent one of J&J's employees breached their fiduciary duties to the ERISA plan, J&J may potentially be held vicariously liable for the breach.  Plaintiffs have pled that the Individual Defendants "were acting within the course and scope of their employment when they engaged in the fiduciary misconduct at issue and because [J&J] actively and knowingly participated in the Individual Defendants' fiduciary breaches," Compl. ¶2, and that "silence about and concealment of asbestos in the talc powder were part a Johnson & Johnson's corporate strategy.  Thus, the Individual Defendants' failure to make corrective disclosures were taken within the course and scope of their employment with [J&J], and [J&J] knowingly participated in the Individual Defendants' fiduciary breaches," *id*. at 161.  At this juncture, those allegations are sufficient to suggest that the doctrine of respondeat superior may be applicable.  Thus, Defendants' motion to dismiss J&J as a defendant, on that basis, is denied.

### ii.  Control Theory of Liability

In addition to arguing that J&J is vicariously liable for the actions of its employees, who were fiduciaries of the Plans, Plaintiffs argue, in their brief, that J&J is a fiduciary within the meaning of Section 1002(21)(A), because the Company exercised control over the Plans' assets – J&J's common stock.  Pl. Br. at 25.  In Plaintiffs' view, the Company "plainly acted as a fiduciary with respect to the activity in question, i.*e.,* whether to continue to conceal the presence of asbestos in J&J's talc products, which affected the price of J&J securities held in the Company stock fund. Courts have found that similar corporate decisions confer fiduciary status on a plan sponsor."  Pl. Br. at 26 (collecting cases).  The problem with this theory of liability is that Plaintiffs did not allege the necessary factual allegations for this Court to determine whether it is a viable theory.  Rather, Plaintiffs' Complaint only alleges a respondeat superior theory of liability as to J&J and does not include the allegation that J&J is a fiduciary because it exercises control over the Plans' assets.  "It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss."  *Frederico v. Home Depot*, 507 F.3d 188, 202 (3d Cir. 2007) (internal quotation and citation omitted); *see Carpenters Health 86 Welfare Fund of Phila. & Vicinity v. Mgmt. Res. Sys.*, 837 F.3d 378, 383 (3d Cir. 2016) (party may not amend complaint in brief opposing a motion to dismiss).  Thus, the Court cannot consider Plaintiffs' arguments in this regard.  To the extent Plaintiffs seek to somehow hold J&J liable as a fiduciary of the Plans, within the meaning of Section 1002(21)(A), based on its control over the Company's stock, they must amend their Complaint.

### B.  Breach of Fiduciary Duty

In order to state a claim for breach of fiduciary duty in the ERISA-context, a plaintiff must allege that the defendants are "1) . . . plan fiduciar[ies] (2)  that breache[d] an ERISA-imposed duty (3) causing a loss to the plan."  *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 328 (3d Cir.

2019) (quoting *Leckey v. Stefano*, 501 F.3d 212, 225–26 (3d Cir. 2007)).  As explained, *supra*, Plaintiffs have alleged that the Individual Defendants were plan fiduciaries, and that J&J was vicariously liable for actions committed by the Individual Defendants within the scope of their employment.  In addition, the parties do not dispute that the Plans have suffered loss by virtue of the significant drop in the value of J&J stock.  Accordingly, the focus, at this juncture, is whether Plaintiffs have adequately alleged that Defendants breached their ERISA-imposed fiduciary duties to the Plans' beneficiaries.

ERISA requires that a fiduciary act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).  Fiduciaries who breach these duties are personally liable to the plan for any resulting losses.  *Id.* at §1109(a)

Analyzing the breach of the duty of prudence in the context of an ESOP, or stock ownership plan, is context-dependent and turns on "the circumstances prevailing at the time the fiduciary acts."  *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014) (internal quotation marks and citation omitted).  In *Dudenhoeffer*, the Supreme Court held that

> [t]o state a claim for breach of the duty of prudence on the basis of inside information, a plaintiff must plausibly allege an alternative action that the defendant could have taken that would have been consistent with the securities laws and that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it.

*Id.* at 428.  In other words, a complaint must plausibly allege that "a prudent fiduciary in the same position could not have concluded that the alternate action would do more harm than good."  *Amgen Inc. v. Harris*, 136 S. Ct. 758, 760 (2016)  (internal quotation marks omitted).

Here, Plaintiffs have alleged that Defendants breached their fiduciary duties to the Plans' beneficiaries by investing in J&J stock, despite their alleged knowledge that the value of the stock was overly-inflated.  As an alternative, Plaintiffs assert that the Individual Defendants "could, and should, have acted to protect the plans," by "making corrective disclosure publicly admitting the existence of asbestos in [J&J's] talc powder."  Compl. ¶158.  In that respect, Plaintiffs emphasize that "Defendants did not have to make a 'special' disclosure only to Plan participants, but could simply have caused, through personnel with financial disclosure responsibilities -- including some of the Defendants in this case -- one corrective public disclosure to be made to the market," in a regular securities filing.  Compl. ¶109, *see also* Compl. ¶118 ("proper disclosure could have, and should have, been made in the regular course of Johnson & Johnson's securities filings.").

