**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

MICHAEL PERRONE, TOM TARANTINO,
and ROCHELLE ROSEN

                Plaintiffs,

   vs.

JOHNSON & JOHNSON, *et al.*,

           Defendants.
_____

Civil Action No.: 19-00923 (FLW)

**OPINION**

**<u>WOLFSON, Chief Judge</u>:**

      In this consolidated class action, plaintiffs Michael Perrone, Tom Tarantino, and Rochelle Rosen (collectively, "Plaintiffs"), who are all participants in the Johnson & Johnson Savings Plan, assert violations of the Employee Retirement Income Security Act of 1974 ("ERISA") by defendants Johnson & Johnson ("J&J" or the "Company"), Peter Fasolo ("Fasolo"), and Dominic Caruso ("Caruso") (collectively, "Defendants").  Plaintiffs allege that Defendants breached their fiduciary duties to participants in the Johnson & Johnson Savings Plan, the Johnson & Johnson Savings Plan for Union Represented Employees, and the Johnson & Johnson Retirement Savings Plan (collectively, the "Plans"), because J&J's senior leadership, including Fasolo and Caruso (the "Individual Defendants") have been aware for decades that J&J's talc-based products, including J&J's Baby Powder, contain asbestos and concealed that information from investors, resulting in an artificial inflation of the value of the Company's stock.  In a prior opinion, dated April 29, 2020 ("Prior Opinion"), I granted Defendants' motion to dismiss the original complaint and gave Plaintiffs leave to amend their claims.  Plaintiffs filed an Amended Complaint and now,

Defendants, once again, move to dismiss Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6).  Defendants also seek to strike Plaintiffs' jury demand.  Plaintiffs oppose the motion.

For the reasons set forth below, Defendants' motion to dismiss is **GRANTED** Plaintiffs' claims are dismissed without prejudice with the right to file an amended complaint within 30 days, consistent with the ruling in this Opinion.

## I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The following allegations are taken from the Amended Consolidated Class Action Complaint ("Am Compl.") and assumed true for purposes of this motion to dismiss. The facts and procedural history of this case were set forth in detail in the Prior Opinion, and the crux of the Amended Complaint's factual allegations, particularly with regard to the Company's alleged historical knowledge of asbestos in its talc products, and the alleged misstatements and omissions in the Company's securities filings, are largely unchanged.  Accordingly, I will not recount them in detail, here, and only briefly summarize the most salient facts, and incorporate any new allegations, when necessary.

Plaintiffs allege that J&J has known since as early as 1957 that its talc products contained asbestos, and the Company has gone to great lengths to conceal this information from government regulators and consumers.   Am. Compl. at ¶¶37-43.   According to Plaintiffs, the truth was eventually revealed, on December 14, 2018, when Reuters published an article entitled "Special Report: Johnson & Johnson knew for decades that asbestos lurked in its Baby Powder" (the "Reuters Article"), which examined internal company documents obtained as part of discovery during recent asbestos-related ovarian cancer litigation, and outlined the Company's alleged knowledge of asbestos in its talc and the ensuing cover-up.  *Id*. at ¶¶44,93.  Allegedly, "[s]hares of Johnson & Johnson stock declined by more than 12.5% following the release of this report." *Id*. at ¶94.

Like in their prior complaint, the Amended Complaint alleges that Defendants had the "opportunity to correct the record and make the truth about asbestos in Johnson & Johnson's talc products known to the public" and if they had done so, "the Plans' participants could have avoided millions of dollars in purchases of artificially inflated J&J shares, and subsequent losses in the value of the Johnson & Johnson stock in their Plan accounts when the truth was revealed to the market." *Id*. at ¶20. I will refer to this theory of the case as the "corrective disclosure" theory. Plaintiffs supplement their prior allegations regarding Defendants' alleged ability to reveal "the truth about asbestos in J&J's talc products" by asserting that

> Defendants, as the Plan's fiduciaries, determined that they would communicate with participants about the J&J shares in the Plan by incorporating J&J's securities filings by reference into their communications with the participants. Accordingly, making securities disclosures was not a purely corporate act, but Defendants specifically adopted a policy of restating those disclosures by incorporation as part of their fiduciary communications with the Plan's participants. And, as with all fiduciary communications, Defendants had a fiduciary obligation to ensure that these communications were truthful and accurate.

*Id*. In that regard, Plaintiffs allege that Plan participants were provided with a "Summary Plan Description and Prospectus," which expressly "incorporated by reference" all of the following documents as participant communications:

> (a) The Company's and the Plan's latest annual reports, filed pursuant to Sections 13(a) or 15(d) of the Exchange Act, or in the case of the Company either (1) the Company's latest prospectus filed pursuant to Rule 424(b) under the Securities Act which contains, either directly or by incorporation by reference, audited financial statements for the Company's latest fiscal year for which such statements have been filed or (2) the Company's annual report on Form 10-K filed under the Exchange Act containing audited financial statements for the Company's latest fiscal year.
>
> (b) All other reports filed pursuant to Section 13(a) or 15(d) of the Exchange Act since the end of the fiscal year covered by the annual

reports or the prospectus or effective registration statement referred to in (a) above.

(c) The description of J&J common stock contained in the Registration Statement on Form S-3, filed with the Commission on August 7, 2001, as amended (Registration No. 333- 67020), including any amendments or reports filed for the purpose of updating such description. All documents filed by the Company and the Plan pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act after the date hereof, and prior to the filing of a post-effective amendment which indicates that all securities offered have been sold or which deregisters all securities then remaining unsold, shall be deemed to be incorporated by reference in the Plan's prospectus (but are not part of this SPD).

*Id*. at ¶108.  Thus, Plaintiffs allege that those securities filings were "not merely communications made by [J&J] officers in their corporate capacity, but by ERISA fiduciaries in their fiduciary capacity to the extent that those filings were made part of fiduciary communications to Plan participants."  *Id*. at ¶109.