Defendants argue that Plaintiffs' Complaint does not satisfy the *Dudenhoeffer* standard because the proposed alternative action – publicly stating in a securities filings that J&J's talc contains asbestos and causes cancer – was not actually viable, and it would have done "more harm than good."  Def. Br. at 11.

### i.  The Viability of Plaintiffs' Alleged Alternative Action

First, the Court addresses Defendants' arguments regarding the viability of the alternate course of action alleged by Plaintiffs; whether the action would have done more harm than good will be discussed, *infra*.  Defendants argue that the alleged alternative action was not a viable one because neither the PBC nor the Individual Defendants had the authority to force J&J to make the requested disclosures in its SEC Filings.  Def. Br. at 11-12.  Furthermore, Defendants contend that even if the Individual Defendants or any of the PBC members had the authority to act on behalf of J&J and make the requested disclosures, doing so would run afoul of *Dudenhoeffer*, because it would require Defendants to violate the securities laws by issuing a false statement.  Def. Br. at

12.  Defendants assert that J&J possessed a good faith belief, supported by scientific evidence, that its talc-based products neither contain asbestos nor cause cancer, thus, Defendants could not have issued a corrective disclosure admitting the existence of asbestos in Johnson & Johnson's talc powder products.  Def. Br. at 12.  In that regard, Defendants highlight the various jury verdicts in J&J's favor and other publicly available materials which purportedly confirm J&J's belief.  *Id*. at 12-13.

In response, Plaintiffs argue that Caurso was J&J's CFO and a "Sarbanes-Oxley signatory" of the securities disclosures issued during the Class Period and both Caruso and Fassolo were members of J&J's Executive Committee.  Compl. ¶¶7, 91, 95-97.  In that capacity, Plaintiffs insist that the Individual Defendants "had ample authority, power and opportunity to cause the Company to make" the corrective disclosures identified as an alternative.  Pl. Br. at 9-11.  Furthermore, Plaintiffs argues that the Court must take as true the allegation that J&J's talc products contain asbestos for purposes of this motion, and thus, the Court cannot consider "Defendants' argument— that there was no asbestos in the talc and that, even if there was, it was not dangerous, and thus there was nothing to disclose in J&J's securities filings."  Pl. Br. at 10.

As an initial matter, the Court finds unavailing Defendants' position that J&J could not have issued a corrective disclosure informing the public about the asbestos in its talc products, because its talc-based products do not contain asbestos and are not harmful.  Critically, this case differs from the typical case alleging a breach of the duty of prudence based on the drop in the value of an ERISA fund's stock.  Typically, such "stock-drop" cases involve the ERISA fiduciaries' response to known information regarding the company in which the ERISA plan has

invested.[10]  Here, however, Plaintiffs' arguments regarding the prudence of continued investment in J&J stock largely turn on the analysis and interpretation of complex and evolving scientific evidence regarding whether J&J's talc based products contain asbestos, and the biological import of that contamination, if any.  In other words, the matter of whether the corrective disclosures were necessary, requires the resolution of disputed scientific evidence underlying Plaintiffs' claims.  At this pleading phase of the litigation, the Court cannot, and has not, assessed the substance of Plaintiffs' allegations that J&J's talc-based products contained asbestos or that the products caused cancer.  Rather, the interpretation of that type of complex scientific evidence, to the extent it bears on the claims asserted, must be the subject of expert testimony.

At this stage, in order to conclude that the J&J could not have issued a corrective disclosure regarding the safety of its talc-products, this Court would be required to credit Defendants' assertion that the Company possessed a good faith belief that J&J's talc products do not contain asbestos and/or are not carcinogenic; the Court cannot do so, since at this motion to dismiss phase, the allegations of Plaintiffs' Complaint have to be taken as true.  Defendants are certainly permitted to raise the defense that the corrective disclosures were not necessary because J&J's products did not contain asbestos.  However, on this motion, I must assume the truth of Plaintiffs' allegations, and draw all reasonable inferences from those facts in Plaintiffs' favor.

---

[10]     For example, in *Harris v. Amgen, Inc.,* 738 F.3d 1026, 1031-1034 (9th Cir. 2013), *judgment vacated and remanded,* 573 U.S. 942 (2014), the plaintiffs alleged that the ESOP fiduciaries were aware of significant safety concerns about two of Amgen's flagship products, and that the company engaged in improper "off-label" marketing of one of its drugs, despite undisclosed, adverse clinical trials.  At the time of plaintiffs' lawsuit, the health risks associated with the drugs had been conclusively determined and the FDA had issued a "black box" warning label, the strongest warning the FDA can require, cautioning against off-label use of the drugs;  thus, there was very little doubt about the safety concerns posed by the Company's products.  *Id.* at 1034.  In the instant case, however, Defendants heavily dispute the scientific evidence upon which Plaintiffs' claims are based.