As an alternative to disclosure, Plaintiffs also allege, what I will refer to as the "cash buffer theory," that "Defendants could have used the unitized nature of the Plans' stock funds to increase the cash buffer of the funds rather than invest in new stock purchases until such time as the stock was no longer artificially inflated."  *Id*. at ¶22; *see also* ¶¶134-136.  Plaintiffs explain that under the Plans' terms "the [Employee Stock Ownership Plan ("ESOP")] component of the Plan is designed to invest primarily in Employer Shares."  *Id*. at ¶134 (citing 2008 Savings Plan, Art. I, Preamble).  Therefore, Plaintiffs aver that "Defendants could have directed the Plans to hold incoming ESOP assets in cash until Johnson & Johnson stock was no longer artificially inflated."  *Id*. at ¶136.  In such a scenario, plan participants would allegedly "still be able to purchase and sell units of the ESOP, and the Fund would still closely track Johnson & Johnson stock, because the enormous size of the ESOP's stock holdings would still dwarf any increase in cash holdings that would occur"; however, the "Plan assets would not be exposed to the artificial inflation of Johnson

& Johnson's stock." *Id*.  In Plaintiffs' view, "[b]ecause no purchase or sale of stock would be required, and because the cash buffer's size was not otherwise disclosed, taking this action would not require disclosure to Plan participants under the Plan's governing language, nor would ERISA itself require this specific disclosure." *Id*.  Further, Plaintiffs allege that "disclosure would not be necessary under the federal securities laws, so any concern Defendants might have about 'spooking' Plan participants or the market generally would be unfounded." *Id*. at ¶137.  Allegedly, "[o]nce the truth came out about Johnson & Johnson's talc products -- as it inevitably would -- Plan participants would have been spared significant harm." *Id*.

### A.  **The Prior Opinion**

In my prior decision, I concluded, *inter alia*, that Plaintiffs had adequately alleged that the Individual Defendants were plan fiduciaries, and that J&J could be held vicariously liable for actions committed by the Individual Defendants within the scope of their employment.  *See* Prior Opinion at 13, 19.  However, I questioned whether the corrective disclosure theory satisfied the standard set forth by the United States Supreme Court in *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).  *Id*. at 20-38.   Under *Dudenhoeffer*, in order to successfully assert a breach of the duty of prudence

> a plaintiff must plausibly allege an alternative action that the defendant could have taken that would have been consistent with the securities laws and that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it.

*Dudenhoeffer,* 573 U.S. at 428.

As an initial matter, I explained that the Court was required to "presume as true that the Company's products contained asbestos, that the Company allegedly sought to conceal that information from the public at large, including investors, and that the Company's statements that its talc products were safe and did not contain asbestos were not in good faith, but rather part of

J&J's scheme to conceal the truth about the dangers of talc." Prior Opinion at 25. Nonetheless, I concluded that Plaintiffs' allegations did not satisfy *Dudenhoeffer* for two reasons. First, I found, based on pre-*Dudenhoeffer* cases regarding the dual role of ERISA fiduciaries who are also corporate insiders, that because "ERISA fiduciaries cannot be held liable for breach of fiduciary duty based on statements made in SEC filings, such fiduciaries also may not be held responsible for failing to issue a corrective disclosure, an action which could only be taken in a corporate capacity." *Id*. at 29. Therefore, Plaintiffs' alleged alternative was insufficient because it would have required the Individual Defendants to take an action which could not have been completed in their fiduciary capacity, but only in their corporate one. *Id*. at 31-34.

Second, I concluded that "[e]ven assuming, *arguendo*, that Plaintiffs have alleged an appropriate alternative action, they have not adequately alleged, as required by *Dudenhoeffer*, that their prescribed course of conduct would not "do more harm than good." Prior Opinion at 34 (quoting *Amgen Inc. v. Harris*, 136 S. Ct. 758, 759 (2016)). I, first, noted that there was a significant drop in J&J stock price following the publication of the Reuters article and it was "not readily apparent that an earlier disclosure of the alleged asbestos in J&J's [had] products would have caused less damage than a later disclosure." *Id*. at 37. As such, I concluded that "Plaintiffs [had] not alleged any particularized facts in support of their contention that an earlier disclosure would have minimized the stock price-drop." *Id*. at 38. Accordingly, I dismissed Plaintiffs' Complaint in its entirety, and  granted Plaintiffs leave to amend their claims. Plaintiffs did so; now, Defendants, once again, move to dismiss Plaintiffs' breach of fiduciary and breach of co-fiduciary duty claims.

## II. **LEGAL STANDARD**

Under Fed. R. Civ. P. 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quotations omitted). Under such a standard, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[A] complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

However, Rule 12(b)(6) only requires a "short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. The complaint must include "enough factual matter (taken as true) to suggest the required element. This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips*, 515 F.3d at 234 (citation and quotations omitted); *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) ("[A] claimant does not have to set out in detail the facts upon which he bases his claim. The pleading standard is not akin to a probability requirement; to survive a motion to dismiss, a complaint merely has to state a plausible claim for relief." (citation and quotations omitted)).

7

In sum, under the current pleading regime, when a court considers a dismissal motion, three sequential steps must be taken: first, "it must take note of the elements the plaintiff must plead to state a claim." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quotations omitted). Next, the court "should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* (quotations omitted). Lastly, "when there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* (quotations and brackets omitted).

## III. <u>ANALYSIS</u>

### A. The Alleged Alternative Actions

In order to state a claim for breach of fiduciary duty in the ERISA-context, a plaintiff must allege that the defendants are "1) . . . plan fiduciar[ies] (2) that breache[d] an ERISA-imposed duty (3) causing a loss to the plan." *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 328 (3d Cir. 2019) (quoting *Leckey v. Stefano*, 501 F.3d 212, 225–26 (3d Cir. 2007)). The crux of the parties' dispute, at this juncture, is whether Plaintiffs have adequately alleged that Defendants breached their ERISA-imposed fiduciary duties to the Plans' beneficiaries, namely the duty of prudence. As I explained in my Prior Opinion, in order to successfully allege breach of the duty of prudence on the basis of inside information, "a plaintiff must plausibly allege an alternative action that the defendant could have taken that would have been consistent with the securities laws and that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it." *Dudenhoeffer*, 573 U.S. at 428. Explained differently, the complaint must plausibly allege that "a prudent fiduciary in the same position could not have concluded that the alternate action would do more harm than good." *Amgen*, 136 S. Ct. at 759.

Here, Plaintiffs allege two different alternate actions: the corrective disclosure theory and the cash buffer theory.  I address each alternate action separately.

### i.  The Corrective Disclosure Theory

Defendants challenge Plaintiffs' corrective disclosure theory on two bases.  *See* ECF No. 44, Def Br at 8-15.  First, Defendants assert that issuing a corrective disclosure in a regular SEC filing is not a viable alternative, because it is not an action that the Individual Defendants could have taken in their fiduciary capacities.  Def. Br. at 10-11.  Further, Defendants assert that, even if issuing a corrective disclosure was a viable alternative, it does not satisfy the second prong of the *Dudenhoffer* test, because it is not plausible that a prudent fiduciary in the same position could have concluded that it would cause more harm than good.  Def. Br. at 15-16.