As alleged, Plaintiffs assert that J&J was engaged in a decades-long scheme to defraud the public regarding the safety of its talc-based products.  In support of their claims, Plaintiffs allege that over the years, various J&J employees expressed concerns about the use of talc, which were documented in internal company memos, and that independent laboratory reports found traces of asbestos in J&J's talc mines and its talc products.  At this motion to dismiss phase, the Court must presume as true that the Company's products contained asbestos, that the Company allegedly sought to conceal that information from the public at large, including investors, and that the Company's statements that its talc products were safe and did not contain asbestos were not in good faith, but rather part of J&J's scheme to conceal the truth about the dangers of talc.

Next, the Court turns to Defendants' arguments that the Individual Defendants did not have the power or authority to issue the corrective disclosures which Plaintiff has identified as an alternative.  Plaintiffs allege that "Defendants had the ability to effectuate corrective public disclosures to cure the fraud consistent with the requirements of the federal securities laws to correct the artificial inflation." Compl. ¶99.  Further, Plaintiffs allege that J&J's 2012, 2013, 2014, 2015, and 2016 Form 10-Ks, each contained misstatements or omissions about the safety of J&J's talc-based products and were "signed by executive Committee members Gorsky and Caruso." Compl. ¶¶ 51, 57, 64, 71, 77.  Under the Sarbanes-Oxley Act of 2002, the signing officers of a Company's required annual or quarterly financial reports must be the directors or officers who are responsible for establishing and maintaining a system of internal controls that ensure material information is made known to the Company's auditor, and the audit committee of the directors. 15 U.S.C. § 7241(4)-(6).  Furthermore, the officers are required to certify – as  Grosky and Caruso allegedly did – that the report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances

under which such statements were made, not misleading. 15 U.S.C. § 7241(a)(2). Thus, it appears that Caruso, as J&J's CFO, had the ability to issue public disclosures on behalf of the Company, or at minimum, the authority to review the Company's securities filings and correct any misstatements therein, such that he could have caused J&J to issue a corrective disclosure.

However, as to Fasolo, Plaintiffs have not alleged any facts indicating that he had the power to authorize, issue, or sign SEC filings on behalf of the company. Unlike Caruso, Fasolo was not a Sarbanes-Oxley signatory of the relevant SEC filings. Regarding Fasolo's purported authority to issue the corrective disclosures, Plaintiffs merely allege that "Fasolo, as a member of the Executive Committee, was uniquely situated to fix this [overvaluing of the stock]. He could have tried to cause truthful or corrective disclosures to be made much earlier to cure the Company's misrepresentations and material omissions and to make the Fund a prudent investment again for the Plan[s]." Compl. ¶99. Plaintiffs have not alleged sufficient facts for this Court to infer that Fasolo had the authority to cause J&J to issue a corrective disclosure in the Company's securities filings. Nonetheless, because Caruso and Fasolo were co-fiduciaries, the claims against Fasolo may proceed based on a co-fiduciary theory of liability.

Under ERISA, a fiduciary is responsible for his or her own breaches of fiduciary duty, as well as the breaches committed by co-fiduciaries. 29 U.S.C. §1105. Co-fiduciary liability arises if the fiduciary "participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach" or "if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach." *Id*. Plaintiffs have alleged that all of the defendants are liable as "cofiduciaries with respect to the above-described violations because they participated knowingly in their co-fiduciaries' breaches; enabled other fiduciaries to violate ERISA by virtue of their own

breaches of fiduciary duty; knowingly undertook to conceal those breaches; enabled their cofiduciaries to commit the breaches and failed to make any reasonable efforts to remedy the breaches." Compl. ¶168.  Plaintiffs have also alleged that Caruso and Fasolo were both members of the Executive Committee, and as members of the Executive Committee, they were both aware of J&J's alleged scheme to defraud the public regarding the dangerous nature of the Company's talc-based products.  Thus, Plaintiffs have alleged sufficient facts from which this Court can reasonably infer that Fasolo had knowledge of, and did not rectify, Caruso's failure to issue a corrective disclosure regarding the alleged asbestos in J&J's talc products, if they, in fact, knew of the Company's alleged concealment of the asbestos.

## ii.  Fiduciary or Non-Fiduciary Conduct

Defendants also raise the related argument that issuing SEC filings, the mechanism through which Plaintiffs allege Defendants should have made their disclosures, are conducted in a corporate capacity, not a fiduciary one, and thus cannot constitute an adequate alternate course of action under *Dudenhoeffer*.  Def. Reply Br. at 8.  In response, Plaintiffs contend that the decision not to make a corrective disclosure, which would have protected the Plans' fiduciaries, constitutes a "fiduciary decision," regardless of the mechanism by which the corrective disclosure would need to be made. Pl. Br. at 23.  Plaintiffs argue that the fact that the alleged alterante action was through an SEC filing is of little import, because "J&J plainly acted as a fiduciary with respect to the particular activity in question, *i.e.*, whether to continue to conceal the presence of asbestos in J&J's talc products, which affected the price of J&J securities held in the Company stock fund." *Id*. at 26.  I disagree.