Plaintiffs argue that ERISA fiduciaries have a duty under ERISA to disclose nonpublic information about a plan sponsor, even if that information was obtained in the fiduciary's capacity as a corporate executive, and therefore, Defendants should have issued a corrective disclosure revealing the alleged truth about the talc in J&J's products.  ECF No. 45, Pl. Br. at 12-13.  Plaintiffs acknowledge that in the Prior Opinion I held that issuing a corrective disclosure was not a viable alternative action under *Dudenhoeffer*, but they argue that "given the newly pleaded allegations showing that Defendants intentionally linked their securities disclosures with their ERISA-covered fiduciary communications, Plaintiffs respectfully submit that the failure to disclose non-public information is subject to ERISA's fiduciary duties in this case."  Pl. Br. at 13.  In other words, Plaintiffs reason that by incorporating J&J's securities filings "into plan-related documents," *i.e.,* the Summary Plan Description ("SPD") and Prospectus, issuing a corrective securities disclosure, or failing to issue such a disclosure, is no longer "a purely corporate" act.  *Id*. at 11.  I remain unconvinced.

In my Prior Opinion, I found that at least one of the Individual Defendants "had the ability to issue public disclosures on behalf of the Company, or at minimum, the authority to review the Company's securities filings and correct any misstatements therein, such that he could have caused J&J to issue a corrective disclosure." Prior Opinion at 25-26. However, I, nonetheless, concluded that issuing a corrective disclosure was not an adequate alternative course of action under *Dudenhoeffer*. Prior Opinion at 25-26   I explained that "[n]ot all actions taken by ERISA fiduciaries constitute fiduciary conduct. ERISA's statutory scheme recognizes that fiduciaries of ERISA plans are often also corporate officers and thus, may wear different hats. Pre-*Dudenhoeffer*, other courts within this district have dismissed claims where plaintiffs sought to allege that ERISA fiduciaries breached their duties to the plan based on misrepresentations made in SEC filings, finding that the issuance of the SEC filing was a purely corporate activity." Prior Opinion at 28-29 (internal quotation marks and citation omitted). Accordingly, I concluded that based on that pre-*Dudenhoeffer* line of cases, which are still good law, Individual Defendants could not be held responsible for failing to issue a corrective disclosure, an action which could only be taken in their corporate capacities. *Id*. at 33. I further explained "there is no indication in *Dudenhoeffer* that the Supreme Court's imposition of the alternative action standard was intended to erode the pre-existing case law recognizing that corporate insiders, who are also fiduciaries of an ERISA plan, play a dual role, and should not be subject to ERISA liability for actions taken solely in their corporate capacity." *Id*. at 31. I elaborated that

> ERISA liability can only arise from actions or omissions taken in connection with the plan, and not corporate actions.  . . . . [T]he inverse, therefore, should also be true.  Because duties owed to ERISA plan beneficiaries are separate and distinct from a fiduciary's corporate obligations, such as the Individual Defendants' roles as corporate officers of J&J, Plaintiff cannot allege, as an alternative action, that the Individual Defendants must act in their corporate capacity in order to satisfy their fiduciary obligations under ERISA.

10

*Id*. at 33.  In their attempt to cure that deficiency, Plaintiffs have not identified a new alternative action; rather, they now seek to reconstrue what I previously held was a corporate act, *i.e*., issuing a corrective SEC disclosure, as a fiduciary action.  The crux of the alternative action asserted by Plaintiffs has not changed: the Amended Complaint, like its predecessor, alleges that "[a] proper disclosure could have, and should have, been made in the regular course of Johnson & Johnson's securities filings" and that "[m]aking a corrective disclosure once it became inevitable that the public would learn about the asbestos in the talc powder was an alternative action that the Defendants could have taken that would have been entirely consistent with the securities laws and which no prudent fiduciary could have viewed as more likely to harm the Plan than to help it." *Compare* Am. Compl. ¶¶129, 130 *with* Compl. ¶¶1120, 121; *Compare* Am. Compl. 173 ("The Individual Defendants, as the Plans' fiduciaries, could, and should, have acted to protect the Plans, including making corrective disclosure publicly admitting the existence of asbestos in Johnson & Johnson's talc powder or directing new investments by Plan participants toward increasing the ESOP's cash buffer rather than toward purchasing artificially inflated stock") *with* Compl. 158 ("The Individual Defendants, as the Plans' fiduciaries, could, and should, have acted to protect the Plans, including making corrective disclosure publicly admitting the existence of asbestos in Johnson & Johnson's talc powder.").  In the Amended Complaint, however, Plaintiffs add a new gloss over their allegations related to issuing SEC disclosures:

> Defendants, as the Plan's fiduciaries, determined that they would communicate with participants about the J&J shares in the Plan by incorporating J&J's securities filings by reference into their communications with the participants.  Accordingly, making securities disclosures was not a purely corporate act, but Defendants specifically adopted a policy of restating those disclosures by incorporation as part of their fiduciary communications with the Plan's participants. . . . It is well established in this and other courts that when an ERISA fiduciary specifically incorporates securities filings into participant communications,

the communications become fiduciary in character and defendants can be subject to fiduciary liability for errors and misstatements in those communications . . .  To be clear, Plaintiffs are not claiming that Defendants bear ERISA fiduciary liability for making false statements in the securities filings to Plan participants—as in Plaintiffs' original complaint, Defendants bear fiduciary liability because they failed to make general corrective disclosure to the market in time to prevent severe damage to J&J's reputation. What is clear is that Defendants' securities filings were not, as a matter of fact, made in a purely corporate capacity, but were made (or not made) in a dual capacity designed to fulfill both securities law and ERISA disclosure requirements. Accordingly, Defendants were not wearing a purely corporate hat when they made, or did not make, securities disclosures; they were as a matter of their own choosing also wearing their ERISA fiduciary hat

Am. Compl. ¶¶20-21.

To that end, Plaintiffs largely rely on *In re Schering-Plough Corp. ERISA Litig.,* No. 03-1204, 2007 WL 2374989, at *1 (D.N.J. Aug. 15, 2007) and the Second Circuit's decision in *Jander v. Ret. Plans Comm. of IBM*, 910 F.3d 620 (2d Cir. 2018) ("*Jander* I").[1]  *See* Pl. Br. at 13-16. Neither decision is persuasive here.