Not all actions taken by ERISA fiduciaries constitute fiduciary conduct.  ERISA's statutory scheme recognizes that fiduciaries of ERISA plans are often also corporate officers and thus, "may

27

wear different hats." *Pegram*, 530 U.S. at 225; *see In re Schering–Plough Corp. ERISA Litig.*, 2007 WL 2374989, *4 (D.N.J. 2007) ("ERISA contemplates that a fiduciary may wear 'two hats' -- one in the capacity as a corporate officer, employee, or agent, and another in the capacity as an ERISA fiduciary").

Pre-*Dudenhoeffer*, other courts within this district have dismissed claims where plaintiffs sought to allege that ERISA fiduciaries breached their duties to the plan based on misrepresentations made in SEC filings, finding that the issuance of the SEC filing was a purely corporate activity. *See e.g.*, *In re Allergan ERISA Litig.*, No. 17-1554 , 2018 WL 8415676, at *3 (D.N.J. July 2, 2018) (rejecting argument that SEC filings issued by the employer-sponsor of ERISA plans constituted fiduciary conduct because "communications made by a company in SEC filings do not become fiduciary statements for ERISA plans unless they are intentionally connected ... to statements ... about the future of benefits, so that its intended communication about the security of benefits was rendered materially misleading." (internal citations and quotation marks omitted)); *In re Schering–Plough Corp.*, 2007 WL 2374989, *7 (finding that misstatements made in securities filings required only be federal securities laws, not by ERISA, were not actionable under ERISA); *In re RCN Litig.*, No. 04–5068, 2006 WL 753149, at *38 (D.N.J. Mar. 21, 2006) (holding that statements made in various press releases and SEC filings were not actionable under ERISA because "[n]one of the [ ] statements, regardless of truth or falsity, were made in any fiduciary capacity regarding the Plan").  In that respect, the Supreme Court has explained that a company does not act as a fiduciary "simply because it made statements about its expected financial condition or because 'an ordinary business decision turn[ed] out to have an adverse impact on the plan.'" *Varity Corp. v. Howe*, 516 U.S. 489, 502-04 (1996) (concluding that a corporate employer was acting as a plan administrator when performing acts such as conveying

information about plan benefits and interpreting plan terms) *c.f. In re Schering–Plough Corp.*, 2007 WL 2374989, *5 (explaining that "courts, both within and outside this district, have rejected attempts by ERISA litigation plaintiffs to impose liability for statements made in [securities filings] . . . they were either general corporate communications made to the public at large or were not discretionary acts" (collecting cases)).  Consistent with those cases, Defendants suggest, that if ERISA fiduciaries cannot be held liable for breach of fiduciary duty based on statements made in SEC filings, such fiduciaries also may not be held responsible for failing to issue a corrective disclosure, an action which could only be taken in a corporate capacity.  I agree with Defendants' position.

Notably, *Dudenhoeffer* did not address the issue currently before this Court: whether the alternate course of action alleged by Plaintiffs may be one that the ERISA fiduciaries could only have taken in their corporate capacity.  In *Dudenhoeffer*, the Court sought to clarify the pleading standard applicable to breach of duty of prudence cases involving ESOPs.  At that time, a number of courts applied a presumption that an ESOP fiduciary who invested in employer stock "acted consistently with ERISA," a standard which evolved from the Third Circuit's decision in *Moench v. Robertson*, 62 F.3d 553 (3d Cir. 1995).  *See, e.g.*, *White v. Marshall & Ilsley Corp.*, 714 F.3d 980, 989 (7th Cir. 2013) ("[P]laintiffs ... must allege ... that the company faced impending collapse or dire circumstances that could not have been foreseen by the founder of the plan." (internal quotation marks omitted)); *Quan v. Comput. Sci. Corp.*, 623 F.3d 870, 882 (9th Cir. 2010) ("[P]laintiffs must ... make allegations that clearly implicate the company's viability as an ongoing concern or show a precipitous decline in the employer's stock combined with evidence that the company is on the brink of collapse or is undergoing serious mismanagement." (internal quotation marks and alterations omitted)); *Kuper v. Iovenko*, 66 F.3d 1447, 1459 (6th Cir. 1995) ("A plaintiff

may ... rebut th[e] presumption of reasonableness by showing that a prudent fiduciary acting under similar circumstances would have made a different investment decision.").