As an initial matter *Schering-Plough*, which predates *Dudenhoeffer*, addressed whether defendants, who were the fiduciaries of an ERISA-plan, could be held liable for misstatements in certain SEC filings.  2007 WL 2374989, at *4.  It does not bear on the issue presented here: whether

---

[1]     *Jander I* was vacated and remanded by the Supreme Court. *See  Ret. Plans Comm. of IBM v. Jander*, 140 S. Ct. 592, 594-95(2020) ("*Jander* II").  In its per curiam opinion, the Supreme Court explained that the arguments raised on appeal focused on issues which had not been raised before the Second Circuit, and therefore, it remanded the case "leaving it to the Second Circuit . . . to determine the[ ] merits" of the late-raised arguments. *Id.* at 595.  On remand, the Second Circuit reinstated its prior decision without change, finding that "[t]he arguments raised in the supplemental briefs either were previously considered by this Court or were not properly raised. To the extent that the arguments were previously considered, we will not revisit them.  To the extent that they were not properly raised, they have been forfeited, and we decline to entertain them." *Jander v. Ret. Plans Comm. of IBM*, 962 F.3d 85, 86 (2d Cir. 2020) ("*Jander III*").  The Supreme Court denied the subsequent petition for writ of certiorari. *Ret. Plans Comm. of IBM v. Jander*, —S. Ct.—, 2020 WL 6551787 (Nov. 9, 2020).

the alternate action of issuing a SEC corrective disclosure is a corporate or a fiduciary act. Defendants breached the duty of prudence to plan fiduciaries by failing to act on inside information.

Moreover, even if *Schering-Plough* were applicable, in this context, it is factually distinguishable. In *Schering-Plough* the plaintiffs alleged that two SEC S-8 forms, the plan's prospectus, and its SPD, "contained material misrepresentations and that defendants breached their fiduciary duties to [p]lan participants by preparing and distributing [p]lan-related communications that incorporated these allegedly misleading statements by reference." *Id.* at *4. The defendants moved to dismiss the plaintiffs' claims, arguing among other things that "the act of preparing and distributing these documents could not have been an ERISA fiduciary action," and that the SPD did not "expressly incorporate any of the disclosures that form the basis for plaintiff's misrepresentation claims." *Id.* The court found that because the S-8 forms and the prospectus "were required *only* by federal securities laws, not by ERISA" they were not actionable under ERISA. *Id.* at 6. However, with respect to the SPD, the court noted that ERISA mandates that *ERISA* requires "plan administrators to periodically furnish all plan participants with an SPD." *Id.* at *6 (citing  29 U.S.C. § 1024(b)(1)). Moreover, the court explained that misrepresentations in securities filings may be actionable under ERISA when they are "incorporated by reference" into "plan-related documents." *Schering-Plough.*, 2007 WL 2374989, at *6-7 (collecting cases). Looking to the SPD, the court found that in a section titled "other important information," the SPD provided that plan participants could request "copies of any prospectuses and financial reports relating to the investment fund to the extent that the [p]lan receives such reports." *Id.* at *7. Accordingly, the court found that "[b]y including a reference to the prospectus within the SPD in this section, the drafters of the SPD explicitly stated that the prospectus contained 'important information and impliedly incorporated by reference the prospectus into the SPD. In so doing, the

SPD's drafters brought any statements made in the prospectus, or incorporated therein, into ERISA's crosshairs." *Id.*

Here, however, unlike the documents at issue in *Schering -Plough*, the SEC filings were not incorporated by reference into the SPD, but only the Prospectus.  The Plans' SPD, in a section titled "Documents Available Upon Request," provides that plan participants "can receive, upon request, copies of the following documents that are incorporated by reference in the Plan's prospectus (but that are not part of this SPD) and are filed by the Company with the Securities and Exchange Commission pursuant to the Securities and Exchange Act of 1934."  ECF No. 44-3, Certification of Keith Miller ("Miller Cert.") Ex. 1, October 2018 SPD and Prospectus p. 54[2]; *see also* Am. Compl. ¶108.  The document explicitly provides that "[a]lthough the above documents and this SPD are part of the Plan's prospectus, neither the Plan's prospectus nor the above documents are incorporated by reference in this SPD."  Miller Cert, Ex. 1. at 55.  In other words, the SPD, itself, expressly provides that the SEC filings are not part of the SPD and are only incorporated by reference into the Prospectus.  The Prospectus, unlike the SPD, is not a document which ERISA requires the fiduciaries to furnish to the plan participants.[3]  *See* 29 U.S.C. § 1022

---

[2]     Although the SPD and Prospectus were not included as exhibits to the Amended Complaint, the Court may consider the exhibit because the Amended Complaint specifically references the document and it partially forms the basis of Plaintiffs' claims.  *See Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) ("In evaluating a motion to dismiss, we may consider documents that are attached to or submitted with the complaint, and any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, and items appearing in the record of the case."); *In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 368 n.9 (3d Cir. 1993) ("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.").

[3]     The federal securities laws, not ERISA, require entities which offer stock to their employees under an employee benefit plan  to provide plan participants with a prospectus  that meets the requirements of Section 10(a) of the Securities Act.  *See* 15 U.S.C. § 77j; 17 C.F.R. §§ 230.428.

(detailing information which must be included in summary plan description); 29 U.S.C. § 1024 (requiring publication of the summary plan descriptions and annual reports  participants and beneficiaries of ERISA plans).  Thus, even under the *Schering-Plough* court's reasoning, it does not appear that the SEC filings at issue could be considered a fiduciary communication.

More importantly, the inquiry regarding whether SEC filings were incorporated into plan communications has no bearing on whether, under *Dudenhoeffer*, a plaintiff asserting a breach of the duty of prudence is required to plead an alternative action which can be taken in the defendant's capacity as an ERISA fiduciary, rather than in a corporate capacity.  *Schering-Plough* – to the extent it is applicable post-*Dudenhoeffer* -- stands for the proposition that ERISA fiduciaries may be liable for misstatements which are incorporated by reference into an ERISA required communication; it does not resolve the question presently before this Court, and Plaintiffs have expressly explained that they are not bringing a fiduciary claim in that regard.

Plaintiffs' reliance on *Jander* is similarly misplaced because it also does not address the question before this Court.  Plaintiffs argue

> The SEC/DOL, in their *amicus* brief in *[Jander v. Ret. Plans Comm. of IBM*, 910 F.3d 620, 630 (2d Cir. 2018)], . . . took the position that *Dudenhoeffer* "squarely" held that ERISA fiduciaries have a duty under ERISA to disclose nonpublic information about the plan sponsor" and that "Justice Kagan, in her concurring opinion in *[Ret. Plans Comm. of IBM v. Jander*, 140 S. Ct. 592, 595 (2020)], agreed, noting that *Dudenhoeffer* 'makes clear' that an ESOP fiduciary does, at times, have a duty to act on inside information."