*Dudenhoefer* rejected *Moench*'s presumption of prudence, and held that "the law does not create a special presumption favoring ESOP fiduciaries" and that "the same standard of prudence applies to all ERISA fiduciaries, including ESOP fiduciaries, except that an ESOP fiduciary is under no duty to diversify the ESOP's holdings."  573 U.S. at 428.  In lieu of applying a presumption of prudence, the Court held that "[t]o state a claim for breach of the duty of prudence on the basis of inside information, a plaintiff must plausibly allege an alternative action that the defendant could have taken that would have been consistent with the securities laws and that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it."  *Id.*  In formulating this revised standard, the Supreme Court advised lower courts to consider, with respect to claims like those asserted by Plaintiffs in this case, to  "consider the extent to which an ERISA-based obligation either to refrain on the basis of inside information from making a planned trade or to disclose inside information to the public could conflict with the complex insider trading and corporate disclosure requirements imposed by the federal securities laws or with the objectives of those laws."  *Id*. at 429.  It also tasked courts with considering "whether the complaint has plausibly alleged that a prudent fiduciary in the defendant's position could not have concluded that stopping purchases -- which the market might take as a sign that insider fiduciaries viewed the employer's stock as a bad investment -- or publicly disclosing negative information would do more harm than good to the fund by causing a drop in the stock price and a concomitant drop in the value of the stock already held by the fund."  *Id*. at 429-430.

Unfortunately, the Supreme Court did not elaborate on the precise nature of the alternative action which a plaintiff must allege.  Nor did the Supreme Court do so in its only two post-

*Dudenhoeffer* decisions involving this issue.  *See Amgen Inc. v. Harris*, 136 S. Ct. 758, 760 (2016) (remanding case to the Ninth Circuit Court of Appeals because that court "failed to assess whether the complaint in its current form "has plausibly alleged" that a prudent fiduciary in the same position "could not have concluded" that the alternative action "would do more harm than good."); *Ret. Plans Comm. of IBM v. Jander*, 140 S. Ct. 592, 595 (2020) (remanding case to the Second Circuit Court of Appeals for consideration of arguments which were raised for the first time on appeal to the Supreme Court).  Nevertheless, there is no indication in *Dudenhoeffer* that the Supreme Court's imposition of the alternative action standard was intended to erode the pre-existing case law recognizing that corporate insiders, who are also fiduciaries of an ERISA plan, play a dual role, and should not be subject to ERISA liability for actions taken solely in their corporate capacity.

Notably, the only case in which a plaintiff has been found to satisfy the *Dudenhoeffer* standard, based on an allegation that an ERISA fiduciary could have issued a corrective disclosure in his or her corporate capacity, is *Jander v. Ret. Plans Comm. of IBM*, 910 F.3d 620, 628 (2d Cir. 2018).  *Jander*, however, was vacated by the Supreme Court and remanded to the Second Circuit to consider certain arguments which were raised by the parties for the first time on appeal to the Supreme Court.   In *Jander*, the Second Circuit reversed the district's court's dismissal of an ERISA stock drop case against IBM, finding that the plaintiffs had alleged facts satisfying the *Dudenhoeffer* standard.  *Id*. at 631.  There, the plaintiffs, participants in an ESOP retirement fund sponsored by IBM, alleged that the defendants breached their duty of prudence by failing to issue a corrective disclosure in certain SEC filings, when they knew that IBM's common stock was overvalued, as a result of certain losses incurred by IBM's microelectronics business.  *Id* at 624.  The Second Circuit found that plaintiffs had adequately alleged that "a prudent fiduciary in the

Plan defendants' position could not have concluded that corrective disclosure would do more harm than good." *Id*. at 628.  In support of its holding, the Second Circuit found the following five circumstances dispositive: (1) the defendants allegedly knew that the stock was "artificially inflated through accounting violations;" (2) two of the defendants "were uniquely situated to fix this problem inasmuch as they had primary responsibility for the public disclosures that had artificially inflated the stock price to begin with"; (3) general economic principles suggest that the reputational damage to a company increases the longer a fraud continues; (4) the stock was traded in an efficient market; and (5) eventual disclosure was inevitable, because the microelectronics business was in the process of being sold. *Id*. at 628-631.

Although the *Jander* Court found that two defendants had the ability to issue public disclosures regarding the stock, it was silent on whether issuing such a disclosure was an adequate alterante course of action, in light of the fact that the defendants could only have issued their disclosure in their corporate capacity (*i.e.*, via IBM's SEC filings).  In fact, the arguments raised on appeal to the Supreme Court touch on this very issue.  *See* Brief for Petitioner at. Br. 27-31 and Brief for U.S. as Amicus Curiae Supporting Neither Party, at. 11-34, *Ret. Plans Comm. of IBM v. Jander*, 140 S. Ct. 592 (2020)(18-1165) (raising various arguments regarding whether an ESOP fiduciary, who is also a corporate insider, has a duty to publicly disclose inside information learned in a corporate capacity, and whether that duty can co-exist with insider's obligations under the securities laws).