Pl. Br. at 13.  In Plaintiffs' view, "[a]pplying *Dudenhoeffer* in this case means that the Amended Complaint should survive the motion to dismiss on the issue of fiduciary status."  *Id*.

Critically, however, the issue on this motion is not whether ERISA imposes a duty for a corporate insider who is also the fiduciary of an ERISA plan to act on insider information; rather, the inquiry, here, is whether the alternate course of action alleged by Plaintiffs must be one that

Individual Defendants, the Plans' fiduciaries, could have taken in their fiduciary capacity.  Neither *Jander* I nor Justice Kagan's concurrence in *Jander* II expressly resolve that question.

In *Jander* I, the Second Circuit reversed the district's court's dismissal of an ERISA stock drop case against IBM, finding that the plaintiffs had alleged facts satisfying the *Dudenhoeffer* standard, where they alleged that  defendants breached their duty of prudence by failing to issue a corrective disclosure in certain SEC filings, when they knew that IBM's common stock was overvalued, as a result of certain losses incurred by IBM's microelectronics business.  910 F.3d. at 624   Although the *Jander* court found that two defendants had the ability to issue public disclosures regarding the stock, it does not appear that the parties addressed the question raised, here, regarding whether disclosure was an adequate alternate course of action, in light of the fact that the defendants could only have issuing an SEC filing, which is solely a corporate act.  That issue was never addressed by the court.

Nor does Justice Kagan's concurrence in *Jander* II, answer the present question.  On appeal before the Supreme Court, petitioners argued that ERISA never imposes a duty on an ESOP fiduciary to act on inside information, however, Justice Kagan's concurrence makes clear that, in her view, *Dudenhoeffer* plainly imposes such a duty.  *See Jander* II, 140 S. Ct. at 595 (Kagan, J. concurring) ("an ESOP fiduciary at times has such a duty; the decision sets out exactly what a plaintiff must allege to state a claim that the fiduciary breached his duty of prudence by "failing to act on inside information.).  The concurrence concluded that *Dudenhoeffer*

> recognizes that a fiduciary can have no obligation to take actions "violat[ing] the securities laws" or "conflict[ing]" with their "requirements" or "objectives."  At the same time, . . . when an action does not so conflict, it might fall within an ESOP fiduciary's duty—even if the securities laws do not require it. The question in that conflict-free zone is whether a prudent fiduciary would think the action more likely to help than to harm the fund.

*Id*. (citations omitted).  First, Justice Kagan's analysis, while persuasive, is not binding on this Court.  *See Germanio v. Goodyear Tire & Rubber Co*., 732 F. Supp. 1297, 1300 (D.N.J. 1990) ("This court is bound by precedents, not concurrences").  More critically, my decision does not conflict with Justice Kagan's view of *Dudenhoeffer's* holding.  Here, Defendants have not argued, nor have I found, that as a matter of law, Plaintiffs cannot allege a breach of the duty of prudence against Individual Defendants for failing to act on insider information.  Indeed, in my prior decision, I expressly noted "[a]lthough I find that the current alternate course of action alleged by Plaintiffs, issuing a corrective disclosure in the form of a public filing with the SEC is not an adequate alternative, this Opinion does not foreclose the possibility that Plaintiffs may be able to allege a different, viable alternative."  Prior Opinion at 39.  Neither this Opinion nor my Prior Opinion are intended to foreclose the possibility that Plaintiffs may allege a duty of prudence based on insider information; rather, the alleged alternative identified here – issuing a corrective disclosure in a regular SEC filing – is inconsistent with ERISA's functional approach to fiduciary liability because it would have required Defendants to take an action which could only have been taken outside of their fiduciary capacity.  Accordingly, I find, as I did on the prior motion to dismiss, that issuing a corrective SEC disclosure revealing the alleged truth about the over inflation of J&J stock and/or the asbestos in the company's talc products, is not a viable alternative action because it is not one which could be taken in a fiduciary capacity, but only in a corporate one.

### ii.  The Cash Buffer Theory

Plaintiffs allege that

> Defendants could have used their fiduciary oversight authority to direct new ESOP investments during the Class Period to be used to increase the ESOP's cash buffer rather than to buy inflated Johnson & Johnson stock. Per the Plan, "The ESOP component of the Plan is designed to invest ***primarily*** in Employer Shares." (2008 Savings Plan, Art. I, Preamble (emphasis added).) Taking this action would

17

have enabled Plan participants to avoid the harm of purchasing artificially inflated Johnson & Johnson stock during the period of the Company's misrepresentations about its talc products.

Am Compl. ¶134

In order to understand Plaintiffs' allegations some understanding of the Plans' funding mechanisms is necessary.  The Plans at issue are "unitized" stock funds, which invest primarily, but not exclusively, in J&J common stock.  Am. Compl. ¶ 22.  As explained in the Prospectus, "a small amount of cash or cash equivalents is held in the Fund to provide daily liquidity."  Miller Cert., Ex. 2, November 2018 Johnson & Johnson Savings Plan Prospectus and Investment Fund Information, p. 2.  When participants invest in the Plans, they purchase units in the relevant fund and each unit represents a combination of stock and cash.  *See* Miller Cert, Ex. 1, p. 25 ("instead of directly owning shares of J&J common stock, you own a portion of the Fund.  The J&J Common Stock Fund and J&J Stock Contributions Fund are made up of shares of J&J common stock as well as a small amount of cash necessary to provide daily liquidity.").  As alleged, it appears that the Plans' fiduciaries would have had the ability and authority to increase the Plans' cash buffer rather than its stock holdings, and Defendants do not challenge the viability of that course of action.  Rather, the parties debate whether a prudent fiduciary could have concluded that increasing the cash buffer would have done more harm than good.

Defendants argue that Plaintiffs' cash buffer theory must be rejected, because a prudent fiduciary could have concluded that diverting new contributions would have done more harm than good.  Def. Br. at 17- 20.  First, Defendants contend that they would have been required to issue a public disclosure explaining why the fund was no longer investing in J&J stock, and such a disclosure would have caused the Company's stock prices to drop, negatively impacting the Plans' funds.  *Id*. at 18.  Alternatively, Defendants argue that even if they were not expressly required to

18

disclose the precise reason for increasing the cash buffer, *i.e.*, the alleged asbestos in J&J's talc-products, increasing the Plans' cash buffers would have caused market speculation and a resulting decline in stock price. *Id*. Finally, Defendants assert that even absent a decrease in the Company's stock price, increasing the cash buffer could have harmed the fund by creating an "investment drag," and other courts have rejected similar arguments based on the possibility that increasing an ESOP plan's cash reserves "reduces the return of the stock portion of the fund and hurts current investors." *Id*. at 18-19.