Because *Jander* is no longer good law, it does not help Plaintiffs' case.  Rather, I find the cases concerning the dual role of ERISA fiduciaries who are also corporate insiders persuasive.  As I have explained above, these cases recognize that when corporate officers are fiduciaries of an ERISA plan, ERISA liability can only arise from actions or omissions taken in connection with

the plan, and not corporate actions.  *See Payonk*, 883 F.2d at 225 ("when employers wear two hats as employers and administrators . . . they assume fiduciary status only when and to the extent that they function in their capacity as plan administrators, not when they conduct business that is not regulated by ERISA.").  In this Court's view, the inverse, therefore, should also be true.  Because duties owed to ERISA plan beneficiaries are separate and distinct from a fiduciary's corporate obligations, such as the Individual Defendants' roles as corporate officers of J&J, Plaintiff cannot allege, as an alternative action, that the Individual Defendants must act in their corporate capacity in order to satisfy their fiduciary obligations under ERISA.

Consistent with the principle "that the fiduciary with two hats wear[s] only one at a time," *Pegram*, 530 U.S. at 225, I find that Plaintiffs may not allege an alternative action which could only be conducted in the ERISA fiduciary's corporate capacity.  Here, to the extent Defendants could have issued an SEC filing revealing the alleged "truth" about the safety of J&J's talc-based products, they could only have done so based on their status as directors of J&J, while wearing their corporate "hats."  Allowing plaintiffs to plead an alternate course of action, based on actions the Individual Defendants could only have taken outside of their fiduciary capacity is inconsistent with ERISA's functional approach to fiduciary liability.

My conclusion in this regard finds support from Justice Gorsuch's concurrence to the *per curiam* opinion remanding *Jander.  See Ret. Plans Comm. of IBM v. Jander,* 140 S. Ct. 592, 596 (2020) (J. Gorsuch, concurring)*.  Justice Gorsuch recognized that "[b]ecause ERISA fiduciaries are liable only for actions taken while 'acting as a fiduciary,' it would be odd to hold the same fiduciaries liable for 'alternative action[s they] could have taken' only in some other capacity." *Id.* at 596 (alteration in original).  Justice Gorsuch further questioned the *Jander* plaintiffs' allegation "that the ERISA fiduciaries should have used their positions as corporate insiders to cause the

company to make an SEC-regulated disclosure," and opined that such a "theory suggests a likely flaw: In ordering up a special disclosure, the defendants necessarily would be acting in their capacities as corporate officers, not ERISA fiduciaries." *Id.*

Justice Gorsuch's reasoning, and this Court's holding, are consistent with long-standing Supreme Court precedent regarding ERISA's functional approach to imposing liability for breach of fiduciary duty.  As the Supreme Court has made clear, the threshold inquiry in analyzing breach of fiduciary duty by an ERISA fiduciary is "whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint."  *Pegram*, 530 U.S. at 226.  Inherent in ERISA's definition of a fiduciary status is the recognition that those with fiduciary status for some purposes, may not be a fiduciary at all times, but rather only when they act with respect to the plan.  *See* 29 U.S.C 1002(21)(A).  Thus, it holds true that in order to adequately allege an alternate action in support of a breach of the duty of prudence, Plaintiffs must allege an action that the Individual Defendants could have taken only in their fiduciary capacity, and not in their corporate capacity; Plaintiff cannot impose greater obligations on the Individual Defendants than what ERISA requires.

Thus, I find that Plaintiffs have not adequately alleged an alternative action because their alternate course of conduct would have required Defendants to take an action which was only possible in their corporate capacity.

### iii.  The Harm Posed by the Corrective Disclosures

Even assuming, *arguendo*, that Plaintiffs have alleged an appropriate alternative action, they have not adequately alleged, as required by *Dudenhoeffer*, that their prescribed course of conduct would not "do more harm than good."  *Amgen*, 136 S. Ct. at 760.

Defendants argue that Plaintiffs' proposed alternative would have required disclosing negative information about J&J's products  which "would have done immense harm by triggering (1) a large stock price reduction; and (2) potential future reductions in the stock price through the imposition of massive liability in the product liability cases pending and yet-to-be-filed against J&J relating to its talc products."  Def. Br. at 15.  Defendants note that as of December 31, 2018, the Plan held approximately $3.6 billion in J&J stock and a decline in the Company's stock price could have caused "tens of millions of dollars in losses on the Plan[s]."  Def. Br. at 15-16.

Plaintiffs dispute Defendant's characterization of *Dudenhoeffer's* "more harm than good" test, contending that that the relevant question is not simply whether disclosure of the information would have caused the Company's stock price to decline.  Pl. Br. at 11.  Plaintiffs contend that if that were the case, ESOP fiduciaries would effectively have "total immunity" for breaches of the duty of prudence in connection with an investment in artificially inflated stock, because it is "virtually impossible to conceive of an alternative action to remove the artificial inflation from J&J's stock that would not involve lowering the stock price to its true value."  *Id*.  Furthermore, Plaintiffs emphasize that, in this case, delaying the disclosure about the presence of asbestos in the J&J's Talc Products "increased the likelihood of a harsher stock-price correction and a more sluggish stock price recovery, which would cause concrete harm to all ESOP participants." Pl. Br. at 12.[11]  I disagree.