In response, Plaintiffs argue that increasing the Plans' cash holdings would not have required disclosure, either under the federal securities laws or under ERSA. Pl. Br. at 18-19. Plaintiffs maintain that, unlike when an ESOP freezes trading activity entirely, "redirecting cash-and-stock purchases into cash-only purchases, while keeping the ESOP open for continued trading activity" does not require disclosure. *Id*. at 19. Plaintiffs also challenge Defendants' position on "investment drag," noting that "[o]nly two district courts have embraced this theory; neither is controlling authority here." *Id*. Further, Plaintiffs emphasize that "[t]he probability of 'investment drag' is minimal; the amount of harm caused to the ESOP if the stock price goes up temporarily is also minimal, because . . . the ESOP 'would still closely track Johnson & Johnson stock, because the enormous size of the ESOP's stock holdings would dwarf any increase in cash holdings that would occur.'" *Id*. at 20 (quoting Am. Compl. ¶ 135.) Finally, Plaintiffs remark that if the cash buffer alternative is not viable, then no action would satisfy the more-harm-than-good test, and ESOP fiduciaries are essentially immune from liability. *Id*.

I find that increasing the fund's cash buffer would have triggered a disclosure under both ERISA and the federal securities laws. ERISA contains a number of reporting and disclosure requirements. *See* 29 U.S.C. § 1021 ("Duty of Disclosure and reporting"). Relevant here, ERISA

requires that plan administrators provide notice of blackout periods where plan participants' rights, such as the right "to direct or diversify assets credited to their accounts" will be either temporarily suspended, limited, or restricted for more than three consecutive business days.   29 U.S.C. §1021(i)(7)(A).   Moreover, the blackout notice is required to provide "the reasons for the blackout period."  29 U.S.C. § 1021(i)(1)(2)(A)(i).  Further complicating matters, the federal securities laws seemingly would have prevented Defendants from making a limited disclosure to only the ERISA plan participants.   Indeed, under the securities regulations, "[w]henever an issuer, or any person acting on its behalf, discloses any material nonpublic information regarding that issuer or its securities" the issuer is also required to simultaneously make a disclosure to the public at large. 17 C.F.R. § 243.100(a)(1); *see also Jones v. Midland Funding, LLC*, No. 08-802, 2009 WL 3053724, at *1 n.1 (D. Conn. Sept. 22, 2009) (explaining that if a "company makes selective disclosure of material nonpublic information, it must disclose the same information publicly."). Failing to make a public disclosure could have exposed Defendants to liability under Section 10(b) and Rule 10b-5.[4]  Accordingly, if Defendants opted to increase the Plans' cash buffers, Defendants would have been required to reveal to the public-at-large that they were doing so, and to explain that they were doing so because the Company's stock was artificially inflated and/or that J&J's talc based products contain asbestos.  In essence, increasing the cash buffer – like issuing a corrective disclosure – would have required the Company to reveal the alleged truth about the talc in its products.

### iii.   "More Harm Than Good"

---

[4]     *Dudenhoeffer* expressly requires courts to "consider the extent to which an ERISA-based obligation either to refrain on the basis of inside information from making a planned trade or to disclose inside information to the public could conflict with the complex insider trading and corporate disclosure requirements imposed by the federal securities laws or with the objectives of those laws."  573 U.S. at 429.

Plaintiffs allege that *Dudenhoeffer*'s "more harm than good" standard is satisfied here, because by the outset of the class period the disclosure of the truth about J&J's talc products was inevitable in light of the increasing number of lawsuits filed against J&J, and the discovery process attendant to such proceedings.  Am. Compl. ¶¶13, 114.  In light of this inevitability, Plaintiffs allege that corrective disclosure would not have done more harm than good to the Plans or their participants.  They assert that

> [g]iven the overwhelming evidence and research showing that later disclosure of the truth and correction of artificial inflation increases the risk of a harsher price correction, as well as a slower-than-necessary price recovery . . . Defendants should have recognized that earlier disclosure was by far the less harmful option than the one that they did choose – namely, waiting for the truth to come out on its own.

Am. Compl. ¶114.  In that regard, Plaintiffs rely on empirical studies and research regarding the reputational and financial impact of misrepresentations on a company's stock and market value. *Id.* at ¶¶ 110-12, 114-117

Because disclosure would have been required, I find that a prudent fiduciary could have concluded that the disclosure would have resulted in a drop of the Company's stock price and thus would have done "more harm than good."  *Amgen*, 136 S. Ct. at 759  (explaining that under *Dudenhoeffer*, a court should "assess whether the complaint in its current form 'has plausibly alleged' that a prudent fiduciary in the same position 'could not have concluded' that the alternative action 'would do more harm than good.' " (quoting *Dudenhoeffer*, 573 U.S. at 409, 410–11)).

As I noted in my Prior Opinion, "[a] public admission of alleged decades long asbestos contamination, in the face of J&J's prior statements to the contrary, would certainly have led to significant reputational harm and a corresponding decrease in the Company's value, regardless of the timing of such a disclosure."  Prior Opinion at 38.  As such I found Plaintiffs' arguments

21

pertaining to the "more harm than good" analysis unavailing.  *Id*.  Plaintiffs rely on those same arguments now, and I, once again, find them unpersuasive

Courts both within and outside of this circuit have held, at the motion to dismiss phase, that it does not satisfy *Dudenhoeffer* when plaintiffs allege increasing an ESOP plan's cash buffer or freezing an ESOP fund's investments in the company's stock as an alternative action.  *See e.g.*, *Singh v. RadioShack Corp.,* 882 F.3d 137, 149 (5th Cir. 2018) (dismissing plaintiffs' claims because, *inter alia*, "a prudent fiduciary in the [defendants' position could have thought that freezing RadioShack stock would signal to the market that insider fiduciaries viewed the employer's stock as a bad investment," causing the Fund's existing holdings of RadioShack stock to decline in value."); *In re Allergan ERISA Litig.*, No. 17-1554, 2018 WL 8415676, at *6 (D.N.J. July 2, 2018)[5](finding that plaintiff's proffered alternatives of freezing ESOP fund or  holding contributions "in cash or some other short-term investment" did not satisfy *Dudenhoeffer*).