---

[11]     In analyzing whether the alleged alternative action could have done more harm than good, the parties largely rely on the Second Circuit's decision in *Jander v. Ret. Plans Comm. of IBM*, 910 F.3d 620, 628 (2d Cir. 2018), and formulate their arguments based on that decision's reasoning.  However, as explained *supra*, *Jander* was vacated by the Supreme Court earlier this year.  At least one district court within the Second Circuit has declined to follow *Jander*, since the Supreme Court's decision. *See Varga v. Gen. Elec. Co.*, No. 18-1449, 2020 WL 1064809, at *4 (N.D.N.Y. Mar. 5, 2020) (explaining that plaintiff's argument that the disclosure of the negative information was inevitable and thus "a prudent fiduciary in defendants' position would not have concluded that 'publicly disclosing negative information sooner rather than later would do more

To meet the "more harm than good" standard, Plaintiffs allege:

> It was more likely than not that the Company's concealment would soon be discovered, as evidenced by the increasing number of users of its products developing cancer, the increasing number of lawsuits filed by victims, and the increasing number of those cases overcoming motions to dismiss and proceeding on to discovery, which Defendants knew (or should have known). When the internal documents showing the perpetration of the massive coverup and misrepresentation were made public, the truth would certainly have to be disclosed to the public. In other words, J&J's misrepresentations about the safety of its talc products were a ticking time bomb. Eventually, that bomb would go off and the truth would have to be disclosed, bringing the artificial inflation of J&J's stock to a swift and painful end. If Defendants were really considering that timely disclosures would do Plan participants more harm or good, they should have considered that, given the likelihood of the truth coming out, a stock price correction was unavoidable— the only relevant question for them should have been whether it would be better for Plan participants for the correction to occur sooner or later. Given the overwhelming evidence and research showing that later disclosure of the truth and correction of artificial inflation increases the risk of a harsher price correction, as well as a slower-than-necessary price recovery, and given the virtual certainty that J&J's concealment was going to be revealed in discovery, Defendants should have recognized that earlier disclosure was by far the less harmful option than the one that they did choose— namely, waiting for the truth to come out on its own. This decision by Defendants led to a much harsher price correction, and a more sluggish recovery, than was necessary.

Compl. ¶105.

In the years following *Dudenhoffer*, the Third Circuit has not had the opportunity to apply the Supreme Court's revised standard for assessing duty of prudence claims in the context of an ESOP. Thus, this Court looks for guidance from out-of-circuit cases. Indeed, courts have repeatedly found a prudent fiduciary could have concluded that issuing a corrective disclosure that results in a drop in stock price would do more harm than good. *See Whitley v. BP, P.L.C.,* 838

---

harm than good to the fund'" relied "almost exclusively on *Jander*," and thus, rejecting plaintiff's argument). I will also not consider any arguments by the parties based on *Jander*.

F.3d 523, 529 (5th Cir. 2016) (finding that disclosing negative, non-public information earlier "would likely lower the stock price," and a prudent fiduciary "could very easily conclude" that such disclosures would do more harm than good); *Graham v. Fearon*, 721 F. App'x 429, 437 (6th Cir. 2018) ("Although earlier disclosure may have ameliorated some harm to the Fund, that course of action was not so clearly beneficial that a prudent fiduciary could not conclude that it would be more likely to harm the fund than to help it."); *see Martone v. Whole Foods Mkt., Inc.*, No. 15-877, 2016 WL 5416543, at *8 (W.D. Tex. Sept. 28, 2016) (rejecting plaintiffs' argument that ERISA fiduciaries should have disclosed that that Whole Foods had a systemic practice of illegally overcharging customers for prepackaged foods, and nothing that "[m]ost problematic for Plaintiff's argument," was that proposed alternative "would make the stock price drop").

Here, Plaintiffs acknowledge that the proposed corrective disclosures would necessarily have caused a drop in the value of J&J's stock. As such, according to the above-referenced cases, this drop in value, on its face, cannot meet the *Dudenhoeffer* standard. Nonetheless, Plaintiffs assert that J&J's alleged cover-up of the asbestos in its talc was a "bomb [that] would go off and the truth would have to be disclosed, bringing the artificial inflation of J&J's stock to a swift and painful end," Compl. ¶105, and thus, the relevant analysis for a prudent fiduciary would have been to compare the benefits and costs of earlier disclosure to those of later disclosure. Therefore, Plaintiffs assert that their proposed alternative would not have done more than harm than good because an earlier disclosure would have would have caused less damage than a later disclosure. While such an allegation could conceivably, satisfy the *Dudenhoeffer* standard, here, Plaintiffs' arguments regarding the timing of the disclosure are unavailing. As an initial matter, it is not readily apparent that an earlier disclosure of the alleged asbestos in J&J's talc products would have caused less damage than a later disclosure. According to the Complaint, following the publication

37

of the Reuters Article, J&J's stock price decreased 10%.  Compl. ¶13.  There is no indication that

such a drop would have been avoided by disclosing the alleged existence of the asbestos earlier.