In *Allergan*, the plaintiffs, participants in Allergan's ESOP, alleged that the company's stock was overvalued as a result of misrepresentations regarding Allergan's financial results and price-fixing allegations regarding generic drugs.  17-1554, 2018 WL 8415676, at *6.  In support of their duty of prudence claim, plaintiffs alleged several alternate actions, including disclosing the anti-trust violations so that the stock would trade at fair value, and holding ESOP contributions in cash rather than investing in the company's stock.  *Id*. at *5-6.  The court rejected both alternatives, finding that a prudent fiduciary could not have concluded that publicly disclosing

---

[5]      *Allergan* was affirmed by the Third Circuit.  *See In re Allergan Erica Litig*., 975 F.3d 348 (3d Cir. 2020).  However, the Third Circuit did not examine the district court's application of *Dudenhoeffer*.  Rather, the Third Circuit affirmed the district court's opinion based on the district court's other independent basis for dismissal: that "the plaintiffs' antitrust allegations fall far short of plausibly suggesting the existence of a price-fixing conspiracy to begin with, as judged under ordinary pleading standards."  *Id*. at 356.

negative information about the company would do more harm than good, because it would "'caus[e] a drop in the stock price and a concomitant drop in the value of the stock already held by the fund.'" *Id*. at 5 (quoting *Dudenhoeffer*, 573 U.S. at 460). The court rejected plaintiff's arguments that earlier disclosure would have been better than later disclosure, noting that "courts have consistently ruled against" such an argument. *Id*. at *5 (collecting cases). The court emphasized that holding the investments in cash "suffer[ed] from the same infirmity as [p]laintiffs' first proposal because ERISA mandates disclosure if plan fiduciaries halt new stock fund purchases," and thus, it would similarly result in a decrease of the Company's stock price. *Id*. at *6.

Similarly, the Supreme Court noted in *Dudenhoeffer*, itself, that freezing purchases of an ESOP fund's stock could signal to the market "that insider fiduciaries viewed the employer's stock as a bad investment." 573 U.S. at 430. Notably, like in *Allergan*, nearly every Circuit Court of Appeals to have considered this issue, has found, that an alternative action does not satisfy *Dudenhoeffer*, when it requires disclosure, either inadvertently or deliberately, of negative information that would cause the company's stock to drop. *Dudenhoeffer*. *See e.g*., *Dormani v. Target Corp*., 970 F.3d 910, 915-16 (8th Cir. 2020) (finding that defendants, fiduciaries of an ESOP plan, "could not have implemented a purchase freeze without inevitable disclosure" and therefore, "a reasonably prudent fiduciary . . . could still believe disclosure was the more dangerous of the two routes."); *Saumer v. Cliffs Nat. Res. Inc*., 853 F.3d 855, 865 (6th Cir. 2017) (dismissing plaintiff's duty of prudence claim because "ceasing purchases might indicate to the market that insider fiduciaries viewed the employer's stock as a bad investment . . and divulging negative information might cause the stock to drop, hurting plan participants," thus, a prudent fiduciary could have concluded that it would do more harm than good); *Whitley v. BP, P.L.C.*, 838 F.3d 523,

529 (5th Cir. 2016) (finding plaintiffs' allegations did not satisfy *Dudenhoeffer* where plaintiff alleged that plan's fiduciaries knew that the company's stock was "overpriced because BP had a greater risk exposure to potential accidents than was known to the market," because  a prudent fiduciary could have "very easily concluded" that plaintiff's proposed alternative actions -- disclosure of the safety defects and freezing stock purchases would do more harm than good).  The sole outlier is the Second Circuit's opinion in *Jander*, which I did not consider in analyzing Plaintiffs' allegations with respect to the "more harm than good analysis" in my Prior Opinion. *See* Prior Opinion at 35 n. 11.  Plaintiffs contend that this Court should consider *Jander* I and reach the same result.  Pl. Br. at 10 n.2; Pl. Br. at 17.

In *Jander* I, the Second Circuit reversed the district court's dismissal of an ERISA stock drop case against IBM, finding that the plaintiffs had alleged facts satisfying the *Dudenhoeffer* standard.  910 F.3d at 631.  There, the plaintiffs filed suit under ERISA after the sale of IBM's microelectronics unit revealed that the subsidiary was overvalued, alleging that in 2013, at the time IBM was soliciting buyers for its microelectronics business, that division "was on track to incur annual losses of $700 million."  *Id*. at 623.  However, IBM did not publicly disclose those losses and continued to value its microelectronics subdivision at $2 billion.  *Id*.  In 2014, IBM announced the sale of its microelectronics business revealing "that IBM would pay $1.5 billion to GlobalFoundries to take the business off IBM's hands and supply it with semiconductors, and that IBM would take a $4.7 billion pre-tax charge, reflecting in part an impairment in the stated value of the microelectronics business."  *Id*.  In light of those circumstances, plaintiffs alleged that the defendants knew that IBM stock was artificially inflated and that rather than continuing to invest in the company's stock, they should have issued a "corrective disclosure of the microelectronics division's impairment, conducted alongside the regular SEC reporting process."  *Id.* at 628.  The

Second Circuit found that plaintiff's theory satisfied *Dudenhoeffer* for several reasons. *Id*. at 628-631. It noted that under plaintiff's theory of the case "the defendants allegedly knew that disclosure of the truth regarding IBM's microelectronics business was inevitable, because IBM was likely to sell the business and would be unable to hide its overvaluation from the public at that point." *Id*. at 630. In the court's view, the allegation that the impending sale rendered disclosure inevitable was "particularly important" and "tip[pped] the scales toward plausibility" because when the stock drop is inevitable, "it is far more plausible that a prudent fiduciary would prefer to limit the effects of the stock's artificial inflation on the ESOP's beneficiaries through prompt disclosure." *Id*. Accordingly, the Second Circuit rejected the argument that a prudent fiduciary could have concluded that an earlier disclosure would have caused more harm than good. *Id*. at 629.