In fact, a public admission of alleged decades long asbestos contamination, in the face of J&J's

prior statements to the contrary, would certainly have led to significant reputational harm and a

corresponding decrease in the Company's value, regardless of the timing of such a disclosure.

More importantly, Plaintiffs have not alleged any particularized facts in support of their contention

that an earlier disclosure would have minimized the stock price-drop, and instead make generalized

allegations that the "[t]he longer that J&J's concealment of the truth went on" the greater the harm

to the Plans.  Compl. ¶107.  However, courts have routinely rejected similar arguments, finding

them such allegations to be too conclusory to satisfy *Dudenhoeffer*'s standard, which was intended

to help "readily divide the plausible sheep from the meritless goats."  573 U.S. at 425; *see In re*

*Allergan ERISA Litig.*, No. 17-1554 , 2018 WL 8415676, at *5 ("courts have consistently ruled

against Plaintiffs' argument that earlier disclosure would have been better than later or non-

disclosure" (collecting cases)); *In re JPMorgan Chase & Co. ERISA Litig.*, No. 12-4027, 2016 WL

110521 at *1 (S.D.N.Y. Jan. 8, 2016) (rejecting plaintiff's argument that "the longer a fraud goes

on, the more painful the correction will be" and noting that "[t]hese assertions are not particular to

the facts of this case and could be made by plaintiffs in any case asserting a breach of ERISA's

duty of prudence.").  For example, in *Martone v. Robb*, 902 F.3d 519, 526-27 (5th Cir. 2018), the

Fifth Circuit rejected the argument that the reputational damage to the company, and thus the harm

to the company's stock, would increase the longer the fraud went on.  The Fifth Circuit affirmed

the district court's conclusion that the allegation that delaying disclosure would increase the risk

of reputational harm to the company, as "too generic" to satisfy *Dudenhoeffer*'s pleading standard.

*Id*. at 527.  The same holds true here.  Plaintiffs have not alleged any specific circumstances which

would have made earlier disclosure more prudent, and the generalized economic and reputational fallout alleged by Plaintiff would almost certainly be applicable in any stock-drop case. Plaintiffs' failure to allege particularized facts in support of why earlier disclosure would have lessened the impact on the ERISA stock is a death-knell to this particular theory.

Accordingly, both counts of Plaintiffs' Complaint are dismissed without prejudice, because Plaintiffs have failed to allege an adequate alternative action.[12] Although I find that the current alternate course of action alleged by Plaintiffs, issuing a corrective disclosure in the form of a public filing with the SEC is not an adequate alternative, this Opinion does not foreclose the possibility that Plaintiffs may be able to allege a different, viable alternative. In the event Plaintiffs are able to do so, they have leave to file an amended Complaint within 45 days from the date of the accompanying Order.

### C. Right to a Jury Trial

Defendants also moved to strike Plaintiffs' jury demand arguing that the ERISA statute does not provide a right to a jury trial, and Plaintiffs are not entitled to a jury under the Seventh Amendment because breach of fiduciary claims are equitable in nature. Def. Br. 25. Because

---

[12]      Count II of Plaintiffs' Complaint alleges that all of the Defendants were liable as co-fiduciaries, pursuant to 29 U.S.C § 1105(a)(1)-(3), because they "participated knowingly in their co-fiduciaries' breaches; enabled other fiduciaries to violate ERISA by virtue of their own breaches of fiduciary duty; knowingly undertook to conceal those breaches; enabled their cofiduciaries to commit the breaches and failed to make any reasonable efforts to remedy the breaches." Compl. ¶168. Plaintiffs' arguments in this respect are derivative of their direct breach of fiduciary duty claim pursuant to 29 U.S.C. § 1104(a)(1). For the reasons explained above, Plaintiffs have not adequately alleged a breach of fiduciary duty by the Individual Defendants, thus Plaintiffs' claim for co-fiduciary liability must be dismissed, as well. *In re Bank of Am. Corp. Sec., Derivative, & Employee Ret. Income Sec. Act (ERISA) Litig.*, 756 F. Supp. 2d 330, 359 (S.D.N.Y. 2010) (dismissing co-fiduciary liability claim where plaintiff failed to plausibly allege a breach of fiduciary duty against any of the fiduciaries).

Plaintiff has failed to state a breach of fiduciary duty claim, and thus, Plaintiffs' Complaint is dismissed, the Court need not reach Defendants' arguments regarding Plaintiffs' jury demand.

### D.  CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss is **GRANTED** and Plaintiffs' Complaint is dismissed without prejudice.  Plaintiffs have failed to plausibly allege an alternative action that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it; to the extent Plaintiffs believe they may be able to allege to an adequate alternative action, they are given leave to file an amended complaint within 45 days of the date of the accompanying Order.


Date: April 29, 2020

/s/ Freda L. Wolfson
Hon. Freda L. Wolfson
U.S. Chief District Judge