I do not find *Jander*'s reasoning persuasive, here, and absent guidance from the Third Circuit, I rely on *Allergan*, and the decisions from the other Circuit Courts, which have rejected similar conclusory allegations that early disclosure would have mitigated harm to an ESOP plan. As I explained in my Prior Opinion,

> it is not readily apparent that an earlier disclosure of the alleged asbestos in J&J's talc products would have caused less damage than a later disclosure. According to the Complaint, following the publication of the Reuters Article, J&J's stock price decreased 10%. . . . There is no indication that such a drop would have been avoided by disclosing the alleged existence of the asbestos earlier. In fact, a public admission of alleged decades long asbestos contamination, in the face of J&J's prior statements to the contrary, would certainly have led to significant reputational harm and a corresponding decrease in the Company's value, regardless of the timing of such a disclosure. More importantly, Plaintiffs have not alleged any particularized facts in support of their contention that an earlier disclosure would have minimized the stock price-drop, and instead make generalized allegations that the longer that J&J's

concealment of the truth went on" the greater the harm to the
Plans.

Prior Opinion at 36-37 (internal quotation marks and citations omitted).  Like before, Plaintiffs allege that "Defendants knew -- or should have known -- that disclosure of the asbestos in J&J's talc products was going to happen one way or another."  Am. Compl. ¶114.  Relying on general economic theories and empirical research, Plaintiffs assert that earlier disclosure of the truth would have resulted in quicker rebound of the J&J's stock price and decreased the long-term reputational harm to the Company, and therefore, would not have done more harm than good.  *Id*. at ¶¶110-117.  Plaintiffs' allegations on this point are nearly identical to the prior version of their complaint, and *Jander* – the sole decision of its kind-- does not change my reasoning.  Plaintiffs rely on generalized allegations that the longer a fraud goes on the more harm to the company's reputation and its stock price.  I do not find these types of general allegations, although accepted by the *Jander* court, to be sufficient, in light of the weight of authority going the other way.  Rather, I find, consistent with *Allergan*, and the decisions of the other Circuit Courts that Plaintiffs' generalized assertions regarding the lingering reputational damage to J&J would have been mitigated by an earlier disclosure insufficiently particularized to satisfy *Dudenhoeffer*.  *Allen,* 967 F.3d 767, 774 (8th Cir. 2020) ("we find Appellants' allegation based on general economic principles -- that the longer a fraud is concealed, the greater the harm to the greater the harm to the company's reputation and stock price -- is too generic to meet the requisite pleading standard"); *Dormani*, 970 F.3d at 915 (affirming district court's dismissal of plaintiffs' duty of prudence claims where plaintiffs alleged "some drop in stock price was inevitable and the earlier the fiduciaries disclosed Target's Canadian problems and the earlier the drop took place, the less time the Plan would spend purchasing artificially inflated Target stock. As we and nearly every other circuit court to confront this type of argument have held, this chain of reasoning is uncertain."); *In re Allergan ERISA Litig.*,

No. 17-1554, 2018 WL 8415676, at *5 ("courts have consistently ruled against plaintiffs' argument that earlier disclosure would have been better than later or nondisclosure" (collecting cases)).

Notably, Plaintiffs have not tied their economic theories to context-specific allegations which quantify the hypothetical economic effect of making an earlier disclosure as it applies to J&J's stock, and I find that they must do so in order to satisfy the pleading standard. In so finding, I am not imposing a heightened pleading standard; however, Plaintiffs must do more than make assertions based on general economic studies regarding the market's response to fraud. Such a "one-size" fits all approach cannot apply in every case and absent further factual allegations, the generalized theory is particularly suspect, here, with respect to J&J, a multi-national, multi-billion entity with divisions which traverse various economic sectors. Such an entity, compared to a smaller company, or one which operates only in a single economic sphere, may be more likely to weather stock price changes in response to negative information. Even in *Jander* I, the Second Circuit recognized that broad economic theories regarding the benefits of early disclosure, like those asserted here, are not a panacea for pleading a breach of the duty of prudence in all cases. *See* 910 F.3d at 630 (explaining that when assessing the import of these type of theories "[c]ourts would also have to assess whether the circumstances would nevertheless have made immediate disclosure particularly dangerous, such that the generalized economic analyses put forward here would not apply. . . . While these economic analyses will usually not be enough on their own to plead a duty-of-prudence violation, they may be considered as part of the overall picture."). Indeed, in crafting the *Dudenhoeffer* standard, the Supreme Court aimed to provide a framework which allows for "careful, context-sensitive scrutiny of a complaint's allegations." 573 U.S. at 425. Therefore, I will grant Plaintiffs one last opportunity to amend their complaint and

incorporate context-specific allegations regarding J&J, which could demonstrate that increasing the Plans' cash buffer would not have done more harm than good.  Accordingly, Plaintiffs' Complaint is dismissed, because Plaintiffs have failed to allege that a prudent fiduciary could not have viewed the alternative action as doing "more harm than good."[6]

### B.  <u>CONCLUSION</u>

For the reasons set forth above, Defendants' Motion to Dismiss is **GRANTED** and Plaintiffs' Complaint is dismissed without prejudice.  Plaintiffs have failed to plausibly allege an alternative action that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it. However, I will permit Plaintiffs the opportunity to re-plead their allegations with respect to more harm than good within 30 days from the date of the accompanying Order.

Date: February 26, 2021

/s/ Freda L. Wolfson
Hon. Freda L. Wolfson
U.S. Chief District Judge

---

[6]      I am cognizant of Plaintiffs' position regarding the high bar for pleading a breach of the duty of prudence in this context.  The *Dudenhoeffer* standard was intended to replace the presumption of prudence which the Supreme Court criticized as "mak[ing] it impossible for a plaintiff to state a duty-of-prudence claim, no matter how meritorious, unless the employer is in very bad economic circumstances," with a more tenable one intended to "readily divide the plausible sheep from the meritless goats."  573 U.S. at 425.  However, this purportedly more reasonable standard, nonetheless, calls for "careful, context-sensitive scrutiny of a complaint's allegations."  *Id*.  In fact, courts have described *Dudenhoeffer's* pleading standard as "tough," "exacting," "a significant burden," and "incredibly difficult to satisfy." *See e.g., Whitley,* 838 F.3d at 529 ("the significant burden of proposing an alternative course of action so clearly beneficial that a prudent fiduciary could not conclude that it would be more likely to harm the fund than to help it."); *Dormani v. Target Corp*., No. 17-4049, 2018 WL 3014126, at *4 (D. Minn. June 15, 2018) ("The *Dudenhoeffer* standard is "very tough," "highly exacting," and "incredibly difficult to satisfy."); *Price v. Strianese*, No. 17-652, 2017 WL 4466614, at *5 (S.D.N.Y. Oct. 4, 2017) ("This is a highly exacting standard that is incredibly difficult to satisfy.").  I have engaged in such an analysis, here, and Plaintiffs' claims do not pass muster under the Supreme Court's precedent.